# 24-778-CR(L)
## 24-1285-CR(CON), 24-1317-CR(CON)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ALLISON MACK, CLARE BRONFMAN, KATHY RUSSELL,
LAUREN SALZMAN, NANCY SALZMAN, AKA PERFECT,

*Defendants,*

KEITH RANIERE, AKA VANGUARD,

*Defendant-Appellant.*

_____

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

DEBORAH J. BLUM, ESQ.
*Attorney for Defendant-Appellant*
225 Broadway, Suite 715
New York, New York 10007
646-535-2586



# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... vi

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF JURISDICTION ......................................................... 4

ISSUES PRESENTED FOR REVIEW ..................................................... 5

STANDARD OF REVIEW ....................................................................... 9

STATEMENT OF CASE ......................................................................... 10

    1.   Before Trial ............................................................................... 10

    2.   At Trial ....................................................................................... 12

    3.   Post-Trial Discoveries of Digital Evidence Falsification ......... 16

    4.   Government's Consolidated Opposition .................................... 18

    5.   Defense's Reply to the Rule 33 ................................................ 19

    6.   The Court's Denials .................................................................. 20

SUMMARY OF THE ARGUMENT ....................................................... 20

    I.   Denial of the Rule 33 ................................................................ 20

    II.   Denial of the Motions to Compel ............................................. 22

    III.  Denial of Recusal ...................................................................... 23

ARGUMENT ......................................................................................24

I.  WHETHER THE DISTRICT COURT ABUSED ITS
    DISCRETION IN DENYING THE RULE 33 BY
    SUBSTANTIALLY RELYING UPON AND CREDITING
    NEW GOVERNMENT EVIDENCE, CREATED POST-
    TRIAL, FROM INDIVIDUALS WHO WERE NEVER
    SUBJECT TO CROSS-EXAMINATION, VIOLATING
    MR. RANIERE'S SIXTH AMENDMENT RIGHT OF
    CONFRONTATION .......................................................................24

    A.  Applicable Law ......................................................................24

    B.  Analysis .................................................................................25

II. THE DISTRICT COURT ABUSED ITS DISCRETION IN
    CREDITING LOVEALL'S REPORT TO DENY THE
    RULE 33 .......................................................................................28

    A.  Loveall's Report Was Based Upon Secret Evidence,
        Violating Mr. Raniere's Fifth Amendment Right to Due
        Process ...................................................................................28

        1.  Applicable Law ...............................................................28

        2.  Analysis ..........................................................................29

    B.  Loveall's Report Failed to Meet the Admissibility
        Standards of FRE 702 and *Daubert* ....................................30

        1.  Applicable Law ...............................................................30

        2.  Analysis ..........................................................................31

    C.  Loveall's Report Failed to Meet the Statutory
        Requirements of 28 U.S.C. § 1746 ........................................31

        1.  Applicable Law ...............................................................31

        2.  Analysis ..........................................................................32

D. Loveall's Report Failed to Refute the 7 Digital Forensics Experts' Findings .............................................32

E. Loveall's Report Contained Indisputable Errors ..............................35

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING THAT "AMPLE TRIAL EVIDENCE" IN CONJUNCTION WITH THE LOVEALL REPORT AND CAMILA'S DECLARATION, OUTWEIGHED THE MATERIALITY OF THE 7 DIGITAL FORENSICS EXPERTS' FINDINGS .........................................................36

IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN IGNORING THAT THE SECOND FORENSIC IMAGE MEETS THE STANDARD FOR BOTH A *BRADY/GIGLIO* VIOLATION <u>AND</u> "NEWLY DISCOVERED EVIDENCE" .................................................38

A. The Court Abused Its Discretion By Not Applying the *Brady* Rule 33 Standard ...................................................38

B. Applicable Law ................................................................38

C. Analysis .........................................................................40

V. THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO FIND THAT THE SECRET FBI PHOTOGRAPH TECHNICIAN MEETS THE STANDARD FOR BOTH A *BRADY/GIGLIO* VIOLATION <u>AND</u> "NEWLY DISCOVERED EVIDENCE" ...........................................44

VI. THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO FIND THAT THE PROOF OF GOVERNMENT INVOLVEMENT IN FALSIFYING MATERIAL EVIDENCE CATEGORICALLY CONSTITUTES "NEWLY DISCOVERED EVIDENCE" AND A *BRADY/GIGLIO* VIOLATION .................................................47

VII.  THE EVIDENCE OF SYSTEMATIC AND
      INTENTIONAL GOVERNMENT MALFEASANCE
      MEETS THE STANDARD FOR DISMISSAL AND
      ALSO CAUSED STRUCTURAL ERROR ...........................................48

      A.  Applicable Law ................................................................48

          1.  Standard for Dismissal .............................................48

          2.  Standard for Structural Error ....................................49

      B.  Analysis ..........................................................................50

VIII. THE DISTRICT COURT ABUSED ITS DISCRETION IN
      DENYING THE MOTIONS TO COMPEL ..........................................52

      A.  Applicable Law ................................................................52

      B.  Analysis ..........................................................................52

IX.   THE DISTRICT COURT ABUSED ITS DISCRETION IN
      DENYING THE MOTION FOR JUDICIAL RECUSAL ....................54

      A.  Applicable Law ................................................................54

      B.  Analysis ..........................................................................55

          1.  The Court Abused Its Discretion in Misapplying
              *Liteky* to Comments Made During the Trial ...............................55

          2.  The Court's Termination of Cross-Examination
              Demonstrates the Appearance of "Deep-Seated
              Favoritism" Towards the Government and "Deep-
              Seated Antagonism" Towards Mr. Raniere ...............................56

          3.  The Court's Comments and Actions at the
              Restitution Hearing Further Demonstrate the
              Appearance of "Deep-Seated Antagonism"
              Towards Mr. Raniere, Requiring Recusal .................................60

CONCLUSION ........................................................................62

    REASONS TO GRANT, VACATE, AND REMAND .................................62

PRINTING SPECIFICATIONS STATEMENT ......................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcorta v. State of Texas,*
355 U.S. 28 (1957) ...................................................................40

*Amorgianos v. National R.R. Passenger Corp.*
303 F.3d 256 (2d Cir. 2002) ....................................................30

*Anderson v. United States,*
417 U.S. 211 (1974) ................................................................21

*Arizona v. Fulminante,*
499 U.S. 279 (1991) ...........................................................49, 51

*Banks v. Dretke*
540 U.S. 668 (2004) ......................................................39, 43, 45

*Bonds v. Cox,*
20 F.3d 697 (6th Cir. 1995) .....................................................32

*Boucher v. U.S. Suzuki Motor Corp.,*
73 F.3d 18 (2d Cir. 1996) ........................................................30

*Brady v. United States,*
397 U.S. 742 (1970) ..........................................................*passim*

*Bullcoming v. New Mexico,*
564 U.S. 647 (2011) ........................................................3, 25, 27

*Crawford v. Washington,*
541 U.S. 36 (2004) ...................................................................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ..........................................................*passim*

*Dilonez v. Fox Linen Serv. Inc.,*
35 F. Supp. 3d 247 (E.D.N.Y. 2014)........................................31

*Flovac, Inc. v. Airvac, Inc.*,
817 F.3d 849 (1st Cir. 2016) ...............................................32

*Giglio v. United States*,
405 US 150 (1972) ....................................................*passim*

*Harris v. Nelson*,
394 U.S. 286 (1969) ...........................................................22

*In re Drexel Burnham Lambert Inc.*,
861 F.2d 1307 (2d Cir. 1988) ...........................................55

*In re United States v. Coppa (In re United States)*,
267 F.3d 132 (2d Cir. 2001) ..............................................43

*ISC Holding AG v. Nobel Biocare Fin. AG*,
688 F.3d 98 (2d Cir. 2012) ................................................55

*Kyles v. Whitley*,
514 U.S. 419 (1995) ......................................................39, 40

*Leka v. Portuondo*,
257 F.3d 89 (2d Cir. 2001) ................................................39

*Liteky* v. *United States*,
510 U.S. 540 (1994) .............................................8, 23, 54, 55

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009) ...........................................................24

*Mendez v. MCSS Rest. Corp.*,
564 F. Supp. 3d 195 (E.D.N.Y. 2021) ...............................31

*Napue v. Illinois*,
360 US 264 (1959) .............................................................48

*Paucar v. Garland*
84 F.4th 71 (2d Cir. 2023) ...................................................9

*Perkins v. Teele*,
No. 3:15-CV-01137 (JCH), 2018 U.S. Dist. LEXIS 122117,
2018 WL 3541864 (D. Conn. July 23, 2018) .....................32

*Poventud v. City of New York*,
750 F.3d 121 (2d Cir. 2014) ...............................................................40

*Reynolds v. Sealift, Inc.*,
311 Fed.Appx. 422 (2d Cir. 2009) .....................................................31

*Rose v. Clark*,
478 U.S. 570 (1986) ......................................................................49, 51

*Smith v. Arizona*,
144 S. Ct. ...........................................................................3, 21, 25, 27

*Smith v. Arizona*,
602 U.S. ___ ......................................................................................25

*Strickler v. Greene*,
527 U.S. 263 (1999) ...........................................................................39

*U.S. v. Abuhamra*,
389 F.3d 309 (2d Cir. 2004) ..................................................28, 29, 30

*U.S. v. Autuori*
212 F.3d 105 (2d Cir. 2000) ..............................................................27

*United States v. Agurs*,
427 U.S. 97 (1976) .............................................................39, 42, 46, 48

*United States v. Alston*,
899 F.3d 135 (2d Cir. 2018) ..............................................................47

*United States v. Amico*,
486 F.3d 764 (2d Cir. 2007) ..................................................54, 55, 58

*United States v. Armstrong*,
517 U.S. 456 (1996) ...........................................................................48

*United States v. Bagley*,
473 U.S. 667 (1985) ...........................................................................38

*United States v. Boles*,
914 F.3d 95 (2d Cir. 2019) ...................................................................9

*United States* v. *Carlton*,
   534 F.3d 97 (2d Cir. 2008) .................................................................55, 59, 62

*United States* v. *Chemical Foundation*,
   272 U.S. 1 (1926) ...................................................................................48

*United States* v. *Christi*,
   682 F.3d 138 (1st Cir. 2012) ...................................................................49

*United States* v. *Davis*,
   836 F. App'x 754 (11th Cir. 2020) ..........................................................53

*United States* v. *Fields*
   592 F.2d 638 (2d Cir. 1978) ...............................................................49, 52

*United States* v. *Forbes*,
   790 F.3d 403 (2d Cir. 2015) ...............................................................38, 43

*United States* v. *Halloran*,
   821 F.3d 321 (2d Cir. 2016) .....................................................................40

*United States* v. *Hicks*,
   2024 U.S. Dist. LEXIS 7877 (W.D.N.Y 1.16.24)....................................32

*United States* v. *Jackson*,
   345 F.3d 59 (2d Cir. 2003) .......................................................................39

*United States* v. *Johnson*,
   2024 U.S. App. LEXIS 22691 (2d Cir. 2024)......................................25, 49

*United States* v. *Keith Raniere, et. al*,
   1:18-cr-00204 (EDNY) .............................................................................10

*United States* v. *Madori*,
   419 F.3d 159 (2d Cir. 2005) .....................................................................10

*United States* v. *Mangano*,
   2022 U.S. Dist. LEXIS 3048 (EDNY Jan. 6, 2022)..............................48, 52

*United States* v. *Middlemiss*,
   217 F.3d 112 (2d Cir. 2000) .....................................................................25

*United States v. Morell*,
524 F.2d 550 (2d Cir. 1975) .................................................................42

*United States v. Purcell*,
967 F. 3d 159 (2d Cir. 2020) ..................................................................9

*United States v. Sanchez*,
813 F. Supp. 241 (S.D.N.Y. 1993) .......................................................42

*United States v. Sessa*,
711 F.3d 316 (2d Cir. 2013), *cert, denied,* —— U.S. ——,
134 S.Ct. 353 (2013) .................................................................................9

*United States v. Thomas*,
981 F.Supp. 2d 229 (SDNY 10.30.13) ..................................................40

*United States v. Wallach*,
935 F.2d 445 (2d Cir. 1991) .................................................................48

*United States v. Walters*,
910 F.3d 11 (2d Cir. 2018) ...................................................................10

*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021) ...................................................................9

*United States v. Williams*,
2017 U.S. Dist. LEXIS 135235 (S.D.N.Y. 2017) ...............................52

*United States v. Wolfson*,
413 F.2d 804 (2d Cir. 1969) ............................................................22, 52

*Williams v. Keisler*,
No. 07 CV 503 (ARR), 2007 U.S. Dist. LEXIS 117028
(E.D.N.Y. Oct. 30, 2007) ......................................................................31

*Zervos v. Verizon N.Y., Inc.*,
252 F.3d 163 (2d Cir.2001) .....................................................................9

**Statutes**

18 U.S.C. § 3231 ...............................................................................................4

18 U.S. § 3500 ......................................................................................*passim*

x

28 U.S.C. § 445(a)................................................................4, 24, 54, 59

28 U.S.C. § 455 ...............................................................................8, 62

28 U.S.C. § 1291 ...................................................................................4

28 U.S.C. § 1746 .........................................................................*passim*

**Rules**

Federal Rules of Criminal Procedure Rule 16................................*passim*

Federal Rules of Civil Procedure Rule 33 .....................................*passim*

Federal Rules of Evidence 702.......................................................*passim*

Federal Rules of Evidence 702(b) ........................................................30

**Constitutional Provisions**

Fifth Amendment to the U.S. Constitution.........................................5, 28

Sixth Amendment to the U.S. Constitution ....................................3, 5, 24

**Other Authorities**

Dang, Quynh, *Secure Hash Standard (SHS)*, FIPS PUB 180-4, Nat'l
    Inst. of Standards & Tech. (2015) ................................................53

New York Post ......................................................................................61

Noah Goldberg (@Noah__Goldberg)**,** *X (formerly Twitter)*
    (May 6, 2022, 10:14 AM)).
    https://x.com/Noah__Goldberg/status/1522580665899925509...................61, 62

Vanity Fair............................................................................................61

## PRELIMINARY STATEMENT

Defendant-Appellant's (hereinafter referred to as "Mr. Raniere") Rule 33 is based upon the post-trial findings of seven (7) independent digital forensics experts, **including four (4) former FBI examiners**, who discovered that material evidence was extensively falsified, with government involvement in the fraudulent conduct:

> "[A] camera card ... and a hard drive were deliberately and extensively manipulated… 168 photos, including the alleged contraband, were planted on the hard drive... Given admitted government misconduct, including violating evidence protocols, providing evidence to unidentified and unauthorized personnel, and altering the original camera card, **the involvement of government personnel in this evidentiary fraud is inescapable – an unprecedented finding in our combined 150+ years of forensic experience.**" (A1698 ¶¶ 1-2, A1700 ¶ 8, A1703 ¶ 16) (emphasis added).

The camera's memory card and hard drive were the core evidence of the alleged child pornography and sexual exploitation predicate acts, which the government said was "at the heart of our racketeering conspiracy." (A217:14-16).

Mr. Raniere met the Rule 33 threshold for *Brady* violations and "newly discovered evidence". The government actively concealed:

(1) the existence and use of a second forensic image[1] of the memory card, secretly created during trial, which was never disclosed, despite repeated requests and the prosecution's assurances of full compliance with their statutory disclosure requirements;

---

[1] A forensic image is an exact replica of the contents of the device. (A310:7-A311:3).

(2) the intentional mishandling of the unpreserved memory card by a secret FBI photograph technician, in violation of FBI and DOJ regulations, deliberately omitted from the chain of custody, and only revealed **4 years after trial**; and

(3) falsification of the digital evidence and government involvement in this fraudulent conduct.

Some of this fraudulent conduct took place during the trial, after the government sought and obtained a prohibition against "presenting evidence or arguments concerning … alleged government misconduct in … this prosecution." (A272).

There is a high likelihood that Judge Garaufis created new precedent by crediting new government evidence and having it serve as two-thirds (⅔) of his basis for denial of the Rule 33. The evidence relied upon by the government was created post-trial solely to oppose the Rule 33 and related Motions to Compel and consisted of a report from the government's post-conviction forensic expert, FBI Senior Computer Scientist David Loveall II, and a declaration from Camila, the alleged subject of the purported underage photos. Neither testified nor were subject to cross-examination of confrontation **at any time**. The Court's reliance on this new government evidence, without a hearing, violated the fundamental constitutional protections afforded to defendants in our justice system.

Relying on Camila's hearsay declaration, which is partly contradicted by her unsworn statement at Mr. Raniere's sentencing, without her being subject to

cross examination, violates Mr. Raniere's Sixth Amendment Right of Confrontation.

Another clear abuse of the Court's discretion is its reliance on Loveall's forensic report due to its many fatal flaws. It was based on material evidence that the government and Court have refused to disclose to the defense, rendering his report a product of 'secret evidence'. Not only was Loveall never subjected to cross-examination in any capacity, but his report relied on the analysis of another FBI examiner who did not testify at all, violating the Confrontation protections established by *Smith v. Arizona* and *Bullcoming v. New Mexico*. Loveall's rebuttals did not cite to data, violating the requirements of Federal Rule of Evidence 702 and *Daubert*, and was undated, violating the requirements of 28 U.S.C. §1746.

Allowing these decisions to stand will permit the government to create new evidence and theory whole-cloth in post-conviction litigation and deprive a defendant of their rights under the Confrontation Clause and other constitutional protections.

Judge Garaufis's decision makes the unacceptable acceptable by allowing systematic, intentional government malfeasance relating to the digital evidence, involving at least eight (8) identified FBI/DOJ personnel.

Respectfully, Judge Garaufis was not the right justice to preside over these determinations. The Court erred in failing to recuse itself pursuant to 28 U.S.C. §

3

455(a), despite clear evidence of the appearance of "deep-seated antagonism" against Mr. Raniere and "deep-seated favoritism" towards the prosecution.

## STATEMENT OF JURISDICTION

This is a consolidated appeal from three (3) final Orders that dispose of Mr. Raniere's current claims. The District Court had subject matter jurisdiction over these actions pursuant to 18 U.S.C. § 3231 and Rule 33 of the Federal Rules of Criminal Procedure. This Court has jurisdiction over this consolidated appeal pursuant to 28 U.S.C. § 1291.

Mr. Raniere filed a timely Notice of Appeal (Doc. 1240) dated March 21, 2024 with respect to the March 7, 2024 Order (SPA12-19) denying (1) the Motion for Reconsideration (A1692-1696) of the Court's November 6, 2023 Memorandum and Order (A1680-1691) denying his first Motion to Compel Production of Evidence, and (2) a separate Motion to Compel Production of Evidence, dated December 21, 2023 (A1747-1759).

Mr. Raniere filed a timely Notice of Appeal (A1842) dated May 7, 2024 in respect to the April 29, 2024 Order (SPA20-30) denying the Rule 33, supplemental Rule 33 focusing on the *Brady* violations, and *pro se* Rule 33 (A767-808; A1197-1210; A1211-1231).

Mr. Raniere filed a timely Notice of Appeal (A1843) dated May 10, 2024 in respect to the April 26, 2023 Order (SPA1-11) denying the Motion for Judicial Disqualification pursuant to 28 U.S.C. § 445(a) (A1159-1191).

On June 13, 2024, the Second Circuit consolidated these appeals. (2nd Circuit, *US v. Raniere*, 24-1285, DktEntry 32.1)

The original deadline for the consolidated appeals was August 21, 2024. (*Id*.) However, on consent, the Second Circuit granted two motions for extension of time and set a new deadline of October 28, 2024. (2nd Circuit, *US v. Raniere*, 24-1285, DktEntry 35.1, DktEntry 37.1).

## ISSUES PRESENTED FOR REVIEW

1. Whether the District Court's substantial reliance on and crediting of new government evidence, created post-trial, from Camila and FBI Senior Computer Scientist David Loveall II, who never testified and were never subject to cross-examination, to deny the Rule 33, without a hearing, violated Mr. Raniere's Sixth Amendment right to confront witnesses?

2. Whether the District Court's crediting of Loveall's forensic report (hereinafter referred to as "Loveall Report") in denying the Rule 33:

   a. Violated Mr. Raniere's Fifth Amendment right to Due Process by allowing Loveall to rely on secret evidence, including an undisclosed

second forensic copy of the camera's memory card, which was never made available to the defense, despite repeated requests and the prosecution's assurances of full compliance with their statutory disclosure requirements?

b. Abused its discretion, due to the Loveall Report's failure to meet the admissibility standards of FRE 702 and *Daubert*?

c. Abused its discretion, due to the Loveall Report lacking a date, in violation of the requirements of 28 U.S.C. § 1746?

d. Abused its discretion, due to the Loveall Report's failure to address at least 12 key defense findings, its agreement with one of the defense's key findings, its decision not to contest another, and its blatant errors?

3. Whether the District Court abused its discretion in finding that "ample [non-digital] trial evidence", in conjunction with the post-trial Loveall Report and post-trial Camila declaration, outweighed the materiality of the 7 digital forensic experts' findings, to deny the Rule 33?

4. Whether the District Court abused its discretion in ignoring that the non-disclosure and concealment of the **second** forensic image of the memory

card constitutes both a *Brady/Giglio* violation and "newly discovered evidence" under Rule 33?

5. Whether the District Court abused its discretion in ignoring that an FBI photograph technician conducted an unauthorized access of the unpreserved memory card, deliberately omitted from the chain of custody, and revealed by the government after trial in their Consolidated Opposition, constitutes both a *Brady/Giglio* violation and "newly discovered evidence" under Rule 33?

6. Whether the District Court abused its discretion in ignoring that the 7 digital forensics experts' discovery of proof of government involvement in falsifying material evidence categorically constitutes "newly discovered evidence" under Rule 33 and a *Brady/Giglio* violation?

7. Whether the evidence of systematic and intentional government malfeasance meets the standard for dismissal of the indictment, or, separately, a reversal of the conviction due to structural error?

8. Whether the District Court abused its discretion in denying Mr. Raniere's Motions to Compel exculpatory evidence, for use in his Rule 33 Reply?

9. Whether the District Court abused its discretion in denying the Motion for Recusal, pursuant to 28 U.S.C. § 455, by:

   a. Erroneously applying the standard set forth in *Liteky* for post-trial judicial comments to comments made during trial?

   b. Failing to acknowledge that its comments both in the presence and absence of the jury evinced a "deep-seated antagonism" against Mr. Raniere?

   c. Failing to acknowledge that its reason for terminating cross-examination of a key government cooperating witness was to prevent the jury from hearing testimony favorable to the defense?

   d. Failing to acknowledge that its post-trial comments during a restitution hearing evinced "deep-seated antagonism" towards Mr. Raniere?

All should be answered in the affirmative.

## STANDARD OF REVIEW

The Second Circuit reviews a District Court's denial of a Rule 33, a Motion to Compel, and a Motion for Judicial Disqualification for abuse of discretion. *See United States v. Sessa,* 711 F.3d 316, 321 (2d Cir. 2013), *cert, denied,* —— U.S. ——, 134 S.Ct. 353 (2013); *United States v. Boles*, 914 F.3d 95, 109 (2d Cir. 2019); *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021).

"A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding— cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).

Issues 1, 2(a), 3, 4, 5, 6, 7, 8, and 9(a) are presented for *de novo* review. Issues 2(b) - (d) and 9(b) - (d) are presented for abuse of discretion review.

As to an error of law, the Second Circuit "review[s] constitutional claims and questions of law *de novo*." *Paucar v. Garland* 84 F.4th 71, 80 (2d Cir. 2023).

This Court reviews challenges to the sufficiency of the evidence underlying criminal convictions *de novo*. *United States v. Purcell*, 967 F. 3d 159, 185 (2d Cir. 2020).

Materiality in the context of an alleged *Brady* violation presents a mixed question of law and fact and is reviewed *de novo* by this Court. See *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citations omitted).

This Court reviews the denial of a motion to dismiss an indictment on grounds of government misconduct *de novo*. *See United States v. Walters,* 910 F.3d 11, 22 (2d Cir. 2018).

## STATEMENT OF CASE

This is a consolidated appeal from post-conviction Memorandum & Orders by The Hon. Judge Nicholas G. Garaufis, USDJ (hereinafter referred to as "Judge Garaufis" and "the Court") in *United States v. Keith Raniere, et. al*, 1:18-cr-00204, (EDNY) in which he denied without a hearing Mr. Raniere's First and Second Motion to Compel Production of Evidence and Motion for Reconsideration (hereinafter jointly referred to as "Motions to Compel") (SPA12-19), Final Rule 33 Motion for a New Trial and its Supplement (hereinafter referred to as "Rule 33") (SPA20-30), and Motion for Recusal (SPA1-11).

### 1. Before Trial

On February 21, 2019, nine (9) weeks before the trial was set to begin, FBI agents made an 'accidental' discovery on a seized Western Digital hard drive (hereinafter referred to as the "hard drive") of alleged child pornography involving a single subject, Camila. (SPA22). The files were outside the date range authorized

10

by the search warrant. This accidental discovery transformed a case about adult conduct into one centering on child exploitation. It led to a second superseding indictment on March 13, 2019, adding two (2) predicate acts of sexual exploitation, for alleged production of the photos, and one predicate act of possession of the photos on the hard drive (hereinafter referred to as "child predicate acts"). (A192-193). The prosecution stated that these charges were "at the heart of our racketeering conspiracy." (A217:14-16).

Pre-trial, the defense requested inspection of all digital evidence which supported these predicate acts (A243:10-15, A265 ¶ 4, A419:5-9). The hard drive was the only piece of digital evidence the prosecution disclosed it would rely on to support the child predicate acts. (Doc. 362, A220-230; A232-264). On April 4, 2019, the prosecution pressed the defense to declare it would be ready for trial. The defense stated that it would be ready, noting that the prosecution had been "accommodating and responsive", as they had made *the hard drive* available to the defense for its expert to analyze (A243:6-A244:2).

However, on April 24, 2019, during the third day of jury selection, the prosecution disclosed a forensic report about a different piece of digital evidence, *a camera's memory card*, by CART Examiner Stephen Flatley (hereinafter referred to as "Flatley"). (A776, 1089). This was the first indication of the government's reliance on the camera's memory card.

## 2. At Trial

On May 4, 2019, three (3) days prior to opening statements, the Court issued its ruling on the motions *in limine*, ordering, "Raniere is prohibited from presenting evidence or arguments concerning… **alleged government misconduct** in … this prosecution". (A272). (emphasis added).

At trial, the child pornography and sexual exploitation predicate acts centered on the digital evidence: a Canon camera (hereinafter referred to as the "camera"), its memory card, and the hard drive, all seized from 8 Hale Drive, a townhouse Mr. Raniere used. (A774). The government's theory at trial was that Mr. Raniere took illicit photographs of a singular underage subject on two (2) dates in 2005[2] with the camera, which stored photographs on its memory card, and the photographs were backed up to the hard drive, where the FBI reported discovering them. (A525:9-A529:24).

Camila, the subject of the alleged underage photographs, did not testify at trial. The photographs were not obviously contraband but were argued to be such,

---

[2] The prosecution had an ever-shifting number of alleged illicit photographs. Before trial, it was "approximately 15" photos. (A226). During trial, it was "18 or so images". (A391:7-9). After trial, it was "at least nine". (A1573).

based upon allegedly being taken in 2005, when she would have been fifteen (15), using the camera[3]. (A528:22-A529:24; A530:17-23).[4]

The 2005 timing was derived from information in the photographs, called EXIF metadata, which is generated by a camera on capture. (A346:18-A347:20). FBI Senior Forensic Examiner Brian Booth (hereinafter referred to as "Booth"), who analyzed the hard drive, testified that EXIF metadata is difficult to modify and "purposely designed" to be that way. Booth affirmed it is the "best evidence" of when the photographs were taken and that the EXIF metadata dates indicated the photos were taken in 2005. (A349:12-4; A359:3-11; A404:7-11). In summation, lead prosecutor AUSA Moira Kim Penza (hereinafter referred to as "AUSA Penza") reiterated this by stating:

> [T]he photographs were taken in 2005 because that's what the data shows… Booth testified that **the most reliable metadata that the FBI could obtain from the images on the Western digital hard drive, said that they were taken… on November 2, 2005 … [and] November 24, 2005.**[5]

_____

[3] That specific camera was necessary to establish an element of production. Neither of the witnesses who were photographed, **as adults**, by Mr. Raniere identified the camera as the one used to photograph them. Camila did not identify that camera in her post-trial declaration.

[4] Camila's sister Daniela testified that Camila underwent an appendectomy in 2007, and was asked, "[I]f you saw an image of Camila where there is no scar on her abdomen, would you know how old she was?" to which Daniela answered, "She would be 16 years or younger." (A295:11-20; A298:24-A299:3) According to the testimony of Special Agent Michael Weniger, no appendectomy scar was visible in the photographs. (A516:6-A517:8). There are photographs of Camila as an adult where sometimes the scar is not visible, as presented in Mr. Raniere's _pro se_ Rule 33. (A1335 ¶ 6).

[5] It should be noted that Camila, in her post-trial declaration, claimed that there was only <u>one</u> (1) single photo session in 2005, "no more than 2-3 months after September 18, 2005." (A1592 ¶ 8).

13

(A529:16-24) (emphasis added).

The defense discovered post-trial that Flatley, who did not testify in this case, testified in a prior case that **metadata creation dates are unreliable and easily altered**. (A1512-1520, 1826).

Five (5) weeks into the six (6) week trial and prior to testimony about the digital evidence, Flatley, who examined the camera and memory card, was suddenly sent to Ghana. Flatley created a forensic image of the memory card before trial, and Booth was substituted as a trial witness to testify about the forensic analysis of the camera and its memory card. (A510:1-16). At trial, the prosecution introduced a "Replacement" report from Booth regarding the memory card. Booth's report, disclosed two (2) days before the close of testimony, showed that the memory card contained photo files that corroborated the 2005 dates of the purported contraband and linked the photographs to the camera tied to Mr. Raniere. (A1006-1007, A1029-1033; A530:17-A531:1).

The prosecution elicited testimony supporting that the camera, containing the memory card, was properly handled in accordance with FBI protocol. Special Agent Christopher Mills (hereinafter referred to as "Mills") testified that FBI protocol, which requires the involvement of the Computer Analysis Response Team (hereinafter referred to as "CART") to review original digital evidence, was

adhered to with the handling of the camera. (A304:8-18)[6]. Four (4) years after trial, the prosecution's footnote revealed that the protocol was **not** followed for the camera and its memory card, as it was accessed outside of CART. (A1579 at n.6).

Booth, a CART member, explained that CART's role is to "protect and process" digital evidence; this involves creating a "forensic image," which is an extraction of the device's data. (A308:2-8; A310:3-A311:2). Booth testified that CART protocol allows for **only one (1) forensic image per device** and that all evidence review and analysis is conducted based on that image. (A311:21-A312:19. The prosecution did not disclose that Booth's "Replacement" report was derived from **a second forensic image**, which he created, a violation of FBI protocol, the existence of which was discovered by the defense post-trial. (A1006-1007, 1038-1039).

During cross-examination of Booth regarding his examination of the camera and memory card, Assistant U.S. Attorney Tanya Hajjar (hereinafter referred to as "AUSA Hajjar") requested a sidebar and represented that Booth did not create any forensic images. (A414:3-A416:4). During it, AUSA Hajjar admitted that they had not disclosed the CART examination notes. In response, the defense reiterated its

---

[6] Three (3) days after Mills' testimony, and the day before the close of testimony, Booth confirmed that an access without a write blocker occurred prior to delivery to CART.

request for all Rule 16 and 3500 materials. (A417:17-24; A417:25-4895:3; A418:16-22).

### 3. Post-Trial Discoveries of Digital Evidence Falsification

Mr. Raniere, in weighing his right to exercise his post-conviction challenges, retained Dr. James Richard Kiper, Ph.D. (hereinafter referred to as "Dr. Kiper"), a retired FBI Special Agent, Forensic Examiner, and "a trainer of forensic examiners, and a trainer of other trainers of forensic examiners," to analyze the digital evidence. (A1003). Based on his specialized knowledge of FBI procedure, Dr. Kiper deduced from details in Booth's report and notes that Booth's report was based on a **second** forensic image of the memory card, which Booth had created on June 11, 2019, violating the very protocol Booth testified to. Dr. Kiper also noted that creating a second forensic image is **strictly prohibited by the FBI**. (A1038).

Dr. Kiper uncovered that Booth's report contained thirty-seven (37) photo files not listed in Flatley's report and that the metadata of several of these photo files had been intentionally manipulated. (A1004-1005). He concluded that there was a "high likelihood" that **all 37 photo files were planted on the memory card in FBI custody**, between the creation of the first and second forensic images. (A1036-1037).

Notably, Dr. Kiper, during his 20 years in the FBI, "never observed or claimed that an FBI employee tampered with evidence, digital or otherwise." (A1003).

Dr. Kiper determined that the alleged contraband, as well as the other photos on the hard drive, had been manually planted there, and that timestamps and folder names had been intentionally manipulated, "happen[ing] to align with the government's narrative." (*Id.*). All of Dr. Kiper's technical findings and conclusions of digital evidence falsification were independently verified and agreed with by six (6) additional forensic experts, including three (3) fellow former FBI CART examiners. (A1074-1087, A1097-1104, A1371-1556).

On March 16, 2022, prior to filing the Rule 33, Mr. Raniere, through counsel, requested the second forensic image from the prosecution. (A1143-1154). On March 18, 2022, AUSA Hajjar responded that the prosecution had "fully complied" with its obligations under *Brady*, Rule 16, and 3500. (*Id.*) Prior to trial, the prosecution made multiple representations about their compliance. (A1749-1752; A1780-1782).

On May 3, 2022, Mr. Raniere filed the Rule 33. (A767-808). Thereafter, with the Court's permission, Mr. Raniere filed a supplemental Rule 33, which focused on *Brady* violations. (A1197-1210). On June 21, 2022, Mr. Raniere filed a

*pro se* Rule 33. (A1211-1231). On April 14, 2023, Mr. Raniere filed a Motion to Compel, seeking access to the second forensic image. (A1358-1556).

### 4. Government's Consolidated Opposition

The government submitted a Consolidated Opposition to Mr. Raniere's Rule 33 and Motion to Compel, denying that evidence manipulation occurred. (A1568-1589).

To support its contentions, the prosecution submitted a forensic report from Loveall, who was not involved in the investigation or prosecution of Mr. Raniere. (A1618-1625). Loveall was given access to the second forensic image, and his report, which was undated in violation of 28 U.S.C. 1746, was created solely for the purpose of opposing the Rule 33 (A1618, A1621-1622 ¶ 9).

In his report, Loveall included rebuttals to five (5) of the seven (7) technical findings by Dr. Kiper. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-1624 ¶17, A1624-1625 ¶18). Of the remaining two (2) findings, he chose not to contest one (1) finding (A1623 ¶ 16), and agreed with the other, that the memory card was accessed on September 19, 2018[7] without a 'write blocker,' a tool meant

---

[7] The defense was aware of this improper September 19, 2018 access at trial. (A492:6-A496:12). Dr. Kiper included this fact as one of several findings which supported his conclusion of intentional evidence manipulation. (A1007-1008).

to prevent alterations to the digital evidence. (A1622 ¶ 10). The Loveall Report only addressed a subset of Dr. Kiper's findings and did not address the 6 other digital forensics experts' reports.

Over 4 years after trial, the prosecution disclosed for the first time, in two parts,[8] that an unidentified FBI "photograph technician" was the individual who improperly accessed the camera's memory card on September 19, 2018, which was before it was delivered to CART for processing, violating FBI protocol. (A1579 at n.6). No such person was listed on the chain of custody or previously disclosed. (A1233-A1235).

The prosecution also included a post-trial declaration from Camila. (A1591-1593). In it, Camila asserted that she was 15 in the photos and that they were taken by Mr. Raniere. (*Id*). Prior to the creation of this declaration, Camila was awarded $507,997.45 in restitution. (A1821).

### 5. Defense's Reply to the Rule 33

In its Reply, the defense included a joint report from the 7 digital forensics experts which provided refutations for each of Loveall's rebuttals, identified errors in his report, and included additional findings of data falsification on the memory

---

[8] In their Consolidated Opposition, the prosecution disclosed the existence of the "photograph technician." (A1579 at n.6). Five (5) months later, in their Opposition to the Second Motion to Compel, the prosecution identified the same individual as an **FBI** photograph technician. (Doc. 1231 at 1).

card, such as the planting of photo files and manual editing of timestamps, which were uncovered during the process of responding to Loveall. (A1698-1727). This report was also included in the Motion for Reconsideration. (A1694).

### 6. The Court's Denials

First, the Court denied the Motion for Recusal. (SPA1-11). The Court then denied, without a hearing, the Motion to Compel, its subsequent Motion for Reconsideration, and a Second Motion to Compel seeking information about the newly disclosed FBI photograph technician. (A1680-1691, SPA12-19). It credited the Loveall Report's rebuttals as more "plausible" than Dr. Kiper's findings, relied on Camila's post-trial declaration, and pointed to the so-called 'ample trial evidence' supporting the jury verdict. Thereafter, in denying the Rule 33 without a hearing, the Court reiterated this reasoning and found no newly discovered evidence or *Brady* violations. (A1840).

### SUMMARY OF THE ARGUMENT

### I.   Denial of the Rule 33

The Court's finding that "Mr. Raniere seeks to have a new trial to challenge evidence … that he had the opportunity to challenge, and did in fact challenge during his trial" is patently wrong. (SPA27-28). Mr. Raniere is not seeking a second bite at the apple. There are clear *Brady/Giglio* violations and "newly discovered evidence" which the Court abused its discretion in not crediting: 1) the

second forensic image of the memory card, 2) the secret FBI photograph technician, and 3) the 7 digital forensics experts' proof of government involvement in the falsification of the digital evidence used to introduce and support the child predicate acts. Each of these were actively concealed by the government.

The Court's conclusion that the defense's evidence would not "likely lead to an acquittal" is flawed. It failed to apply the *Brady* standard for Rule 33 review, a less strict standard, despite the defense identifying *Brady* violations.

The Court erroneously credited new government evidence, created post-trial, serving as its primary basis for the Rule 33 denial. Put simply, Judge Garaufis' reliance upon Camila's declaration and the Loveall Report violates the Confrontation Clause. Neither testified before the jury and were never subject to cross examination yet the Court credited their testimonial statements as proof of the truth of the matters they asserted. *See Smith v. Arizona*, 144 S. Ct. 1785, 1792 (2024) (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). The Loveall Report does not comply with *Daubert*, FRE 702, and 28 U.S.C. § 1746.

The government should not be permitted to claim that there is no "newly discovered evidence" when they indisputably created new evidence post-trial and disclosed previously concealed information to the defense for the first time, and then used it to oppose Mr. Raniere's Rule 33 and Motions to Compel.

Finally, the Court fails to recognize that the 7 digital forensics experts' conclusion that the hard drive and camera's memory card were falsified is fatal to the child predicate acts, independent of any so-called other 'ample trial evidence.' The Court's refusal to order a hearing, despite the unanimous determination by **4 former members of the FBI digital forensics unit** regarding unprecedented government malfeasance, and the Court's reliance on new unscrutinized evidence created post-trial by the prosecution shocks the conscience.

## II.    Denial of the Motions to Compel

A District Court has broad discretion to fashion discovery mechanisms suitable to the case before it. According to the Supreme Court, "where specific allegations before the court show reason to believe that the petitioner may... be able to demonstrate that he is" entitled to a new trial, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Harris v. Nelson,* 394 U.S. 286, 299 (1969); *see also United States v. Wolfson*, 413 F.2d 804, 808 (2d Cir. 1969) (in dictum, suggesting that *Harris* applies to Rule 33 motions).

The Court erroneously concluded there was no "reasonable probability" that testing the requested evidence, including the 2 forensic images of the memory card, would prove Mr. Raniere's innocence. However, this conclusion is based on the same three (3) flawed factors: 1) the Loveall Report, 2) Camila's post-trial declaration, and 3) 'ample trial evidence.' Permitting the defense to test the

22

forensic images would further prove digital falsification. It would also confirm

whether 37 specific photo files are present only on the second forensic image,

which Dr. Kiper concluded a high likelihood of. If true, this would prove they were

planted on the memory card in FBI custody during the months between the

creation of the 2 forensic images. This finding would entitle Mr. Raniere to a new

trial, if not a dismissal.

Finally, the Court failed to recognize that Loveall used both the concealed

second forensic image and the first forensic image[9] to make new, material claims

opposing the Rule 33. The defense needed access to both forensic images to

competently respond to these claims. In a circular way, the Court used the Loveall

Report to deny the defense access to evidence needed to challenge it, and then

relied on that report to deny the Rule 33.

## III. Denial of Recusal

The District Court abused its discretion in denying Mr. Raniere's motion for

recusal by misapplying the standard in *Liteky v. United States*. The Court

incorrectly relied on *Liteky* to justify its denial; as *Liteky* stands for the proposition

that recusal is not warranted where "upon completion of the evidence, [a Judge is]

exceedingly ill disposed towards the defendant". However, the comments in

question occurred early in the trial, during ongoing evidence, before a

---

[9] The first forensic image was first known to the defense on the third day of jury selection.

determination of guilt. Judge Garaufis's comments revealed that the Court's termination of cross-examination of a key government witness was based upon preconceived notions of Mr. Raniere's guilt and an effort to protect the government's case; demonstrating "deep-seated favoritism" towards the prosecution. Further, the Court's exchange with defense counsel during the restitution hearing highlighted its "deep-seated antagonism" incompatible with judicial impartiality. These incidents show bias, warranting recusal pursuant to 28 U.S.C. § 455(a) to ensure a fair evaluation of Mr. Raniere's post-conviction motions.

## ARGUMENT

I. **Whether the District Court Abused Its Discretion in Denying the Rule 33 by Substantially Relying Upon and Crediting New Government Evidence, Created Post-Trial, from Individuals Who Were Never Subject to Cross-Examination, Violating Mr. Raniere's Sixth Amendment Right of Confrontation**

### A. Applicable Law

Under *Crawford v. Washington,* 541 U.S. 36 (2004), a witness's testimony against a defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. This principle was further extended in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), where the Court held that affidavits reporting the results of forensic analysis are testimonial, requiring the analyst who prepared

the report to testify in person. *See also Bullcoming v. New Mexico*, 564 U.S. 647 (2011.

In *Smith v. Arizona*, 602 U.S. ___; 144 S. Ct. 1785, 1791 (2024), The Supreme Court held that "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing", thereby implicating the Confrontation Clause. *See also United States v. Johnson*, 2024 U.S. App. LEXIS 22691, at *34 (2d Cir. 2024).

Pursuant to this Court's precedent, a district court faced with a Rule 33 motion must be careful to consider any reliable **trial evidence**[10] as a whole, rather than on a piecemeal basis. *See, e.g.*, *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (emphasis added). An analysis of trial evidence is a required aspect of the analysis, not post-trial evidence created by the government, which forms ⅔ of Judge Garaufis' basis for his denial of the Rule 33 and related Motions to Compel. (SPA15, SPA29).

**B. Analysis**

Defendants have fewer rights in post-conviction proceedings, given the existence of evidence previously subjected to an adversarial process. **Here, Mr.**

---

[10] If this Court finds a structural error occurred, or that an evidentiary hearing is necessary to make this determination, as discussed in Section VII**,** the trial evidence cannot be considered "reliable."

**Raniere's case is unique because the Court relied on, and credited, new government evidence, created post-trial.** Since the government's newly created evidence was never subject to an adversarial process, nor presented for the jury's scrutiny, the Court should not have made a credibility determination.

The Court credited the post-trial declaration of Camila, despite its hearsay, for the truth of her assertion that she was 15 years old in the photographs. Yet while the Court acknowledged that Camila never testified at trial[11] (SPA24), it went on to fully credit the declaration as one-third (⅓) of its reasons for denial. Moreover, in assessing the declaration's credibility, the Court failed to discuss the fact that Camila had previously been awarded $507,997.45 in restitution, a material factor potentially impacting her motives. (A1821).

The Court also failed to consider critical inconsistencies in her declaration, raised in the Rule 33 Reply. (A1821-1822). In it, Camila claims there was only a single photo session in 2005 and claims certainty of the timing because "it was the only time he took photographs of me like that." (A1592 ¶ 8, A1593 ¶ 10). Yet, this is contradicted by her statement at sentencing, when she alleged multiple photo sessions at age 15. (Sentencing Hearing T. (10/27/20) at 21: 7-13). The

---

[11] Neil Glazer, a civil attorney who represented Daniela, Camila's sister, and other testifying government fact witnesses, wrote in a pre-trial email, "Cami has been interviewed… the fact is they don't need her testimony to prosecute and convict Raniere... Moira [AUSA Penza] told me, and this is a quote, '**we have all the evidence we need.**'" (A1330) (emphasis added).

government's theory, presented at trial and based on the EXIF dates, claimed **2** photo sessions on precise dates in 2005, further casting doubt on the veracity of Camila's declaration.

The Court relied on the Loveall Report for the truth of whether digital evidence falsification occurred. The Loveall Report relied on Flatley's analysis, specifically the settings[12] he used to generate his report, to make material assertions. (A1621-1622 ¶ 9). Neither Flatley nor Loveall testified in the case, and Loveall had no involvement in the prosecution of Mr. Raniere. (A1618 ¶ 2). **This set of circumstances is the exact harm sought to be prevented** under *Bullcoming v. New Mexico*, and *Smith v. Arizona*, which require that the analyst responsible for the original analysis testify in court.

If this had occurred during trial, not taking testimony from Camila, Loveall, or Flatley would be a clear violation of the Confrontation Clause. By crediting the truthfulness of this new government evidence, the Court usurped the jury's role in assessing witness credibility. As noted in *U.S. v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000): "the court may weigh the evidence and credibility of witnesses... At the same time, the court may not wholly usurp the jury's role. It is only where exceptional circumstances can be demonstrated that the trial judge may intrude

---

[12] The defense was not provided these settings; they are not a part of Flatley's report.

upon the jury function of credibility assessment." No such exceptional circumstances exist here.

Respectfully, the Confrontation Clause protections must apply here given that the government introduced unconfronted post-trial evidence from new witnesses, effectively presenting a different case than at trial and bolstering it. The Court used this new **post-trial** government evidence to justify why the defense's newly discovered evidence would not have changed the **trial** outcome. This logical fallacy created by the Court's erroneous Rule 33 analysis is precisely why this Court must intervene.

## II.    The District Court Abused Its Discretion in Crediting Loveall to Deny the Rule 33

### A. Loveall's Report Was Based Upon Secret Evidence, Violating Mr. Raniere's Fifth Amendment Due Process Rights

#### 1.  Applicable Law

The practice of the government utilizing undisclosed evidence is a violation of due process. In *U.S. v. Abuhamra*, this Court held that the district court's reliance on *ex parte* information provided by the government, during a post-conviction bail hearing, which was not disclosed to the defense, violated due process. *U.S. v. Abuhamra*, 389 F.3d 309, 322 (2d Cir. 2004). The *Abuhamra* Court also opined:

> "Although a defendant who has been found guilty at trial retains only a modest conditional expectation of continued liberty…

28

neither the defendant nor the public would be well served by having determinations that so immediately affect even this reduced interest routinely made in closed proceedings or on secret evidence." *Id. at* 324.

## 2. Analysis

Loveall used both images in his analysis and made material assertions about them. (A1621-1622 ¶ 9). The government has refused defense access to these same materials.[13] To verify or challenge Loveall's critical claim that the 2 forensic images are "identical"[14] and thus 37 photo files were not planted in FBI custody, the defense must have access to both forensic images. Additionally, Loveall relied on Flatley's report settings, which are not listed in his report, to assert that the 37 photo files on the second forensic image do not appear in Flatley's report of the first forensic image due to different settings.

The only time the Court addressed Mr. Raniere's reliance on *Abuhamra* was in denying the Second Motion to Compel, opining "*Abuhamra* is thus inapplicable to this case where the court did not rely on arguments presented *ex parte* or *in camera* and does not concern access to information relevant to a party's bail application." (SPA16). However, the Court relied on secret evidence to adjudicate the Rule 33, violating due process. The Rule 33 and *Abuhamra* both deal with

---

[13] The defense was aware of the **first** forensic image at trial.

[14] The literal interpretation of Loveall's assertion is that the forensic image of the **camera** is identical to the forensic image of the **memory card**, which is false and impossible, as discussed in Section II(E)

29

secret evidence within a post-conviction proceeding. Yet in the Rule 33, the liberty interest impacted is greater, as is the level of secrecy. *Abuhamra* dealt with a defendant's post-conviction bail hearing while awaiting sentencing, whereas a Rule 33 entails the possibility of a new trial. While *Abuhamra* dealt with *ex parte* evidence, the Rule 33 deals with secret evidence.

This Court must avoid a ruling that makes it acceptable for district courts to rely on secret government evidence to deny a Rule 33.

### B. Loveall's Report Failed to Meet the Admissibility Standards of FRE 702 and *Daubert*

#### 1. Applicable Law

Under *Daubert*, the judge must ensure that an expert's testimony rests on a reliable foundation and is relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993). It is an abuse of discretion to admit expert testimony based on speculative assumptions. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate [its] exclusion". *Amorgianos v. National R.R. Passenger Corp.* 303 F.3d 256, 266 (2d Cir. 2002). Expert testimony must be "based on sufficient facts or data." FRE 702(b).

### 2. Analysis

Loveall's rebuttals of Dr. Kiper's technical findings are speculative and outright lack data. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-1624 ¶17, A1624-1625 ¶18, A1699 ¶ 4(d); A1824). Loveall's conclusions rest on conjecture, unverified assertions and are unsupported by sufficient facts or data. As such, the Loveall Report fails to meet the reliability and evidentiary requirements set forth in *Daubert* and FRE 702. This Court must avoid a ruling that violates this Supreme Court precedent and the FRE.

### C. Loveall's Report Failed to Meet the Statutory Requirements of 28 U.S.C. § 1746

#### 1. Applicable Law

Under 28 U.S.C. § 1746, an unsworn declaration must be "dated" to be valid. Failure to date an unsworn declaration is "technical noncompliance." *Dilonez v. Fox Linen Serv. Inc.*, 35 F. Supp. 3d 247, 253 (E.D.N.Y. 2014). This Court has upheld exclusion of undated affidavits. *See Reynolds v. Sealift, Inc.*, 311 Fed.Appx. 422, 425 (2d Cir. 2009). The District Courts of the Second Circuit, including The Eastern District of New York:

> "have routinely exercised their discretion against admitting undated, unsworn declarations into evidence. See, e.g., *Mendez v. MCSS Rest. Corp.*, 564 F. Supp. 3d 195, 209 (E.D.N.Y. 2021) (declining to accept plaintiff's undated, unsworn declaration); *Williams v. Keisler*, … 2007 U.S. Dist. LEXIS 117028 at *4

31

(E.D.N.Y. Oct. 30, 2007) ("The document is not actually an affidavit, since it is unsworn, and is not admissible as an unsworn declaration because it is undated."); *Perkins v. Teele*, … 2018 U.S. Dist. LEXIS 122117 … at *2 n.3 (D. Conn. July 23, 2018) (disregarding an undated, unsworn declaration)". *United States v. Hicks*, 2024 U.S. Dist. LEXIS 7877, at *10 - 12 (W.D.N.Y 1.16.24).

Other Circuits have also deemed undated declarations inadmissible. *See, e.g., Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 n.2 (1st Cir. 2016); *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1995).

### 2. Analysis

The Loveall Report is undated, making it inadmissible, technically non-compliant, and invalid. (A1618, A1825). The Court abused its discretion in crediting and relying upon it.

### D. Loveall's Report Failed to Refute the 7 Digital Forensics Experts' Findings

The Court's claim that "Loveall's explanations… thoroughly refute Kiper's key findings" is incorrect. (SPA29, citing to A1682-1683). Of Dr. Kiper's 7 technical findings, Loveall only provided speculative rebuttals to five (5) of them; the 7 digital forensics experts refuted these 5 in their joint response. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-1624 ¶17, A1624-1625 ¶18, A1699 - A1703). The prosecution and Loveall had the opportunity to contest at least **12** other significant defense findings and failed to do so. In their Opposition to the

32

Rule 33, they opposed only Dr. Kiper's findings, in part, and none of the other experts' findings. In their Opposition to the Motion for Reconsideration, they failed to contest the 7 digital forensic experts' joint report. Thus, and as summarized below, the Loveall Report was hardly a "thorough refutation":

| Defense Finding | Loveall / Government's Response |
|---|---|
| Mills committed perjury by testifying that the camera was handled in compliance with FBI protocol. (A1206). | **Uncontested.** |
| Booth committed perjury regarding the reliability of EXIF metadata and that receiving unsealed evidence is not extraordinary. (A1037-1039). | **Uncontested.** |
| SAs Lever and Maegan Rees each reviewed the unpreserved camera and memory card, for a total of 24 days, before it had been sent to CART, violating FBI procedure. (A1035-1036). | **Uncontested.** |
| The USAO was provided the original, unpreserved memory card, which is prohibited by FBI protocol. (A1383). | **Uncontested.** |
| An unauthorized forensic exam was done on the unpreserved memory card on 9/19/18, 5 months before it was delivered to CART. (A1383). | **Uncontested.** |
| Booth created a second forensic image of the memory card, in violation of FBI procedure. (A1006-1007, A1038-1039). | **Uncontested.** |

| | |
|---|---|
| Booth's receipt of the memory card from Mills in an unsealed bag violated FBI procedure. (A1034). | **Uncontested.** |
| Photos 81-100 on the memory card were planted by a computer with manually edited creation dates, falsely supporting the 2005 timeframe. (A1703 ¶ 15(a), A1707-1709). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[15] |
| Photos 224-243 on the memory card were planted by a computer with manually edited creation dates, falsely supporting the 2005 timeframe. (A1703 ¶ 15(b), A1709-1711). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[16] |
| A computer was used to manually edit the last accessed dates of Photos 21-42, falsely supporting the 2005 timeframe. (A1703 ¶ 15(c), A1711-1713). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[17] |
| A computer was used to manually edit the last accessed dates of Photos 193-199, falsely supporting the 2005 timeframe. (A1703 ¶ 15(d), Bates 17-18). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[18] |
| Folder names on the hard drive were intentionally manipulated, falsely supporting the 2005 timeframe. (A1009-1010, 1378-1379). | **Loveall responded but did not contest**. (A1623 ¶ 16). |
| The 168 photos, including the alleged contraband, were **manually planted on the hard drive** and disguised to appear as if they were automatically backed up by a computer in 2009. (A1011-1012, | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1623-1624 ¶ 17, A1624-1624 ¶18, A1700 ¶ 8). |

---

[15] This defense finding was also included in the Reply to the Rule 33, not in the original findings Loveall reviewed.

[16] *See* footnote 14.

[17] *See* footnote 14.

[18] *See* footnote 14.

| A1379, A1448-1451). | |
|---|---|
| Photos 93-97 on the memory card had their metadata intentionally manipulated. (A1004-1005, A1437-1439). | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1702 ¶ 14). |
| 37 photo files, with "high likelihood", were planted on the memory card in FBI custody, between 4/11/19 and 6/11/19. (A1036-1037). | Rebutted defense's finding without proof and is unverifiable by the defense without access to the forensic images. (A1621-1622 ¶ 9, A1702 at n.1). |
| Timestamps of at least 12 photos on the hard drive were intentionally manipulated to falsely support the 2005 timeframe. (A1008-1009; A1378-1379). | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1622 ¶¶ 11-12, A1622-A1623 ¶ 13, A1623 ¶¶ 14-15, A1701 ¶¶ 9-10). |
| Memory card altered on 9/19/18 in FBI custody. (A1007-1008). | **Agreed.** (A1622 ¶ 10). |

The Court's denial renders the above uncontested findings of government misconduct and data falsification as acceptable.

### E. Loveall's Report Contained Indisputable Errors

The Court ignored false assertions made by Loveall that undermine the credibility of his report. For example, Loveall wrote:

> "The fact that additional files appeared in one report [of the memory card] is a result of the use of different settings. I have examined the disk images [forensic copies] created of 1B15 and 1B15a and determined that they are identical." (A1621-1622 ¶ 9).

To a layperson, this statement appears as though Loveall is confirming that the 2 forensic images of the memory card are "identical." However, he is actually stating

that a forensic image of the *camera* (1B15) is identical to a forensic image of the *memory card* (1B15a). This is technically impossible and false, as they are 2 distinct devices. (A1699 ¶ 4(b), A1702 ¶ 12).

Additionally, in opposing Dr. Kiper's finding that the photos were planted on the hard drive, Loveall wrote, "I procured a Dell Dimension 8300-20090330, the same [computer] model identified in the folder name, to test Kiper's claim." (A1623-1624 ¶ 17). "Dell Dimension 8300-20090330" is not a computer model. (A1699 ¶ 4(a), A1825). The Court failed to address these blatant falsehoods in the Loveall Report, which were pointed out in the defense submissions, before concluding that Loveall's explanation "offers a far more plausible and convincing explanation" of the discrepancies in the digital data. (SPA29).

## III. The District Court Abused Its Discretion in Finding that "Ample Trial Evidence" in Conjunction with the Loveall Report and Camila's Declaration, Outweighed the Materiality of the 7 Digital Forensics Experts' Findings.

Judge Garaufis cited three (3) incorrect reasons (SPA29) to deny the Rule 33. ⅔ of them, Loveall Report's and Camila's declaration[19], should not have been credited, *supra*. The third, "ample evidence [non-digital evidence] presented at

---

[19] Camila's declaration does not negate the 7 digital forensics experts' findings showing data falsification and government malfeasance.

trial," including "the photos themselves", cannot be credited as a reason for a

denial given that:

- The "photos themselves" are not proof of guilt, contrary to the Court's opinion (A1681); they are not obviously contraband. It is their alleged 2005 dating, derived from EXIF metadata[20] that makes them appear illegal.

- The government's other so-called "ample" trial evidence was debunked point by point by Mr. Raniere (A1743-1745). For example, the Court cites "communications from Mr. Raniere referencing the photos [from 2005]." However, the referenced text exchange (A1587) is from 2014, when Camila was 24, and simply mentions pictures "from way back" without reference to any specific time frame, age or other incriminating information. The Court's determination that these messages refer to the photos in question is baseless. (A626).

- **Falsification of the hard drive and camera's memory card is a standalone issue that, if credited, is fatal to the child pornography and sexual exploitation predicate acts, regardless of other trial evidence. The devices formed the basis of these acts and should not have been admitted. The Court failed to recognize this.** Further, government involvement in falsification of evidence is a due process violation requiring relief, independent of the question of guilt or innocence.

---

[20] To this end, the Court incorrectly concluded, "Booth acknowledged before the jury that the metadata was not reliable as to when the photos were taken." In this comment, the Court cites to Booth's testimony about one type of metadata, **file creation dates**, being unreliable, but ignored his testimony that **EXIF metadata** was reliable. (A501:13-A502:17). EXIF data is what the government used to establish the alleged 2005 timeframe.

**IV.** **The District Court Abused Its Discretion in Ignoring that the Second Forensic Image Meets the Standard for Both a *Brady/Giglio* Violation <u>and</u> "Newly Discovered Evidence".**

    **A. The Court Abused Its Discretion by Not Applying the *Brady* Rule 33 Standard**

The Court committed an error of law by applying the wrong standard to review the Rule 33, which is presented to this Court for *de novo* review. It used the *Forbes* standard, which Judge Garaufis enunciated in his denial:

> "Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that '(1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.' *United States v. Forbes,* 790 F.3d 403, 406-07 (2d Cir. 2015)." (SPA25).

The *Forbes* standard requires that newly discovered evidence "would likely result in an acquittal." However, Mr. Raniere claims *Brady* violations, requiring a less strict standard of review: "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (A1817-1818).

    **B. Applicable Law**

There are three (3) components of a *Brady* violation: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either

38

willfully or inadvertently; and [3] prejudice must have ensued." *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

As to prong one, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including [law enforcement]." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). (Petitioner's conviction was reversed and remanded for a new trial ordered due to the prosecution's failure to disclose material evidence favorable to the accused).

As to prong two, *Brady* material that is not "disclos[ed] in sufficient time to afford the defense an opportunity for use" may be deemed suppressed within the meaning of the *Brady* doctrine. *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir. 2001). In *Banks,* The Supreme Court opined:

> "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. … A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 694-96 (2004).

The Supreme Court in *Agurs*, held that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976). The deliberate suppression by the government of evidence favorable to a defendant would

constitute a denial of due process. *Alcorta v. State of Texas*, 355 U.S. 28, 78 (1957).

As to prong three, whether prejudice ensued, the materiality analysis "turns on the cumulative effect of all . . . evidence suppressed by the government." *Kyles*, 514 U.S. at 421. As reiterated in *United States v. Thomas*, 981 F.Supp. 2d 229, 242 (SDNY 10.30.13):

> "*Brady* does not require a "strong" or "overwhelming" probability of a **different outcome**, only a "**reasonable probability** that the Government's suppression affected the outcome of the case ... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles*, 514 U.S. at 434 (internal citations omitted)."

The "remedy for a *Brady* violation is vacatur of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to her." *United States v. Halloran*, 821 F.3d 321, 342 n.14 (2d Cir. 2016) (quoting *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc)).

### C. Analysis

The Court erroneously opined:

> "[Mr. Raniere's] **defense was also aware of [the memory card] during trial** ... [yet uses it] to argue that the evidence now in focus is both "newly discovered" and the "key evidence" that would prove his innocence. But the Defendant provides no persuasive argument that he could not have discovered this evidence with diligence." (SPA28) (emphasis added).

40

**The Court fundamentally misconstrues the issue**. The defense's argument is not about the memory card itself but the data extracted from it — specifically, the *second* forensic image. At trial, the defense was aware of the first forensic image only. The defense had no knowledge that Booth created a second forensic image and that his testimony and analysis was based on it.

Dr. Kiper's post-trial analysis revealed that Booth created this second forensic image **3 days before the close of testimony**. (A1006). At trial, the government actively concealed the existence of this second forensic image. On direct examination, AUSA Hajjar elicited testimony from Booth describing the FBI protocol of only creating 1 forensic image of the original digital evidence. (A311:21-A312:19). Booth omitted that he violated this protocol by creating a second image. Further, during cross-examination of Booth, regarding the notes of his examination of the camera and memory card, AUSA Hajjar requested a sidebar. During it, **she told the Court that Booth did not create any forensic images**, stating, "[Booth] testified yesterday he received the forensic image from Ms. Donnelly … **he never said I was the one who imaged the devices.**" (A414:3-A416:4) (emphasis added).

In fact, Booth deceptively concealed that he created a second forensic image, as further highlighted in his Administrative Note entry on June 7, 2019, in the CART Examination Notes. In it, he states, "Request was made by SA Lever of

item 1B15 [the camera, containing the memory card] to be processed in lieu of ITS/SFE Steven Flatleys availability as he would be overseas during trial. This exam would be utilized in trial. **SSA Trenton Schmatz concurred and authorized to process the item.**" (emphasis added). (A930). However, Booth omits that his "processing" would entail creating a second forensic image, which he knew was prohibited and that Schmatz could not authorize; re-imaging can only be authorized by the Assistant Director of the FBI Operational Technology Division. (A1038-1039).

Despite repeated defense requests under Rule 16 and 3500 for all digital evidence, including during that sidebar and before trial (A416:9-11; A417:25-A418:7; A418:16-22; A419:5-9), the prosecution never disclosed the existence of the second forensic image. This failure to comply with the defense's request, given the prosecution's statutory disclosure requirement, "is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106.

For *Brady* purposes, the prosecution is imputed with knowledge of the second forensic image, as it was created by Booth, a testifying witness and "arm of the prosecution." *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975); see also *United States v. Sanchez*, 813 F. Supp. 241, 247 (S.D.N.Y. 2.10.93). The Court must avoid a ruling that allows the prosecution to "hide" material evidence that the prosecution is obligated to disclose, such as the second forensic image,

which they secretly used at trial, and then shift the burden to the defense to "seek" it. *See Banks*, 540 U.S. at 694-96, As such, the second forensic image of the camera's memory card is "suppressed" under *Brady*.

There is a "reasonable probability that the government's suppression" of the second forensic image "affected the outcome of the case," establishing a *Brady/Giglio* violation. *In re United States v. Coppa (In re United States),* 267 F.3d 132, 134 (2d Cir. 2001). Had the second forensic image been disclosed, it would have had a material impact on the outcome of the case. Defense counsel would have had it analyzed by a forensic expert. This should have revealed that the camera's memory card had been extensively falsified and led to an application for suppression of the camera and its memory card. Without them, the prosecution is unable to link the production of the photos to Mr. Raniere, a required element of the sexual exploitation acts. (A530:17-A531:1).

For Rule 33 purposes, the second forensic image constitutes "newly discovered evidence". Before and during trial, defense counsel diligently sought all relevant scientific evidence relating to these charges, "from which the court can infer due diligence." *Forbes,* 790 F.3d at 406-07. Given the government's intentional concealment of the second forensic image, there was no way for the defense, through due diligence, to have discovered it. Given the fatal impact of the

newly discovered evidence, an acquittal on the child predicate acts would have

been likely, meeting the threshold for Rule 33 relief.

## V. The District Court Abused Its Discretion in Failing to Find that the Secret FBI Photograph Technician Meets the Standard for Both a *Brady/Giglio* Violation <u>and</u> "Newly Discovered Evidence".

The Court failed to acknowledge the prosecution's disclosure in their

Consolidated Opposition:

> "This [September 19, 2018] access [without a write blocker] was not the result of law enforcement "tampering,"... [H]aving no reason to believe that the metadata of the contents of the Canon EOS 20D camera card had any evidentiary value, law enforcement agents directed that a photograph technician copy the photographs from the camera card in order to provide the photographs more expeditiously to defense counsel." (A1579 at n.6)

This disclosure, **made in a footnote 4 years after trial,** is clearly "newly

discovered evidence," as was argued by the defense in its Rule 33 Reply. (A1810,

1814, 1816).

It revealed intentional government misconduct with respect to the camera

and memory card and its unauthorized access on September 19, 2018[21] as analyzed

in a joint report from the 4 former FBI examiners, submitted in the Reply to the

Second Motion to Compel (A1771-A1776):

- The prosecution directed this operation, as they disclosed in the footnote that its purpose was for discovery production, "to provide the photographs … to defense counsel", which is under the prosecution's purview, and their

---

[21] At trial, the defense was solely aware of the fact that the memory card was accessed without a write blocker on September 19, 2018.

paralegal was involved in creating the report from the technician's access (A1383).

- The prosecution, in directing this operation, intentionally circumvented CART, which is prohibited, whether or not the evidence is believed to have value. (A1774 ¶ 14)

- The prosecution knowingly concealed it until 4 years after trial.

- The FBI technician and Lever, who provided the access, **deliberately concealed** this operation from the chain of custody. (A1773 ¶ 11; Chain of Custody at A1233-A1235).

- The FBI technician knowingly violated protocol by accessing the original, unpreserved memory card and used "an unknown forensic tool" on it, constituting "an unauthorized forensic examination" and altered the memory card (A1773 ¶ 11, A1774 ¶ 17).

- The intentional misconduct by Lever and the FBI technician could have led to termination, lacked a legitimate explanation, and is **unprecedented in their combined 55 years of FBI service**. (A1773 ¶ 11, A1774 ¶ 14, A1776 ¶ 21).

This Court must avoid a ruling that makes such secret manipulation of evidence acceptable.

The onus is not on the defense to "scavenge" for an unauthorized operation that was intentionally concealed from the chain of custody, and for which no *Brady* notice was ever provided. *See Banks,* 540 U.S. at 694-96. During cross-examination, the prosecution's disclosure requirement was prompted when the defense questioned Booth about the improper access without a write blocker (A496:19-25), as the defense repeatedly requested all materials relating to the

45

digital evidence. The prosecution's failure to respond to a specific request and prompt, such as this one, is "seldom, if ever, excusable." *Agurs*, 427 U.S. at 106.

The prosecution's knowing concealment of the FBI technician's involvement demonstrates that this information was clearly suppressed under *Brady*. Their footnote disclosure, on July 21, 2023, is particularly egregious because the prosecution previously made an affirmative representation of full compliance with *Brady*, Rule 16, and 3500 on March 18, 2022. (A1154).

The secret FBI photograph technician also constitutes "newly discovered evidence" under Rule 33, as no amount of due diligence on the part of the defense could have exposed an individual not listed on the chain of custody. To date, the prosecution and Court have denied the defense access to the FBI technician's identity and records relating to their access. (A1762-1763, SPA15-19).

The week before and after the prosecution directed this operation, six (6) months after seizure and before the camera and its memory card were sent to CART, AUSAs Penza and Hajjar repeatedly and falsely assured the Court that all devices had been processed by CART **"[w]ithin days"** of seizure. (See, e.g., A88 ¶ 1; A112:25-A113:12; Doc. 143 at 1¶ 2 (9/24/18)).

This prosecution's lack of required *Brady/Giglio* notice, regarding the secret FBI photograph technician, deprived the defense from impeaching Mills and

Booth[22] about this concealed and intentional malfeasance, and using it to seek

suppression of the camera and memory card.[23]

## VI.     The District Court Abused Its Discretion in Failing to Find that the Proof of Government Involvement in Falsifying Material Evidence Categorically Constitutes "Newly Discovered Evidence" and a *Brady/Giglio* Violation.

In its denial of the Rule 33, the Court ignored that the 7 digital forensics

experts' discovery of government involvement in facilitating and concealing the

falsification of key evidence is **categorically** newly discovered and suppressed

under *Brady*. They concluded that "**the involvement of government personnel in**

**this evidentiary fraud is inescapable**". (A1703 ¶ 16) (emphasis added). The

government "may not knowingly use false evidence, including false testimony, to

obtain a tainted conviction." *United States v. Alston*, 899 F.3d 135, 145 (2d Cir.

2018) (citations omitted).

Our legal system operates on a presumption of good faith by the

government. "The presumption of regularity supports the official acts of public

officers and, in the absence of clear evidence to the contrary, courts presume that

---

[22] The Court's opinion that "Mr. Raniere's counsel cross-examined … Booth extensively about the photographic evidence, the … hard drive, the camera card, … the related metadata, and the chain of custody of the digital evidence" (SPA23-24) is undermined by the fact that the defense was deprived of the ability to do a complete cross-examination, as the secret FBI photograph technician and the second forensic image were concealed and "suppressed".

[23] To seek suppression, defense counsel would need to challenge the Court's prohibition on presenting evidence or argument concerning government misconduct. (A272).

they have properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996).

This Court must avoid a ruling that undermines this presumption of regularity. Therefore, it must find the 7 digital forensic experts' findings of fraudulent government conduct, uncovered after trial, to be both "suppressed" under *Brady* and constitute "newly discovered evidence" under Rule 33, and/or order a hearing.

Additionally, the uncontested, material perjury by Mills and Booth about the integrity and authenticity of the digital evidence, as listed in the table in Section II(D), independently warrant reversal of the conviction. *See Giglio v. United States*, 405 US 150, 153 (1972); *Napue v. Illinois*, 360 US 264, 269 (1959); *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991); *Agurs*, 427 U.S. at 103.

## VII. The Evidence of Systematic and Intentional Government Malfeasance Meets the Standard for Dismissal and Also Caused Structural Error

### A. Applicable Law

#### 1. Standard for Dismissal

Dismissal is generally appropriate only when the prosecution engages in "'egregious and deliberate' misconduct or act[s] flagrantly, willfully, and in bad faith.'" *United States v. Mangano*, 2022 U.S. Dist. LEXIS 3048, at *7 (E.D.N.Y. Jan. 6, 2022) (citations omitted).

"It is only in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, that the indictment may be dismissed… We have approved this extreme sanction only when the pattern of misconduct is widespread or continuous." *United States v. Fields* 592 F.2d 638, 648 (2d Cir. 1978) (citations omitted).

## 2. Standard for Structural Error

In *Arizona v. Fulminante*, The Supreme Court recognized that there are "structural defects in the constitution of the trial mechanism … [which] defy analysis by harmless error standards." *Arizona v. Fulminante*, 499 U.S. 279, 280 (1991). Such structural defects require automatic reversal without any need to demonstrate prejudice. *Johnson*, 2024 U.S. App. LEXIS at *18. In addition to being per se reversible, these structural types of errors need not be preserved by objection and thus may be raised for the first time on appeal. See *United States v. Christi*, 682 F.3d 138 (1st Cir. 2012).

Structural errors share in common that they undermine a criminal trial such that it "cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Rose v. Clark*, 478 U.S. 570, 577-78 (1986). As such, as a result of structural error, the question of guilt or innocence cannot be determined.

## B. Analysis

While the class of structural errors is extremely limited, the systematic and pervasive **intentional** government malfeasance in Mr. Raniere's case qualifies.[24] This misconduct involved at least eight (8) identified FBI and DOJ personnel and spanned multiple departments, involving CART, non-CART FBI employees, and the prosecutors, who knew or should have known. A subset of these findings is summarized below:

### <u>CART:</u>

- Booth committed perjury about the reliability of EXIF metadata and that unsealed evidence is not extraordinary in FBI evidence handling. (A1037-1039).

- Booth knowingly violated FBI protocol by creating a second forensic image, and intentionally concealed it. (A1006-1007, A1038-1039).

- Schmatz knowingly violated FBI protocol by approving Booth's creation of the second forensic image, as he lacked the authority to approve this action. (*Id.*).

### <u>Non-CART FBI employees:</u>

- Rees, Lever and an FBI photograph technician knowingly violated FBI protocol by reviewing the unpreserved camera and memory card. (A1035-1036, A1773 ¶ 11).

- Lever and the FBI photograph technician knowingly violated FBI protocol by concealing the technician's access from the chain of custody. (A1773 ¶ 11; Chain of Custody at A1233-A1235).

- Mills committed perjury about proper CART handling of the camera, despite

---

[24] Mr. Raniere preserved this argument in his Rule 33 Reply. (A1823; *Id.* at n.1).

signing the chain of custody prior to his testimony; the chain of custody showed unauthorized non-CART handling of the camera. (A1206, A1235).

**Prosecution:**

- AUSAs Hajjar and Penza intentionally circumvented CART for the unpreserved camera and memory card and concealed the FBI photograph technician's access until 4+ years after trial. (A1774 ¶ 14; A1579 at n.6).

- AUSAs Hajjar and Penza made false assertions to the Court about proper CART handling of all digital evidence and full compliance of their statutory disclosure obligations. (A1749-1752; A1780-1782).

- AUSA Hajjar should have known she was eliciting Mills' false testimony about the proper CART handling of the camera, as the prosecution had directed the unauthorized handling of the camera outside of CART.

- AUSA Hajjar misrepresented that Booth did "not create any forensic images", which she should have known was false. (A414:3-A416:4)

The above subset of findings demonstrates widespread and coordinated malfeasance that affected the integrity of evidence handling, evidence processing, evidence disclosure, witness handling, and the presentation of the case at trial. Its impact is not isolatable and constitutes a structural error, which fundamentally undermined the trial's "framework" (*Arizona,* 499 U.S. at 310) such that the trial could not "reliably serve its function as a vehicle for determination of guilt or innocence." *Rose*, 478 U.S. at 577-78.

Respectfully, this Court must find this to be a structural error or remand the case for an evidentiary hearing to fully develop the record, to avoid a ruling that makes the above, largely uncontested government malfeasance to be within

tolerance.

The above also demonstrates "widespread", "continuous", and "egregious and deliberate" misconduct by the government such that dismissal is warranted. *Mangano*, 2022 U.S. Dist. LEXIS at *7; *Fields* 592 F.2d at 648.

## VIII. The District Court Abused Its Discretion in Denying the Motions to Compel

### A. Applicable Law

In opining on a defendant's post-trial motion for discovery, this Court has held:

> "In some instances when possible exculpatory evidence not known by a defendant to exist at the time of trial is later shown to have then been in the Government's hands and the information necessary to develop fully the exculpatory nature of the evidence must be obtained from government sources it might be improper for a district judge to deny a motion for discovery when coupled with a timely motion for a new trial." *United States v. Wolfson*, 413 F.2d 804, 808 (2d Cir. 1969).

"In certain circumstances, some discovery may be appropriate as part of the post-trial factual development." *United States v. Williams*, 2017 U.S. Dist. LEXIS 135235, at *5 (S.D.N.Y. 2017).

### B. Analysis

Its denial of the Motions to Compel (SPA12-19), the Court made multiple factual and legal errors warranting reversal and the requested disclosure:

- The Court abused its discretion in not finding that the second forensic image was "suppressed" under *Brady* and "newly discovered evidence" under Rule 33. (A1689-1690).

- The Court abused its discretion in concluding that testing the 2 forensic images would not raise a "reasonable probability" of Mr. Raniere's innocence, instead erroneously relying on unconfronted newly created government evidence and so-called "ample" trial evidence. (A1689).

- The District Court made a clear error in concluding that digital evidence is "wholly different from DNA evidence, which has been shown capable of conclusively demonstrating a petitioner's innocence." (A1685). For instance, comparing the 2 forensic images' "hash values" is more accurate than DNA testing[25] and could, with virtually 100% accuracy, verify or disprove Loveall's claim about the 37 photo files not being planted while in FBI custody.

- The District Court misapplied the standard of fundamental fairness when it dismissed the defense's request as a "fishing expedition" and cited to *United States v. Davis*, 836 F. App'x 754, 758 (11th Cir. 2020) and its holding that

---

[25] The National Institute of Standards and Technology describes SHA-256, a hash algorithm, which creates hash values, as offering exceptionally strong "collision resistance," meaning it is "computationally infeasible" for two different files to produce the same hash value. The chance of such a collision is approximately **1 in $2^{256}$**, which is infinitesimal. See Quynh Dang, *Secure Hash Standard (SHS)*, FIPS PUB 180-4, Nat'l Inst. of Standards & Tech. (2015).

"[a] blanket assertion of fabricated evidence not substantiated by any credible source is not enough to warrant a new trial or even an evidentiary hearing." However, the defense did not make a "blank assertion"; it made precise scientific assertions about the planting of specific photos and manipulation of specific timestamps. These assertions were unanimously substantiated by highly credible sources, the 7 digital forensics experts, including 4 former FBI examiners.

## IX. The District Court Abused Its Discretion in Denying the Motion for Judicial Recusal

### A. Applicable Law

In evaluating the appropriateness of recusal, courts consider the statutory requirement that a Judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This provision is to "be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky* v. *United States,* 510 U.S. 540, 548 (1994) 3; *United States v. Amico,* 486 F.3d 764, 775 (2d Cir. 2007) ("[T]his test deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary.").

To constitute a basis for recusal due to bias stemming from judicial sources, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current [or] prior proceedings" would have to demonstrate "a

deep-seated favoritism or antagonism that would make fair judgment impossible."
*Liteky*, 510 U.S. at 555.

The operative question is whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal." *United States* v. *Carlton,* 534 F.3d 97, 100 (2d Cir. 2008) (alterations in original); *ISC Holding AG v. Nobel Biocare Fin. AG,* 688 F.3d 98, 107 (2d Cir. 2012); *see also In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1313 (2d Cir. 1988); *Amico,* 486 F.3d at 775.

### B. Analysis

#### 1. The Court Abused Its Discretion in Misapplying *Liteky* to Comments Made During the Trial

In denying recusal, Judge Garaufis cited primarily to *Liteky* to justify his position:

> "Alleged bias may not warrant recusal where 'upon completion of the evidence, [a Judge is] exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person' throughout the trial. *Liteky*, 510 U.S. at 550-51." (SPA4).

The Court's citation to *Liteky* ignores that it refers to a judge's conduct "upon **completion** of the evidence." The Court repeats this error in opining:

> Even if the court's comments at time [after the termination of Lauren Salzman's cross-examination] evinced … some sort of distaste for the defendant, no reasonable observer would, **after witnessing the trial …** earnestly believe that the distaste was the result of some sort of extrajudicial bias or deep-seated antagonism. (SPA8) (emphasis added).

55

Here, the Court's comments relating to his termination of the cross-examination of Lauren Salzman (hereinafter referred to as "Ms. Salzman") took place during the first half of the trial, ten (10) days into the twenty-three (23) days of testimony, prior to any determination of guilt.

> ## 2. The Court's Termination of Cross-Examination Demonstrates the Appearance of "Deep-Seated Favoritism" Towards the Government and "Deep-Seated Antagonism" Towards Mr. Raniere

During cross-examination of Ms. Salzman, defense counsel asked a critical question, "What was your intention when you were in DOS?" (A284:7). The case involved charges that related to alleged activities involving DOS. The crux of the government's theory regarding DOS was that the actions of Mr. Raniere and some of his co-defendants, including Ms. Salzman, were **intended to harm**, a necessary element of these charges.[26] Ms. Salzman was critical to their case, as she was the sole testifying cooperating witness and a founding member of DOS. Ms. Salzman then gave an answer that tended to invalidate her extortion plea, showing a lack of required intent to harm:

> "My intention was to prove to Keith that I was not so far below the ethical standard that he holds that I was -- I don't even know how far below I am. I was trying to prove my self-worth, and salvage

_____

[26] The indictment alleged that the actions of Mr. Raniere involved "instilling in them [DOS members] fear" and the threats of actions "calculated to harm." (A198 ¶ 34).

this string of a hope of what I thought my relationship might someday be, and I put it above everything else; I put it above my friends, and I put it above other people, helping them in their best interest. That's what I did when I was in DOS." (A284:9-16).

In the presence of the jury, the Court abruptly terminated cross-examination. The Court then twice offered the prosecution to reexamine the witness, which they declined. (A284:23-A285:4). The Court later conceded that defense counsel was not harassing the witness. (A288:2-10).

The Court's decision that the defense could not continue questioning but the prosecution could itself shows the appearance of "deep-seated favoritism" towards the prosecution. After dismissing the jury, the Court gave its first justification for terminating cross-examination:

> **I am not going to have someone have a nervous breakdown** on the witness stand in front of -- excuse me, this is not DOS. This is not the allegations… I think it's absolutely necessary that there be a certain level of consideration for someone's condition. And that's really what this was… **I had a crisis here. And not in my courtroom.** (A286:24-A287:8). (emphasis added).

In its denial of the Motion for Recusal, the Court reiterated that its rationale was "to avoid needless harassment and attend to the witness's wellbeing." (SPA7).

However, if the Court thought that Ms. Salzman was having a "nervous breakdown", it could have done any number of things, including: offering her a recess, giving the defense a limiting instruction, or dismissing her entirely without asking for redirect. The Court took the only option that is antithetical to its stated

concern; immediately inviting the prosecution to subject Ms. Salzman to more questioning, asking **not once but twice** if the government wanted to question her on redirect. This refutes that it intervened out of concern for the witness's well-being.

The Court also provided a second justification, accusing the defense of asking an improper question:

> I have to sentence this defendant and **what you did was, basically, ask her to make legal judgments** about whether what she did in pleading guilty was farcical that she took somebody else's advice, some lawyer, so she could get out from under a trial… **When I tried to cut off the line of questioning**, you just went right back to the line of questioning. (A288:11-A289:3) (emphasis added).

However, this justification is disproven by the fact that the Court allowed defense counsel's question, over the prosecution's objection. (A284:4-8).

By process of elimination, this reveals that the Court's termination of cross-examination was not due any impropriety with the question, nor the witness' emotional state, but **the content of her answer**.

The Court's decision to intervene reveals its intent was to prevent the jury from hearing testimony that was favorable to the defense; not an "ordinary effort at courtroom administration" as it claimed. (Doc. 1194 at 7). A judge should not be partial to the government's case. The Court's intervention, in front of the jury, demonstrates "[a]n appearance of partiality … that made it inappropriate for him to continue to preside." *Amico*, 486 F.3d at 767.

58

The Court also demonstrated "deep-seated antagonism" towards Mr. Raniere by its comment, "I am not going to have someone have a nervous breakdown on the witness stand in front of -- excuse me, **this is not DOS.**" (A286:24-A287:1) (emphasis added). "[T]his is not DOS" indicated a pre-judgment that Mr. Raniere's role in DOS was intended to harm. This was a central question being litigated in the trial. The Court taking a critical action during the trial based on a predetermination of the defendant's guilt, before any jury verdict, is textbook bias and evidences "significant doubt that justice would be done absent recusal." *Carlton,* 534 F.3d at 100.

The Court's final justification is equivalent to an admission of bias:

> "I may not get everything right up here, but I will tell you, **as a human being, it was the right decision**. Alright? And **before I'm a judge, I'm a human being."** (A289:4-6) (emphasis added).

What distinguishes the role of a judge from humans generally is their required impartiality. Yet the Court's comment logically equates to: **this is something that a human generally would do, but that a judge would not**. The Court's decision to vacate this role clearly demonstrates that his "impartiality might reasonably be questioned," meeting the statutory standard of 28 U.S.C. § 455(a).

The Court acknowledged that its termination of cross-examination potentially implicated appellate ruling, stating, "So, you have your record, and if

there is a conviction, you can appeal my decision to the Second Circuit, okay?"

(A287:9-11).

### 3. The Court's Comments and Actions at the Restitution Hearing Further Demonstrate the Appearance of "Deep-Seated Antagonism" Towards Mr. Raniere, Requiring Recusal

The Court's "deep-seated antagonism" towards Mr. Raniere was also

expressed through direct statements made to defense counsel[27] during the

restitution hearing. In answering the Court, Mr. Raniere stated that he was not

aware of who the restitution victims were. (A549:3-8). A contentious exchange

between the Court and defense counsel then ensued about whether the proceeding

would be delayed to allow Mr. Raniere to confer with counsel. This led to the

Court bringing up that counsel had requested a one-hour postponement of the

hearing to attend the funeral and shiva of counsel's mentor, who had just passed

away due to pancreatic cancer. This culminated in the following exchange:

Mr. Fernich: There is absolutely nothing dilatory about my request.

The Court: Excuse me.

Mr. Fernich: I wanted the day off to go to Joel Winograd's funeral, who died of pancreatic cancer on Sunday morning.

The Court: **Give him this to go cry on. He's not a member of your family, sir.**
…

---

[27] Mr. Raniere retained separate defense counsel to handle the restitution hearing.

The Court: **Be seated or I'll have you arrested.**

(A576:23-A578:12) (emphasis added).

This colloquy made its way to *Vanity Fair*, as cited to in the Motion
for Recusal. It provided additional context surrounding this exchange:

> "According to the *New York Post ...* during the hearing, [after the
> above exchange] Garaufis and Fernich **spent half an hour staring
> at each other in silence** as the rest of the courtroom looked on…
> When Fernich said during the hearing that Garaufis lacked "human
> decency," the judge, according to the tabloid, **grabbed a box of
> tissues,** told a court clerk, "Give him this to go cry," and threatened
> to have Fernich arrested unless he sat down. (A1177 at n.5).
> (emphasis added).

Mocking a person's grief over the death of their mentor, is one most would find
inappropriate to express. It is expected that a Senior District Court Judge would not
say such a thought aloud. There is no way to determine that the bias inherent in this
comment was against defense counsel, and not Mr. Raniere, who would be
impacted negatively regardless.

In response to the Motion for Recusal being filed, Noah Goldberg, a
journalist and "an objective, disinterested observer" present at the restitution
hearing, tweeted: "Keith Raniere's lawyer asked for the judge in the case to recuse
himself for being biased, citing **one of the most bizarre moments in court I've
ever seen** in which a lawyer was told by the judge to go cry about a funeral for a
colleague who had just died of pancreatic cancer." (Noah Goldberg
(@Noah__Goldberg)**,** *X (formerly Twitter)* (May 6, 2022, 10:14 AM)). (emphasis

added). https://x.com/Noah__Goldberg/status/1522580665899925509). *See also Carlton,* 534 F.3d at 100.

## CONCLUSION

## REASONS TO GRANT, VACATE, AND REMAND

For the foregoing reasons, Defendant-Appellant, Mr. Raniere, respectfully submits that: 1) the Order denying the motion for a new trial, the Rule 33, should be reversed and the case remanded for either a new trial or an evidentiary hearing; 2) the Order denying the Motions to Compel should be reversed and remanded, ordering the production of the 2 forensics images to the defense; and 3) the Order denying the Motion for Recusal under 28 U.S.C. § 455 should be reversed and remanded.

Dated:     New York, New York
          October 28, 2024

Respectfully submitted,

\s\ Deborah J. Blum

By:  Deborah J. Blum
     DEBORAH J. BLUM, ESQ.
     Attorney for Defendant-Appellant
     225 Broadway, Suite 715
     New York, New York 10007
     646-535-2586

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.


Dated:      New York, New York
             October 28, 2024

                        Respectfully submitted,

                        _____

By:    Deborah J. Blum
        DEBORAH J. BLUM, ESQ.
        Attorney for Defendant-Appellant
        225 Broadway, Suite 715
        New York, New York 10007
        646-535-2586

**SPECIAL APPENDIX**

**<u>Table of Contents</u>**

**<u>Page</u>**

Memorandum and Order of the Honorable Nicholas G. Garaufis,
    dated April 26, 2023 (Docket No. 1194)...................................... SPA1

Memorandum and Order of the Honorable Nicholas G. Garaufis,
    dated March 6, 2024 (Docket No. 1238) .................................. SPA12

Memorandum and Order of the Honorable Nicholas G. Garaufis,
    dated April 29, 2024 (Docket No. 1256) .................................. SPA20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES,

           -against-

KEITH RANIERE, et al.,

                 Defendant.

**MEMORANDUM & ORDER**
**18-CR-204 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is a Motion for Recusal and Judicial Disqualification of this court, filed by Defendant Raniere on May 6, 2022. (Mot. for Recusal (Dkts. 1170-71).) Defendant Raniere seeks recusal pursuant to both 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1). For the reasons set forth below, this motion for recusal is DENIED.

## I.  BACKGROUND

### A.  Factual History

The court assumes familiarity with the underlying facts of the case, *United States v. Raniere*, et al., and summarizes briefly below only those facts relevant to the instant motion.

In May and June 2019, this court held a several week jury trial regarding the criminal charges brought against Defendant Keith Raniere. That trial included testimony from a plethora of witnesses. (*See generally* Dkts. 634, 636, 638, 654, 658, 660, 661, 662, 670, 672, 674, 676, 678, 680, 687, 695, 697, 699, 704, 706, 711, 713, 723.) One such witness, Lauren Salzman, played an important role at trial as a cooperating witness. (*See generally* Dkts. 670, 672.) An exchange between the court and an attorney for the defense that took place during the cross-examination of Ms. Salzman, on the 10th out of 23 days of testimony, is among the incidents in dispute on this motion. (Mem. In Support (the "Mot.") (Dkt. 1171) at 2-7); (May 22, 2019 Trial Tr. (Dkt. 958)

at 2265-70.) After the trial was completed, the court undertook typical post-trial duties such as presiding over restitution hearings and sentencing the various defendants who had pleaded guilty or been convicted at trial. Two such hearings are at issue in this motion. First, on July 20, 2021, a hearing was held for the purposes of determining the amount of restitution owed by Defendant Raniere. (Mot. at 7-16; Restitution Hearing Tr. (Dkt. 1193).) Second, on September 30, 2020, a hearing was held for the purposes of sentencing Defendant Clare Bronfman. (Mot. at 17-18; Bronfman Sent. Tr. (Dkt. 964).)

**B. Procedural History**

Defendant Raniere filed the instant Recusal Motion on May 6, 2022. (Mot.) On May 9, 2022, the Court acknowledged receipt of the motion and stated that it would defer consideration of the motion until the Second Circuit resolved the appeal of the judgment of conviction, which was at the time *sub judice* after oral argument. (May 9, 2022 Text Order.) On January 3, 2023, two mandates issued from the Second Circuit, affirming the district court's judgments in full. (Dkts. 1183-84.)[1] Shortly thereafter, Defendant filed with the Second Circuit a petition for a writ of mandamus, seeking relief consistent with this Motion. (*See* Dkt. 1185.) On March 20, 2023, a mandate issued from the Second Circuit, denying that petition on the basis that "Petitioner has not demonstrated that he lacks an adequate, alternative means of obtaining relief, that his right to the writ is clear and indisputable, and that granting the writ is appropriate under the circumstances." (*Id.*) The court now considers the Motion.

---

[1] On April 17, 2023, the Supreme Court denied Defendant Raniere's petition for a writ of certiorari. *See* Order List, Supreme Court of the United States at 3 (Apr. 17, 2023), https://www.supremecourt.gov/orders/courtorders/041723zor_4gdj.pdf.

2

## II.  LEGAL STANDARD

Defendant Raniere moves for recusal under both 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1). These two statutory provisions are governed by similar but distinct legal standards.

### 1.  28 U.S.C. § 455(a)

In evaluating the appropriateness of recusal under § 455(a), courts consider the statutory requirement that a Judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).[2] This provision is to "be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994)[3]; *see also Amico*, 486 F.3d at 775 ("[T]his test deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary."). The operative question is whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal." *United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008) (alterations in original); *ISC Holding*, 688 F.3d at 107; *see also In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988); *Amico*, 486 F.3d at 775.

---

[2] *See, e.g., ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 107 (2d Cir. 2012) ("Recusal here is governed by 28 U.S.C. § 455(a), which states that '[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'") (alterations in original); *see also SEC v. Razmilovic*, 728 F.3d 71 (2d Cir. 2013), *as amended* 738 F.3d 14, 29 (2d Cir. 2013); *In re Int'l Bus. Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995); *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007); *United States v. Giordano*, 442 F.3d 30, 48 (2d Cir. 2006); *United States v. Basciano*, No. 03-CR-929 (NGG), 2008 WL 794945, at *10 (E.D.N.Y. Mar. 24, 2008).

[3] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

3

**SPA4**

The *Liteky* court explained that the goal of a recusal analysis is to identify not just whether the judge in question holds a "favorable or unfavorable disposition or opinion," but whether such views are "wrongful or inappropriate." *Liteky*, 510 U.S. at 550. Moreover, the level of bias necessary to warrant recusal under §455(a) is higher if it is derived from a judicial—rather than extrajudicial—source. *Liteky*, 510 U.S. at 555 (stating that § 455(a) analyses rely on a highly "significant (and often determinative) extrajudicial source factor")

Alleged bias may not warrant recusal where "upon completion of the evidence, [a Judge is] exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person" throughout the trial. *Liteky*, 510 U.S. at 550-51. This would likely not constitute recusable bias because the judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings." *Id.* To constitute a basis for recusal due to bias stemming from judicial sources, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current [or] prior proceedings" would have to demonstrate "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555; *see also ISC Holding*, 688 F.3d at 107; *Razmilovic*, 738 F.3d at 29; *Basciano*, 2008 WL 794945, at *10. Even "a judge's comments during a proceeding that are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" *Carlton*, 534 F.3d at 100 (citing *Liteky*, 510 U.S. at 555); *see also Razmilovic*, 738 F.3d at 29.

By contrast, the "requirement of deep-seated antagonism does not apply" where "opinions are . . . 'derive[d] from a source outside judicial proceedings.'" *ISC Holding*, 688 F.3d at 107 (quoting *Liteky*, 510 U.S. at 551, 554) (differentiating bias derived from judicial versus extrajudicial sources).

2.   28 U.S.C. § 455(b)(1)

§ 455(b)(1) requires a judge to recuse himself "where he has a personal bias or prejudice concerning a party[.]" 28 U.S.C. § 455(b)(1). *See, e.g., United States v. Osinowo*, No. 95-CR-1334, 1996 WL 20514, at *1 (2d Cir. 1996). Courts have emphasized that while motions brought under § 455(a) are evaluated pursuant to an objective standard, § 455(b)(1) "mandates recusal only where the court harbors *actual* prejudice or bias against a particular defendant." *Id.* (citing *Liteky*, 510 U.S. at 553) (emphasis added); *see also Pri-har v. United States*, 83 F. Supp. 2d 393, 397 (S.D.N.Y. 2000). As in a § 455(a) analysis, § 455(b)(1) typically requires an "extrajudicial" source factor. *Liteky*, 510 U.S. at 553 ("§ 455(b)(1) . . . contains the 'extrajudicial source' limitation[.]"); *see also Curley v. St. John's Univ.*, 7 F. Supp. 2d 359, 362 (S.D.N.Y. 1998); *Pri-har*, 83 F.Supp. at 397 (applying the logic of *Liteky* to § 455(b)(1) claims).

3.   Recusal for the Purposes of Ruling on a Rule 33 Motion

Although much of the controlling case law cited was developed in the context of a party seeking a judge's recusal prior to the commencement of litigation or trial, the standards for recusal under § 455(a) and/or (b)(1) remain the same where the party moving for recusal has also moved (or is simultaneously moving) for a new trial under Fed. R. Crim. P. 33. *See United States v. Scaretta,* No. 97-CR-1089, 1997 WL 829256, at *4 (2d Cir. 1997); *Osinowo*, 1996 WL 20514, at *1; *United States v. Robinson*, No. 16-CR-545 (SJF) (AYS), 2021 WL 62076, at *25 (E.D.N.Y. Jan. 6, 2021); *Pri-har*, 83 F. Supp. at 394; *United States*

5

**SPA6**

*v. Agunbiade*, No. 90-CR-610(S)-02 (JRB), 1995 WL 351058, at *1 (E.D.N.Y. May 10, 1995).[4]

## III. LEGAL ANALYSIS

The court will now assess the Defendant's various arguments for recusal in turn. None of the cited-to examples of supposed bias reach the standards set forth by 28 U.S.C. §§ 455(a) or 455(b)(1).

### A. Trial conduct

First, the Defendant argues that "the Court's comments and personal opinions expressed about Mr. Raniere, his Defense team, and his co-defendants, displayed a deep-seated, unequivocal hostility and personal bias against Mr. Raniere and his Defense team, making disqualification for all future proceedings, in this case, warranted and, indeed, mandatory." (Mot. at 21.)

With regard to the allegedly biased conduct during Ms. Salzman's testimony at trial, the Defendant exhibits a foundational misunderstanding of what constitutes personal, extra-judicial bias, rather than honestly held viewpoints gained throughout presiding over a trial. Here, there is no indication whatsoever that this

---

[4] In addition to filing a motion for a new trial pursuant to Rule 33, Defendant Raniere took the unusual step of filing a petition for a writ of mandamus at the Court of Appeals prior to decision on the Rule 33 motion. While such a step is typically not taken until *after* the district court decides the underlying recusal motion, the court is aware of two other cases in which parties attempted to do so prior to a district court ruling on the recusal. *Qualls v. United States*, No. 07-CR-14 (DLI), 2018 WL 1513625, at *1 (E.D.N.Y. Mar. 27, 2018); *Buhannic v. TradingScreen Inc.*, No. 19-CIV-10650 (ER), 2020 WL 4058949, at *4 (S.D.N.Y. July 20, 2020). In both instances, the appellate court denied the petition for a writ of mandamus, and the district court proceeded to evaluate the recusal motions under the same legal standards it would have used had no writ of mandamus been sought. *Qualls*, 2018 WL 1513625, at *1; *Buhannic*, 2020 WL 4058949, at *4.

court harbored any animosity or "personal bias" toward Defendant Raniere prior to the trial, during which many unsavory facts about Mr. Raniere were proven beyond a reasonable doubt.

The Defendant also fails to recognize the wide discretion granted to judges in the administration of a trial. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky*, 510 U.S. at 556; *see also Farr v. Greiner*, No. 01-CV-6921 (NG), 2007 WL 1094160, at *15 (E.D.N.Y. Apr. 10, 2007) (quoting *Gilliam v. Foster*, 75 F.3d 881, 900 (4th Cir.1996)) ("Generally, a trial judge possesses wide latitude to maintain control over the courtroom to ensure the integrity of the proceedings."). In particular, "[t]rial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Cordero v. Rivera*, 677 F. Supp. 2d 684, 699 (S.D.N.Y. 2009) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Here, the court's choice to curtail cross-examination of a witness to avoid needless harassment and attend to the witness's wellbeing was well within the bounds of a trial judge's discretion. The court's behavior in furtherance of this legitimate goal, therefore, did not meet the extremely high standard for bias stemming from a judicial source—that of evincing "deep-seated . . . antagonism."[5] *Liteky*, 510 U.S. at 555. Thus, the court is not required to recuse itself under 455(b)(1)'s actual bias rule.

The standard under 455(a) is one of whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done

---

[5] Moreover, the comparison to a World War-I era case in which a federal judge exhibited blatant xenophobia is an analogy that is, at best, inapt.

absent recusal." *Carlton*, 534 F.3d at 100. Even if the court's comments at time evinced not just frustration and impatience, but some sort of distaste for the defendant, no reasonable observer would, after witnessing the trial over which the court was then presiding, earnestly believe that the distaste was the result of some sort of extrajudicial bias or deep-seated antagonism. This threshold has therefore also not been met.[6]

### B. Restitution Hearing Conduct

Second, the Defendant asserts that "Judge Garaufis displayed an unacceptable bias toward Mr. Raniere's Defense team by letting his frustration with the Defense's request for a delay" of the Restitution Hearing interfere with his duty to preside over the trial impartially. (Mot. at 24.) Here too, there is no evidence that the court harbored any bias with an extra-judicial source against Mr. Raniere. The restitution hearing in question happened *after* the trial took place. Moreover, any conduct evincing bias was allegedly aimed toward an attorney hired by Defendant Raniere after the conclusion of trial, and there is no evidence that any disagreement between the court and that counsel reflected a broader issue between the court and the defendant. Thus, the court exhibited no bias stemming from *either* an extrajudicial or judicial source toward the Defendant at this time, let alone the "deep seated . . . antagonism" required to mandate recusal under 28 U.S.C. 455(a). *Liteky*, 510 U.S. at 555. Finally, the fact that the allegedly biased conduct was directed only toward one of a series of lawyers representing the defendant, and never toward the defendant himself, weighs strongly against any finding that the

---

[6] The Defendant also raises the question of whether less extreme measures would have been possible. It is altogether possible that less extreme measures were available. However, that is not the standard to which this court must be held in considering a recusal motion.

district court "harbors actual prejudice or bias against a defendant," *Osinowo*, 100 F.3d at 2. This incident therefore also does not require recusal under 28 U.S.C. 455(b)(1).

### C.  Sentencing Hearing Conduct

Third and finally, the Defendant argues that this court's choice to "tripl[e] the sentence of Ms. Bronfman, a first-time offender, because she refused to 'renounce' Mr. Raniere and the NXIVM organization," presents further evidence of this court's bias toward Defendant Raniere. (Mot. at 26.)

In determining the appropriate sentence for Defendant Bronfman, the court considered the required sentencing factors. 18 U.S.C. § 3553(a). These factors include the need for a sentence that reflects the seriousness of the offense, the need for a sentence that promotes respect for the law, and the goal of providing a just punishment. (*See* Bronfman Sent. Tr. at ECF 121); *see also* 18 U.S.C. § 3553(a)(2)(A). The court made no findings as to whether Defendant Bronfman had any real time knowledge of the extent of Defendant Raniere's criminal behavior. As part of its analysis of the sentencing factors, however, the court did take into consideration Defendant Bronfman's continued support for Defendant Raniere *after* learning the full extent of his criminal conduct. (*See* Bronfman Sent. Tr. at ECF 123 ("It does, however, concern me that she continues to stand by Raniere and believe in his work, even as he stands convicted of heinous conduct."); *see also* Mandate of USCA as to 20-5320-cr (Dkt. 118) ("Summary Order") at ECF 38 ("a full reading of the District Court's lengthy statement (which covers thirty pages of the transcript) shows that it was primarily concerned with Bronfman's actions *after* she found out about DOS in June 2017, including gher reinvigorated support of Raniere").) In doing so, the court displayed fidelity to its obligation to carefully weigh the sentencing factors and other relevant information, and therefore displayed no bias—extra-judicial or otherwise.

The court carefully articulated the ways in which Defendant Bronfman's actions in devotion to Defendant Raniere without regard to the seriousness of his crimes had reflected a sincere lack of respect of the law. The court also endeavored to consider how the sentence compared to sentences of other similarly situated defendants. But, as the court took great pains to describe, the circumstances of Ms. Bronfman's offenses, and in particular the relationship between her and Mr. Raniere, provided important context when considering the seriousness of her offenses, and set her conduct far apart from other otherwise similarly situated defendants. (Bronfman Sent. Tr. at ECF 124 ("[T]he context of Ms. Bronfman's criminal conduct places her in [an] all together different category from other defendants convicted of the same offenses; and, therefore, her circumstances defy easy comparison.").) Indeed, the court made clear that "the offenses of conviction . . . were more serious here than those crimes might ordinarily be under other circumstances." (Bronfman Sent. Tr. at ECF 121.) The Second Circuit, affirming this court in full, agreed wholeheartedly with this assessment, pointing out that her "conduct—before and after her indictment—readily distinguishe[d] her" from her co-defendants, and reiterating this court's assertion that the context for her criminal conduct set her far apart from other defendants convicted of the same offenses. (Summary Order at ECF 38.) In sentencing Ms. Bronfman accordingly, the court appropriately exercised its wide discretion in matters of sentencing. (*See id.*) ("[T]he District Court acted well within its discretion in arriving at its conclusion.")

To have considered Ms. Bronfman's relationship with Mr. Raniere in the process of doing so does not indicate impermissible bias—either of the objective sort required for recusal under 455(a) or of the actual sort required for recusal under 455(b)(1). 28 U.S.C. § 455(a)-(b)(1). Indeed, "[t]he Second Circuit has repeatedly held that a sentencing court is entitled to rely on

information gleaned from a trial in which the person to be sentenced was neither a defendant nor represented by counsel." (Bronfman Sent. Tr. at ECF 100.) To the extent the court properly gleaned such information about that relationship from the lengthy trial and the surrounding proceedings, and weighed that evidence at sentencing, it was proper to do so.

## IV. CONCLUSION

For the foregoing reasons, Defendant Raniere's motion seeking for this court to recuse itself prior to consideration of Rule 33 motions in this action is DENIED.

SO ORDERED.

Dated:     Brooklyn, New York
           April 2̲6̲, 2023

                                        s/Nicholas G. Garaufis

                                        NICHOLAS G. GARAUFIS
                                        United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                        -against-

KEITH RANIERE,

                        Defendant.

**MEMORANDUM & ORDER**
**18-CR-204 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are two motions filed by Defendant Keith Raniere: (1) his motion for reconsideration of the court's November 6, 2023, Memorandum and Order denying his motion to compel production of evidence, (*see* Mot. for Recons. (Dkt. 1225)), and (2) a separate motion to compel production of evidence. (*See* Post-Conviction Mot. to Compel dated December 21, 2023 ("Second MTC") (Dkt. 1230).) For the reasons set forth below, both motions are DENIED.

The court further sets April 22, 2024, as the final deadline for Defendant's submission of his Reply in support of his pending Rule 33 motion.

## I.  BACKGROUND

The court assumes familiarity with the background of this case. In brief, Mr. Raniere was convicted on June 19, 2019 on seven counts, including racketeering, racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Jury Verdict (Dkt. 735).) On October 27, 2020, he was then sentenced to 120 years in the custody of the Federal Bureau of Prisons. (*See* October 27, 2020 Minute Entry (Dkt. 968).) Since his conviction, Mr. Raniere has filed three motions for a new trial pursuant to Fed. R. Crim.

P. 33. (*See, e.g.*, First Rule 33 Mot. (Dkt. 851); Second Rule 33 Mot. (Dkt. 956); Third Rule 33 Mot. (Dkts. 1169, 1176).) The court denied the first two of the these. (Mem. and Order dated July 17, 2020 (Dkt. 902) (denying first Rule 33 motion); Mem. and Order dated October 23, 2020 (Dkt. 963) (denying second Rule 33 motion).) His third remains pending.

Since filing his latest Rule 33 motion, Mr. Raniere has made two requests to the court to compel the Government to produce information relating to his child exploitation and child pornography predicate acts. (*See* Post-Conviction Mot. to Compel dated April 14, 2023 ("First MTC"); Second MTC.) On November 6, 2023, this court denied Mr. Raniere's first motion to compel the production of evidence. (*See* Mem. and Order dated November 6, 2023 (Dkt. 1224) (denying First MTC).) Mr. Raniere then moved for reconsideration of this denial two weeks later. (Mot. for Recons; *see also* Opp. to Mot. for Recons. (Dkt. 1229).) He then filed his second, separate request for the court to compel production of evidence on December 21, 2023. (Second MTC; *see also* Opp. to Second MTC (Dkt. 1231); Reply (Dkt. 1233); Supp. Reply (Dkt. 1235).)

The court considers the motion for reconsideration and the latest motion to compel in turn.

## II.  MOTION FOR RECONSIDERATION

The standard courts apply when considering motions for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking

a second bite at the apple[.]" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012). Courts in this Circuit have thus generally held that parties seeking reconsideration may not advance new facts not previously presented to the Court. *See In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014) (noting that a "party seeking reconsideration" may not "advance new facts, issues, or arguments not previously presented to the Court.") (quoting *Schonberger v. Serchuk*, 742 F. Supp. 108, 119 (S.D.N.Y. 1990)); *United States v. Morillo-Vidal*, No. 10-CR-222 (RWS), 2011 WL 4072173, at *2 (S.D.N.Y. Sept. 13, 2011); *see also* Local Civil Rule 6.3 ("No affidavits shall be filed by any party unless directed by the Court.")

Mr. Raniere does not cite to any controlling law that the court overlooked. (*See generally* Mot. for Recons.) He asserts that the court overlooked two items that Defendant argues are "critical"—(1) that it was fundamentally unfair for the court to consider the Loveall Declaration and (2) that the Loveall Declaration was incorrect. (Mot. for Recons. at 1-2; *see also* Loveall Decl. (Dkt. 1213-3).) But neither of these arguments were overlooked or alter the conclusion reached by the court. The court, in denying the motion to compel evidence, found that Mr. Raniere did not have "(1) *Brady* rights to this information; (2) post-conviction due process rights to this information; and (3) the right to this information under principles of 'elemental fairness.'" (Mem. and Order dated November 6, 2023 at 5.) The Loveall Report was considered by the court in the latter "elemental fairness" analysis alongside the "ample evidence at trial" when finding that "even assuming" a standard premised on "elemental fairness" applied, Mr. Raniere could not meet this standard. (*Id.* at 8-10.) Specifically, the court found that:

> Mr. Loveall's report, refuting Kiper's key findings, offers a far more plausible and convincing explanation of any anomalies

in the photos' metadata. Mr. Loveall's report is further supported by the ample evidence presented at trial and Camila's declaration that she is certain of the circumstances and timing of the photos. In sum, the evidence presented at trial, the Government's expert report, and Camila's declaration substantially outweigh the arguments raised in the Report and Mr. Raniere's motion. Mr. Raniere therefore does not raise a reasonable probability that testing the evidence would demonstrate he did not commit the offense. (*Id.* at 10.)

Mr. Raniere's arguments in the present motion questioning the veracity of the report are better characterized as attempts to relitigate old issues. *See Analytical Surveys, Inc.*, 684 F.3d at 52. The court therefore DENIES Defendant's motion for reconsideration.

## III. SECOND POST-CONVICTION MOTION TO COMPEL

This Second MTC has much in common with the first. Mr. Raniere again requests information that he argues will demonstrate that the Government fabricated evidence relating to his conviction of racketeering acts of child pornography and child exploitation. (*See generally* Second MTC.)[1] And he again argues that withholding this information violates his due process rights and principles of "elemental fairness." (*Id.* at 9-12.)

The court thus incorporates its discussion concerning the relevant standards to Mr. Raniere's request to compel production of

---

[1] In his First MTC, "Mr. Raniere request[ed] (1) two forensic copies of the camera card and corresponding FTK log files; (2) a file listing of the Hard drive that contained the images of child pornography (the "Western Digital hard drive"); and (3) CART examination notes." (Memorandum and Order dated November 6, 2023 at 3 n.1.) In his Second MTC, Mr. Raniere requests: "all information pertaining to the unknown photograph technician who, prior to trial, and without authorization, changed and forensically manipulated an unpreserved, essential piece of evidence -- the camera card." (Second MTC at 1; *see also* Second MTC, Ex. A (Requested Information Relating to the Photograph Technician) (Dkt. 1230-1).)

4

evidence from its November 6, 2023 order. (*See* Mem. & Order dated November 6, 2023 at 5-11.) In considering Defendant's present request under these standards, the court finds that Mr. Raniere does not have post-conviction due process right to the requested information and DENIES his motion.

Mr. Raniere again does not cite any law showing he has a right to the information requested. He primarily relies on *U.S. v. Abuhamra* 389 F.3d 309, 322. (2d Cir. 2004), for the contention that the Government must hand over this information. (*See* Second MTC at 9-10). In *Abuhamra*, the Second Circuit found that the respondent's right to a fair hearing was violated when the district court relied on information presented *ex parte* and *in camera* when denying respondent's bail application. *Id.* at 332-33. *Abuhamra* is thus inapplicable to this case where the court did not rely on arguments presented *ex parte* or *in camera* and does not concern access to information relevant to a party's bail application. This motion instead concerns a request for information relevant to Mr. Raniere's post-conviction motion for a new trial. His rights to this information therefore "must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009).

And Mr. Raniere again does not demonstrate that "elemental fairness" should lead the court to compel the Government to grant him access to this information. Mr. Raniere's counsel had an opportunity to review and test the veracity of the photographic evidence prior to trial. (*See* Mem. and Order dated November 6, 2023 at 10-11.) The evidence requested would thus not support his Rule 33 motion because he cannot show that "'the evidence could not with due diligence have been discovered before or during trial.'" (*Id.* (quoting *United States v. Forbes*, 790 F.3d 403, 408-09 (2d Cir. 2015)). And Mr. Raniere is unable to

show that the evidence raises a reasonable probability as to his innocence in light of the substantial evidence supporting the relevant charges in addition to the photos, including:

> messages from [the victim] where she referenced her sexual relationship with Raniere beginning in 2005 when she was fifteen years old; communications from Mr. Raniere referencing the photos; testimony from [the victim's] sister that she was aware of the relationship prior to Fall 2006; a folder containing nude pictures of the other women with whom Mr. Raniere had a sexual relationship and in which the pictures of [the victim] were found; testimony that Mr. Raniere sought to take similar pictures of other women; [the victim's] medical records, which included statements indicating she was in a sexual relationship with the same partner since she was underage; and testimony from [the victim's] sister identifying her as the person in a sanitized version of the photos. (Id. at 2.)

The Government provided additional information rebutting the claims of fabrication including: a declaration from the victim verifying the photos and the Loveall report discussed above. (*Id.* at 4, 9-10.) Considered together, Mr. Raniere is unable to demonstrate a reasonable probability that he did not commit the offense.

The court therefore finds that "Mr. Raniere provides no legal support for his request, and even if applying his desired standard of 'fundamental fairness,' Mr. Raniere fails to show that access to this evidence violates fundamental fairness." (*Id.* at 11.)

## IV. RULE 33 MOTION

Mr. Raniere was convicted in June 2019 and his third Rule 33 motion for a new trial has been outstanding since May 2022. (*See* Third Rule 33 Mot.) The court has not ruled on this motion primarily due to his filing of separate motions that the court

## SPA18

considered and decided. (*See e.g.,* Not. of Mot. for Recusal (Dkt. 1170); First MTC; Second MTC.) The court also granted multiple requests to extend the deadline for Mr. Raniere to file a reply in support of his third Rule 33 motion due to logistical challenges presented by Mr. Raniere's incarceration. (*See* Def. Mots. for Extension of Time to Reply (Dkts. 1217, 1220, 1221, 1222, 1226).)

This court granted the most recent extension of time to file a reply on November 28, 2023, at which time the court noted that it would update the deadline for the Reply when ruling on Mr. Raniere's motion for reconsideration. (See Min. Entry dated November 28, 2023.) The court now sets the deadline for April 22, 2024, approximately 45 days following the release of this order. The court will not grant an additional request for an extension beyond this date. Mr. Raniere has had ample time to consider and respond to the Government's response to Mr. Raniere's third Rule 33 motion and now has an additional 45 days to do so. Any potential prejudice in not granting an additional extension is outweighed by an interest in the finality of his conviction.

SPA19

### V.   CONCLUSION

For the reasons discussed herein, the court DENIES Mr. Raniere's motion for reconsideration and second post-conviction motion to compel. The court further sets a final deadline of April 22, 2024, for Mr. Raniere to file his reply in support of his pending third Rule 33 motion for a new trial.

SO ORDERED.

Dated:     Brooklyn, New York
           March 6, 2024

                                        s/Nicholas G. Garaufis
                                        _____
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    -against-

KEITH RANIERE,

                                  Defendant.

**MEMORANDUM & ORDER**
**18-CR-204 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

On June 19, 2019, Defendant Keith Raniere was convicted of racketeering, racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Jury Verdict (Dkt. 735); Judgment (Dkt. 969) at 1-2.) Now before the court is Mr. Raniere's third motion for a new trial premised on what he argues is newly discovered evidence relating to two of the eleven predicate acts supporting his racketeering conviction. (*See* Not. of Mot. (Dkt. 1168); Mem. of Law in Support of Mot. for Rule 33 Relief ("Mot.") (Dkt. 1169); Suppl. to Mot. (Dkt. 1176); *see also* Mem. and Order dated July 17, 2020 (Dkt. 902) ("First Rule 33 M&O") (denying Defendant's first Rule 33 motion); Mem. and Order dated October 23, 2020 (Dkt. 963) ("Second Rule 33 M&O") (denying Defendant's second Rule 33 motion).)[1]

---

[1] In addition to this third Rule 33 motion, Mr. Raniere filed a *pro se* fourth new trial motion on June 21, 2022. (*See* Pro Se Mot. (Dkt. 1178).) This motion raises the same issues previously considered by this court when denying Mr. Raniere's first two motions for a new trial relating to allegations of Government intimidation or perjury by key witnesses, which this court has previously rejected as bases to grant a new trial, as well as issues raised in the present motion which the court considers herein. Mr. Raniere's *pro se* motion is therefore also DENIED. (*See generally* First Rule 33

SPA21

For the reasons discussed herein, Mr. Raniere's motion for a new trial is DENIED.[2]

## I.   BACKGROUND

The court assumes familiarity with this case's background, which the court reviews only as relevant to the present motion.[3]

As the leader of NXIVM, Mr. Raniere engaged in criminal activities that led a jury to find him guilty of racketeering, racketeering conspiracy, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Judgment at 1-2; *see also* Sentencing Mem. (Dkt. 966) at 9-18 (describing underlying criminal activity).) Mr. Raniere's racketeering charge was predicated on eleven acts, including child exploitation and possession of child pornography. (*See* Jury Verdict at 2-3.) The jury found that the Government proved each of these eleven predicate acts beyond a reasonable doubt. (*Id.*)

The child pornography and child exploitation predicate acts are the focus of this motion. These acts were added in the second superseding indictment returned by the grand jury in March 2019. (*See* Second Superseding Indictment (Dkt. 430) ¶¶ 21-23;

---

M&O (discussing purported perjury); Second Rule 33 M&O (discussing purported Government intimidation).)

[2] On April 19, 2024, Mr. Raniere filed a habeas petition which discusses some of the same underlying facts reviewed in his Rule 33 motion, but in the context of constitutional ineffective assistance of counsel claims. (*See* Habeas Petition (Dkt. 1252) at 27-42.) Because the habeas petition considers separate claims, the court finds that it is proper to consider the outstanding Rule 33 motion and the habeas petition separately. This order thus RESERVES DECISION on the outstanding habeas petition pending additional briefing from the parties.

[3] Much of the underlying facts relevant to this motion were recently reviewed when denying Mr. Raniere's request to compel evidence. (*See* Mem. and Order dated Nov. 6, 2023 (Dkt. 1224) at 1-3.)

SPA22

*see also, generally,* Superseding Indictment (Dkt. 50).) Specifically, they were added after the Government discovered pornographic images depicting a minor in February 2019, while reviewing a previously seized hard drive (the "Western Digital hard drive"). (Gov Mem. of Law in Opposition to Rule 33 Mot. ("Opp.") (Dkt. 1213) at 4-5; *see also* Letter from Government dated February 21, 2019 (Dkt. 362) (noting discovery of child pornography images on the Western Digital hard drive).) The defense moved to dismiss or sever the newly added predicate acts (Defense Letter dated March 17, 2019 (Dkt. 436)), which this court denied. (Mem. and Order dated April 29, 2019 (Dkt. 600) at 31-32.)

The defense initially raised concerns about their ability to analyze the evidence relating to the newly added predicate acts prior to the start of the trial, which was then scheduled for April 29, 2019. (*See, e.g.*, Defense Letter dated March 17, 2019 at 2; March 18, 2019 Status Conference Tr. (Dkt. 467) at 20:11-24 (noting that jury selection was to begin on April 8, 2019, with the trial to begin on April 29, 2019).) However, in a filing dated March 22, 2019, Mr. Raniere represented that he was ready for trial "even though the government has superseded the indictment" and he "request[ed] that the Court keep the dates for the current trial schedule." (Defense Mem. dated March 22, 2019 (Dkt. 456-1) at 2-4.) Given the conflicting statements from Mr. Raniere's defense team, the Government sought to ensure that he was ready to proceed, after noting numerous times that it would consent to the trial's adjournment if necessary to allow his defense team time to conduct a forensic examination of the photographs and the photographs' metadata. (*See, e.g.*, Gov. Mem. of Law dated March 29, 2019 (Dkt. 485) at 6-10.)

The issue of a potential delay in the trial was then discussed at a status conference held on April 4, 2019, where the Government raised the defense's prior statements that Raniere may not be

ready for trial following the recent filing of the Second Superseding Indictment. (April 4, 2019 Status Conference Tr. (Dkt. 510) at 11:14-17.) The court therefore asked Mr. Raniere's defense counsel whether they could make an "affirmative statement that based on what's in the second superseding indictment . . . that [Mr. Raniere] will still be ready to go to trial." (*Id.* at 14:20-25.) Mr. Raniere's counsel responded saying that he will "be ready to go to trial." (*Id.* at 15:1-5.) Mr. Raniere's counsel also noted that the Government had been "very responsive" and accommodating in allowing the defense's forensic expert to visit the FBI to examine the relevant evidence. (*Id.* at 12:10-13:2, 15:1-5.) The trial then began on May 7, 2019. (*See* Dkt. 631.)

At trial, the Government introduced the photographs of the victim and metadata to prove the child pornography and child exploitation predicate acts. (Opp. at 19.) Further evidence proving that the pictures were from 2005 when the victim was fifteen years old included messages from the victim where she referenced her sexual relationship with Raniere beginning in 2005; communications from Mr. Raniere referencing the photos; testimony from the victim's sister that she was aware of the relationship prior to Fall 2006; a folder containing nude pictures of the other women with whom Mr. Raniere had a sexual relationship and in which the pictures of the victim were found; testimony that Mr. Raniere sought to take similar pictures of other women; the victim's medical records, which included statements indicating she was in a sexual relationship with the same partner since she was underage; and testimony from the victim's sister identifying the victim as the person in a sanitized version of the photos. (*Id.* at 19-20 (citing trial exhibits and the trial transcript).)

Mr. Raniere's counsel cross-examined FBI Senior Forensic Examiner Booth extensively about the photographic evidence, the

4

Western Digital hard drive, the camera card ("CF card"), the related metadata, and the chain of custody of the digital evidence. (June 13, 2019 Trial Tr. (Dkt. 979) at 4898:1-4947:4, 4962:8-4975:4, 4986:19-4988:21.) During his testimony, Booth acknowledged before the jury that the metadata was not reliable as to when the photos were taken (*id.* at 4940:13-15), that metadata could be changed or altered (*id.* at 4987:21-4988:12), and that he was unaware of who accessed the camera card on September 19, 2018 while it was in the FBI's possession. (*Id.* at 4973:19-25.)

The victim depicted in these photographs did not testify at trial, but she submitted a sworn declaration in response to this motion. (*See* Camila Decl. (Dkt. 1213-1).) In the declaration, the victim affirms that she reviewed each of the photographs at issue and that she is certain both that she is the subject of each photo and that she was 15 years old when the photos were taken. (*Id.* ¶¶ 5, 8.) She also affirms that Mr. Raniere began sexually abusing her in 2005, when she was 15 years old. (Camila Decl. ¶ 5; *see also* Camila Impact Statement (Dkt. 965-1) at 1.)

Following his conviction in June 2019, Mr. Raniere has filed multiple motions for a new trial pursuant to Fed. R. Crim. P. 33. (*See* Mot.; First Rule 33 M&O; Second Rule 33 M&O.) His first two were denied in July and October 2020. (First Rule 33 M&O; Second Rule 33 M&O.) The present motion was filed in May 2022. (*See* Mot.) The Government responded to this motion in July 2023 and Mr. Raniere filed his Reply on April 17, 2024.[4]

---

[4] The delay in briefing of the present motion largely resulted from stays while the court considered separate motions filed by the Defendant or his appeals of separate motions. The court also granted numerous requests by the defense for extension of time to submit Mr. Raniere's Reply. (*See* Mem. and Order dated March 6, 2024 (Dkt. 1238) at 6-7 (reviewing the delay in briefing the present motion).)

## II. LEGAL STANDARD

Rule 33 endows district courts with the authority to order a new trial "if the interest of justice so requires." Fed. R. Crim. Pro. 33. District court have "broad discretion to grant a new trial," but should grant such motions "sparingly and in the most extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." *United States v. Gramins,* 939 F.3d 429, 444 (2d Cir. 2019).[5] In considering Rule 33 motions, the focus is "whether letting a guilty verdict stand would be a *manifest injustice.*" *Id.*

Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that "(1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes,* 790 F.3d 403, 406-07 (2d Cir. 2015). The Second Circuit has "long held that to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence could not with due diligence have been discovered before or during trial." *Id.* at 408-09. The court in conducting this analysis considers the balance between "protecting the finality of judgments and the interests of justice [] inherent in the Rule 33 analysis." *Id.* at 408.

## III. DISCUSSION

Mr. Raniere fails to demonstrate that justice requires a new trial, and the court therefore denies his motion.

---

[5] When quoting case law, except as otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

The basis for the Defendant's motion are allegations that the Government manipulated and fabricated "all the key evidence" used to prove the child pornography and child exploitation predicate acts. (Mot. at 3.) In his Reply, Mr. Raniere clarifies that he does not allege that the photos themselves were falsified, but instead only that the "files, timestamps, folders and metadata" associated with the pictures were fabricated. (Reply (Dkt. 1253) at 16-17.) This purported clarification is surprising because in the very first sentence of Mr. Raniere's memorandum in support of the present motion filed in May 2022, he states that "the government manufactured child pornography and planted it on a computer hard drive to tie it to him." (Mot. at 3.) And subsequent filings did not contradict this statement but instead reinforced it through broad statements such as: "the child pornography evidence was fabricated." (First Post-Conviction Mot. to Compel (Dkt. 1192) at 3-4.) His Reply therefore directly contradicts his prior representations about the photographic evidence at issue. Nevertheless, in light of his Reply's purported clarification, the court considers the digital evidence's "files, timestamps, folders, and metadata." (Reply at 17.)

The Defendant argues that the FBI falsified metadata on the digital camera card ("CF card") and Western Digital hard drive to fit the Government's narrative that the photographs were taken in 2005 when the victim was fifteen years old. (*See, e.g.,* Mot. at 12-13.) He further alleges that he did not have time to thoroughly examine the metadata evidence (Reply at 2), and that the Government covered up this manipulation by soliciting false testimony during trial. (Mot. at 19-20.)

These allegations of data manipulation do not constitute newly discovered evidence under Rule 33, which requires the defendant to show that "the evidence was discovered after trial . . .[and]

that the evidence could not with due diligence have been discovered before or during trial." *Forbes*, 790 F.3d at 409. They are also contrary to the record.

In the leadup to trial and during trial, Mr. Raniere was made aware of the metadata evidence soon after the Government discovered the photographs on the Western Digital hard drive. (*See* Letter from Government dated February 21, 2019.) His defense then had an opportunity to test and challenge this evidence prior to trial, including by hiring a forensic expert who visited the FBI to review this evidence. His defense then had an opportunity to cross-examine the FBI Agent called by the Government to discuss the photos and their metadata. In this cross-examination, the Agent testified to the metadata and its ability to be altered. (June 13, 2019 Trial Tr. at 4987:21-4988:20.) The jury considered this evidence alongside other evidence presented at trial and convicted Mr. Raniere of these charges.

Raniere argues that even if his defense team was aware of the evidence, a new trial is warranted because there was not sufficient time for his experts to analyze the metadata. (Reply at 10.) But this post-trial argument is in conflict with Mr. Raniere's trial counsel clearly stating multiple times after the photographs were discovered and the new charges were added to his Second Superseding Indictment that he was ready for trial. (*Cf.* April 4, 2019 Status Conference Tr. at 15:1-5; Defense Mem. dated March 22, 2019 at 2-4.) The Government offered to adjourn the trial date on consent specifically to allow the defense to have more time to examine the evidence connected to his child pornography and exploitation charges, which he rejected. (*See* Gov. Mem. of Law dated March 29, 2019 at 6-10; April 4, 2019 Status Conference Tr. at 15:1-5.)

Mr. Raniere ultimately seeks to have a new trial to challenge evidence that he previously stated he was ready to challenge, that

he had the opportunity to challenge, and that he did in fact challenge during his trial. The jury found him guilty of the predicate acts at issue so he now attempts to manufacture "new evidence" he argues would lead to his acquittal to receive a second bite at the apple. These are not extraordinary circumstances where a new trial is necessary to prevent a manifest injustice.

Mr. Raniere separately argues that it was "impossible" to discover certain evidence relating to the metadata, specifically, the camera card and details of the chain of custody of the metadata. (Reply at 9-10.) In doing so, he seeks to distinguish the metadata evidence his defense indisputably had the opportunity to review and challenge—*i.e.*, the evidence found on the Western Digital hard drive—from other evidence connected to the metadata. (*Id.*) His argument is that if given the opportunity to examine this other source of the metadata, it would reveal the "tampering" on which his motion relies. (*Id.*) This argument fails. Mr. Raniere seeks to circumvent his defense's ability to inspect and challenge the photographs' metadata by distinguishing the evidence his defense reviewed from other pieces of evidence such as the CF card—which, to be clear, his defense was also aware of during trial (*see, e.g.*, June 13, 2019 Trial Tr. 4901:1-25, 4902:11-25, 4906:10-4907:4)—to argue that the evidence now in focus is both "newly discovered" and the "key evidence" that would prove his innocence. But the Defendant provides no persuasive argument that he could not have discovered this evidence with diligence, *see Forbes*, 790 F.3d at 409, or that the evidence now in focus demonstrates manipulation or falsification of metadata that would support an acquittal. Ultimately, as with his prior unsuccessful motion for a new trial, Mr. Raniere "does not point to a single case in which a court has recognized the kind of evidence he cites as the basis for his motion as 'newly discovered evidence' under Rule 33." (Second Rule 33 M&O at 7.)

The motion also fails because Mr. Raniere cannot demonstrate that the purported newly discovered evidence would result in acquittal or otherwise demonstrate that a new trial is necessary to prevent a manifest injustice. *Forbes*, 790 F.3d at 411. Mr. Raniere's primary support for his argument that the metadata was falsified are proffered expert reports submitted alongside his motion. (Reply at 3-4; *see also* Kiper Report (Dkt. 1169-1) at ECF 195-264); *see also* Dkt. 1178-2.) In response to these reports, the Government submitted a Declaration by David Loveall II, a Senior Computer Scientist with the FBI. (Loveall Decl. (Dkt. 1213-3).) This court previously considered the Defendant's and Government's reports when denying Mr. Raniere's motions to compel evidence. (*See* Mem. and Order dated Nov. 6, 2023 (Dkt. 1224) at 3-4, 9-10; Mem. and Order dated March 6, 2024 (Dkt. 1238) at 3-4.) In doing so, the court found that the Loveall Declaration "offers a far more plausible and convincing explanation of any anomalies in the photos' metadata" than the reports submitted by the Defendant, especially when considered alongside the "ample evidence presented at trial," *see supra,* and the victim's affidavit affirming that she was fifteen in the photographs. (Mem. and Order dated Nov. 6, 2023 at 9-10; Mem. and Order dated March 6, 2024 at 3-4.).) Mr. Raniere disagrees with the court's prior findings in his Reply. (Reply at 18-21.) But he provides no reason for the court to reconsider its prior determination that the evidence presented at trial, the Loveall report, and the affidavit submitted by the victim verifying her identity and age in the photos provide a far more plausible explanation for the discrepancy in the metadata than the Defendant. The court is confident that the evidence demonstrates Mr. Raniere's guilt as to these charges.

In sum, the court finds that the evidence is not newly discovered under Rule 33 and that, even if it was considered newly discovered, it would not "likely result in an acquittal." *Forbes*, 790 F.3d at 407. Justice does not require a new trial and the court denies

SPA30

Mr. Raniere's Rule 33 motion.[6] *See United States v. Snyder*, 740 F. App'x 727, 728 (2d Cir. 2018) (summary order) ("A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.").

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for a New Trial is DENIED and his request for an evidentiary hearing is DENIED as moot.

SO ORDERED.

Dated:     Brooklyn, New York
           April 2, 2024

                              s/Nicholas G. Garaufis
                              NICHOLAS G. GARAUFIS
                              United States District Judge

---

[6] The court further finds that an evidentiary hearing is not necessary to decide the present motion. *See United States v. Ghavami*, 23 F. Supp. 3d 148, 157 (S.D.N.Y. 2014) ("Whether to hold an evidentiary hearing before deciding a motion for a new trial rests within the district court's discretion."); *see also United States v. Helmsley*, 985 F.2d 1202, 1209-10 (2d Cir. 1993) (district court may properly decline to hold hearing where "the moving papers themselves disclosed the inadequacies of the defendant['s] case").