# 24-778(L)

## 24-1285(CON)
## 24-1317(CON)

*To Be Argued By:*
TANYA HAJJAR

# United States Court of Appeals
### For the Second Circuit

❖

UNITED STATES OF AMERICA,

*Appellee,*

– against –

ALLISON MACK, CLARE BRONFMAN, KATHY RUSSELL, LAUREN SALZMAN,
NANCY SALZMAN, also known as PERFECT,

*Defendants,*

KEITH RANIERE, also known as VANGUARD,

*Defendant-Appellant.*

——————————

**On Appeal From the United States District Court
for the Eastern District of New York**

---

## BRIEF AND APPENDIX FOR THE UNITED STATES

---

JOHN J. DURHAM,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

ANTHONY BAGNUOLA,
TANYA HAJJAR,
   *Assistant United States Attorneys,*
    *Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................iv

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ........................................................................ 4

    I.    Raniere's Trial Conviction ...................................................... 4

    II.   Relevant Pretrial Proceedings ................................................. 6

        A.    Search of the Hale Drive Residence and
             Initial Production of Electronic Discovery .................... 6

        B.    Discovery of Child Pornography on the
             Western Digital Hard Drive ......................................... 9

        C.    Raniere's Asserted Readiness for Trial ....................... 10

        D.    Disclosure of Trial Exhibits ......................................... 12

    III.   Presentation of Child Exploitation Evidence at
        Trial ...................................................................................... 14

    IV.   Sentencing ............................................................................ 20

    V.    Post-Trial Litigation ............................................................. 21

        A.    Prior Motions for a New Trial ..................................... 21

        B.    Raniere's Direct Appeal of his Conviction
             and Sentence ............................................................... 22

        C.    The Appealed-From Orders .......................................... 23

            1.    Motion for Recusal .............................................. 23

ii

2.   Third Motion for a New Trial and
Motion for Post-Conviction
Discovery ...................................................... 25

SUMMARY OF ARGUMENT ..................................................... 32

ARGUMENT .................................................................................. 34

POINT ONE - THE DISTRICT COURT DID NOT ABUSE
ITS DISCRETION IN DENYING RANIERE'S
MOTIONS FOR A NEW TRIAL AND
POST-CONVICTION DISCOVERY ............................... 34

I.    Standard of Review .............................................................. 34

II.   Applicable Law ...................................................................... 35

III.  The District Court Properly Denied Raniere's
Motions for a New Trial and Post-Conviction
Discovery ................................................................................ 37

A.   Raniere Identifies No Newly Discovered
Evidence ......................................................... 37

1.   Duplicate Forensic Image of the
Canon Camera Memory Card ............................. 40

2.   Access of the Canon Camera
Memory Card ...................................................... 45

3.   Expert Reports .................................................. 47

B.   Raniere Cannot Demonstrate That Any
Purported Newly Discovered Evidence
Would Result in Acquittal .......................... 53

C.   The District Court Properly Denied
Raniere's Motion for Post-Conviction
Discovery ..................................................... 59

iii

POINT TWO - THE DISTRICT COURT DID NOT ABUSE
          ITS DISCRETION IN DENYING RANIERE'S
          MOTION FOR RECUSAL..................................................62

     I.    Standard of Review ..............................................62

     II.   Applicable Law ..................................................62

     III.  The District Court Properly Denied Raniere's
           Motion for Recusal .............................................63

CONCLUSION .........................................................68

iv

## TABLE OF AUTHORITIES

Page

### CASES

*Apple v. Jewish Hosp. & Med. Ctr.*,
  829 F.2d 326 (2d Cir. 1987) ........................................................ 62, 63

*Brady v. Maryland*,
  373 U.S. 83 (1963) .................................................................... 28

*ISC Holding AG v. Nobel Biocare Fin. AG*,
  688 F.3d 98 (2d Cir. 2012) ......................................................... 62

*Kosovich v. Metro Homes, LLC*,
  405 F. App'x 540 (2d Cir. 2010) ................................................. 55 n.14

*Liteky v. United States*,
  510 U.S. 540 (1994) ........................................................... 63, 64, 66

*LoCascio v. United States*,
  473 F.3d 493 (2d Cir. 2007) ....................................................... 62

*Massaro v. United States*,
  No. 97-CV-2971 (MGC),
  1998 WL 241625 (S.D.N.Y. May 12, 1998) ................................... 48

*Pri-har v. United States*,
  83 F. Supp. 2d 393 (S.D.N.Y. 2000).............................................. 48

*Raniere v. United States*,
  143 S. Ct. 1756 (2023).................................................................. 2

*Strickler v. Greene*,
  527 U.S. 263 (1999) ................................................................... 41

*United States v. Bout*,
  144 F. Supp. 3d 477 (S.D.N.Y. 2015).......................................... 48

v

*United States v. Boyd,*
  131 F.3d 951 (11th Cir. 1997).................................................54

*United States v. Conte,*
  99 F.3d 60 (2d Cir. 1996) ......................................................63

*United States v. Coppa,*
  267 F.3d 132 (2d Cir. 2001) ..................................................39

*United States v. Eggleston,*
  823 F. App'x 340 (6th Cir. 2020) ...................................55 n.14

*United States v. Fares,*
  978 F.2d 52 (2d Cir. 1992) ....................................................36

*United States v. Ferguson,*
  246 F.3d 129 (2d Cir. 2001) ..................................................35

*United States v. Forbes,*
  790 F.3d 403 (2d Cir. 2015) .........................................36, 54

*United States v. Franzese,*
  525 F.2d 27 (2d Cir. 1975) ....................................................54

*United States v. Garcia,*
  948 F.3d 789 (7th Cir. 2020)......................................55, n.14

*United States v. Gershman,*
  31 F.4th 80 (2d Cir. 2022)......................................................60

*United States v. Helmsley,*
  985 F.2d 1202 (2d Cir. 1993) ................................................36

*United States v. McCourty,*
  562 F.3d 458 (2d Cir. 2009) ..................................................35

*United States v. Owen,*
  500 F.3d 83 (2d Cir. 2007) ....................................................36

*United States v. Payne,*
  63 F.3d 1200 (2d Cir. 1995) ..................................................41

vi

*United States v. Raniere,*
 55 F.4th 354 (2d Cir. 2022) ........................................... passim

*United States v. Raniere,*
 No. 20-3520,
 2022 WL 17544087 (2d Cir. Dec. 9, 2022) .................................. passim

*United States v. Rigas,*
 583 F.3d 108 (2d Cir. 2009) ................................................. 34

*United States v. Rowland,*
 826 F.3d 100 (2d Cir. 2016) ................................................. 34

*United States v. Sanchez,*
 969 F.2d 1409 (2d Cir. 1992) ................................... 35, 54, 57

*United States v. Sasso,*
 59 F.3d 341 (2d Cir. 1995) ................................................. 36

*United States v. Stewart,*
 433 F.3d 273 ................................................................. 34

*United States v. Sun Myung Moon,*
 718 F.2d 1210 (2d Cir. 1983) ............................................. 37

*United States v. Thompson,*
 76 F.3d 442 (2d Cir. 1996) ................................................. 63

*United States v. Zackson,*
 6 F.3d 911 (2d Cir. 1993) ............................................. 39, 46

## STATUTES

18 U.S.C. § 2251 ................................................... 13 n.5

18 U.S.C. § 2256 ................................................... 15 n.6

28 U.S.C. § 455 ....................................................... 62

vii

## <u>RULES</u>

Fed. R. Crim. P. 33 ........................................................... passim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 24-778(L), 24-1285(CON), 24-1317(CON)

───────────────

UNITED STATES OF AMERICA,

*Appellee*,

-against-

ALLISON MACK, CLARE BRONFMAN, KATHY RUSSELL, LAUREN
SALZMAN, NANCY SALZMAN, also known as PERFECT,

*Defendants*,

KEITH RANIERE, also known as VANGUARD,

*Defendant-Appellant*.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

## PRELIMINARY STATEMENT

Defendant-Appellant Keith Raniere appeals from: (1) an order
denying his motions for a new trial, entered April 29, 2024; (2) an order
denying his motion to reconsider the denial of his motion to compel post-
trial discovery, entered March 7, 2024; and (3) an order denying his

2

motion for recusal and judicial disqualification, entered on April 26, 2023, in the United States District Court for the Eastern District of New York (Garaufis, J.).

In May and June of 2019, after a six-week jury trial, Raniere was convicted of racketeering, racketeering conspiracy, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking, and attempted sex trafficking. The district court sentenced Raniere principally to 120 years' imprisonment. In a pair of rulings issued on December 9, 2022, this Court affirmed Raniere's conviction and sentence. *See United States v. Raniere*, 55 F.4th 354, 357 (2d Cir. 2022); *United States v. Raniere*, No. 20-3520, 2022 WL 17544087, at *1 (2d Cir. Dec. 9, 2022) (summary order). The Supreme Court denied certiorari. *See Raniere v. United States*, 143 S. Ct. 1756 (2023).

Following his conviction, Raniere filed various motions, including motions for a new trial pursuant to Federal Rule of Criminal Procedure 33, a motion to compel post-conviction discovery, and a motion for judicial recusal. While the motion for recusal was pending, Raniere filed a writ of mandamus with this Court seeking the same relief, which was denied. *See In re Keith Raniere*, No. 22-3112, at Dkt. No. 22.

3

      In this appeal, Raniere claims that the district court abused its discretion in three ways, namely by: (1) denying his third motion for a new trial; (2) denying his motion for post-conviction discovery; and (3) denying his motion for judicial recusal.

      These arguments are without merit.

4

## STATEMENT OF FACTS

### I.    Raniere's Trial Conviction

On June 19, 2019, Raniere was convicted of racketeering, racketeering conspiracy, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking, and attempted sex trafficking. (DE:735)[1]; *see Raniere*, 55 F.4th at 359.  The evidence at trial established that Raniere led a criminal enterprise and that he and his co-conspirators committed a wide range of criminal acts, including sex trafficking, forced labor, alien smuggling, wire fraud, and obstruction of justice.  (DE:735); *see Raniere,* 55 F.4th at 357.  Raniere's crimes related to his creation and leadership of a self-styled coaching and self-help organization called Nxivm, and a secret society called "DOS," an acronym for "Dominus Obsequious Sororium," a phrase that roughly translates to "Lord/Master of the Obedient Female Companions."  *Id.*  The government also presented evidence that Raniere and his co-conspirators recruited and

---

[1]    References to "A," "SPA," and "GA" are to Raniere's appendix, his special appendix, and the government's appendix, respectively. References to "DE" are to entries on the district court's docket (No. 18-CR-204 (NGG) (E.D.N.Y.)).  "T" refers to the trial transcript.  "GX" refers to government exhibits introduced at Raniere's trial.  "RBr." refers to Raniere's brief in this appeal.

5

groomed sexual partners for Raniere, and that women were assigned to engage in sexual acts with Raniere. *Id.* After a six-week trial in May and June of 2019, Raniere was convicted of all seven counts—including 11 racketeering acts under Count Two—submitted to the jury. *Id.* at 359-60.

As relevant here, three predicate acts of racketeering were added in a second superseding indictment returned by the grand jury in March 2019. (A:185-213 ("Second Superseding Indictment" or "S-2")). Those racketeering acts related to Raniere's production and possession of child pornography images of "Camila," who was a fifteen-year-old child when Raniere began sexually abusing her in 2005.[2] (SPA:21-24; T:3457-65, 3524; GX:301-R). Specifically, on November 2, 2005 and November 24, 2005, Raniere took photographs of Camila constituting child pornography, which, as described below, were recovered from a Western Digital-brand hard drive (the "Western Digital Hard Drive") seized from

---

[2] Counts Three, Four, and Five of S-2, which charged Raniere with production and possession of child pornography based on the same conduct, were dismissed prior to trial for lack of venue.

6

a residence located at 8 Hale Drive, Halfmoon, New York (the "Hale Drive Residence").  (SPA:22; DE:1213).

II.    Relevant Pretrial Proceedings

    A.    Search of the Hale Drive Residence and
          Initial Production of Electronic Discovery

          On March 27, 2018, law enforcement agents conducted a judicially authorized search of the Hale Drive Residence, which Raniere used as his "Executive Library," as well as a separate property belonging to the president of Nxivm.  (A:1571, 1142).  During those searches, law enforcement agents seized over 70 electronic devices, including the Western Digital Hard Drive and a Canon EOS 20D camera containing a memory card (the "Canon Camera").  (A:1571).

          Shortly after the defendants' arraignment on a superseding indictment on July 23, 2018 (*see* DE:50), the government began producing electronic discovery, including copies of the contents of the seized electronic devices, to Raniere and his co-defendants.  (DE:593-1 (August 3, 2018 discovery letter); A:87-88 (September 11, 2018 discovery letter)).  The government's August 2018 discovery letter to the defendants, including Raniere, notified the defendants that electronic devices had been obtained through the execution of a search warrant at the Hale

7

Drive Residence and stated that the defendants could contact the government to "examine the physical evidence discoverable under Rule 16." (DE:593-1 at 5). Among other things, the discovery letter enclosed a copy of the search warrant application for the Hale Drive Residence, as well as photographs taken during the execution of the warrant. (*Id.* at 3).

The district court thereafter directed the parties to litigate certain discovery issues before a magistrate judge; at subsequent hearings on September 13, 2018 and September 18, 2018, the magistrate judge directed the government to expedite the production of electronic discovery to defense counsel, to prioritize the discovery requested by counsel, and to report the status of production as to each electronic device in its possession. (DE:137, 139, 143, 145, 154). Several of the devices contained inaccessible media or appeared to contain no relevant data, and the Canon Camera contained primarily nude photographs of Raniere and his sexual partners. (GX:520, 521). At that time, having no reason to believe that the metadata associated with the photographs on the Canon Camera had any evidentiary value, agents with the Federal Bureau of Investigation ("FBI") directed that a photograph technician

8

create a copy of the photographs from the Canon Camera's memory card to facilitate their expeditious disclosure to defense counsel. (A:1579).

In October 2018, the government provided all defendants, including Raniere, with copies of the Western Digital Hard Drive. (DE:593-2). At that time, law enforcement agents were not aware that the Western Digital Hard Drive contained child pornography; as a result, a full forensic copy of the drive was provided to all defendants. (*Id.*).

Approximately five months later, at another proceeding before the magistrate judge in February 2019, the government characterized the Hale Drive Residence as a property in which no defendant was seeking to assert "any privacy interests" and as to which "numerous people" had access. (A:179-84). No defendant objected to the government's assertion or claimed standing to challenge the execution of the search warrant at the Hale Drive Residence. (*Id.*).[3]

---

[3]    After the child pornography images were discovered on the Western Digital Hard Drive, Raniere filed a motion to suppress the images seized from the Western Digital Hard Drive, which the district court denied. (GA:4).

9

B.   Discovery of Child Pornography
     on the Western Digital Hard Drive

In February 2019, during its review of electronic materials seized from the Hale Drive Residence, the government discovered that the Western Digital Hard Drive contained images of Camila that constituted child pornography. (GA:5-6). The government immediately notified defense counsel and requested the return or deletion of any copies of the Western Digital Hard Drive. (DE:362).[4] The government attempted to create a sanitized version of the Western Digital Hard Drive—*i.e.*, without the folder containing child pornography—and provided it to Raniere's counsel. (GA:6). But Raniere's counsel alerted the government that, based on counsel's own review, the drive still contained carved (*i.e.*, deleted but forensically recovered) images of the child pornography, and counsel returned the drive to the government to be re-produced a second time. (*Id.*).

On March 13, 2019, a grand jury in the Eastern District of New York returned the Second Superseding Indictment against Raniere

_____

[4]    The following day, the government obtained a search warrant to search the Western Digital Hard Drive for additional evidence of child pornography and sexual exploitation of children. (*Id.*).

10

and co-defendants Clare Bronfman, Allison Mack, Kathy Russell, and Lauren Salzman, which, among other things, added predicate racketeering acts alleging production and possession of child pornography. (A:185-213).

C.    Raniere's Asserted Readiness for Trial

On March 1, 2019, counsel for Raniere contacted the government by email and requested to inspect the material on the Western Digital Hard Drive that the government had identified as child pornography. (A:1573, 1681). Pursuant to that request, defense counsel thereafter inspected the Western Digital Hard Drive at the FBI's Computer Analysis and Response Team ("CART") premises. (*Id.*). After counsel's inspection, on March 21, 2019, counsel for Raniere requested to have a defense computer expert conduct a forensic examination of the child pornography, and on March 25, 2019, defense counsel and the expert inspected the evidence at the FBI's premises. (*Id.*; *see* A:929 (noting that "images have been made available for full review by the defense team in the CART Review room")). As reflected in its opposition to Raniere's March 22, 2019 motions to sever or dismiss the child exploitation racketeering acts, therefore, the government noted that

11

"Raniere ha[d] retained an expert, to whom the government has made the photographs available for inspection" and that Raniere's "extra-record factual assertions about the images suggest that his expert has begun his analysis." (A:227).

Amid this activity, the government repeatedly sought to ensure that Raniere was ready to proceed to trial and noted numerous times that it would consent to an adjournment of trial if necessary to permit Raniere's defense team to conduct a forensic examination of the relevant photographs and metadata, offers that Raniere rebuffed. (SPA:22; A:223-27). In one letter dated March 22, 2019, for example, Raniere represented that he was ready for trial "even though the government has superseded the indictment" and requested that the district court "keep the dates for the current trial schedule." (DE:456-1 at 2-4). On March 29, 2019, Raniere's co-defendant Allison Mack filed, with the consent of the government, a request for a 30-day adjournment of the trial date. (DE:481). The same day, in response, Raniere filed a letter "thank[ing] the [c]ourt for setting the firm trial date that has existed for months now" and stating that he was "look[ing] forward to abiding by the [c]ourt's trial date." (DE:483).

12

Indeed, Raniere indicated his readiness for trial throughout the pretrial proceedings. At a status conference held on April 4, 2019, for example, counsel for Raniere indicated that the defense forensic expert had conducted a review of the evidence at the FBI's premises and represented that Raniere expected to be fully ready by the trial date:

> [W]e do have an expert. The expert's been down to the FBI. The Government was very responsive when I asked for dates. They accommodated our dates. Our expert went down. I expect they'll accommodate our other dates.
>
> So as long as we're continuing to be productive as we've been—and I think that will continue—I fully expect to be ready for those charges and all the charges on the trial date.

(A:243-45). At the government's request, the district court asked Raniere's counsel to confirm that he would be ready for trial, to which Raniere's counsel responded that Raniere would be "ready to go to trial." (A:246).

D.    Disclosure of Trial Exhibits

On April 30, 2019 and May 1, 2019, the government provided to Raniere's counsel a preliminary list of trial exhibits, which included, among other things, the Western Digital Hard Drive (GX:503) and accompanying forensic reports concerning its contents (GX:504, 504A,

13

505, 505A, 506, 507); photographs recovered from the Western Digital Hard Drive (GX:508-19), including the photographs of Camila (GX518A-U); the Canon Camera (GX:520) and an accompanying forensic report (GX:521); and photographs from the Canon Camera (GX:522-23).[5] (GA:1-3).

After the trial had begun, the government learned that the CART forensic examiner who had examined the Canon Camera was unavailable to testify. (A:510). Accordingly, another CART examiner who had examined the Western Digital Hard Drive, Senior Forensic Examiner Brian Booth, sought and received permission from his supervisor to re-examine the Canon Camera, generate a replacement report for that device, and then testify as to the FBI's search of both the Western Digital Hard Drive and the Canon Camera. (A:930). Booth's

---

[5]    The images of "Camila" underlying the racketeering acts related to Raniere's production and possession of child pornography were recovered only from the Western Digital Hard Drive, not from the Canon Camera. The contents of the Canon Camera, including its metadata, were introduced primarily to corroborate other evidence that the Canon Camera, which was made in Japan, was used to create the images, thus satisfying the element that the child pornography was "produced . . . using materials that ha[d] been mailed, shipped, or transported in or affecting . . . foreign commerce." 18 U.S.C. § 2251(a).

14

replacement report was not identical to the original report; it was more inclusive, due to the settings Booth used to generate it. (A:1621-22). Raniere's counsel never objected to the admission of the replacement report on the ground that it was provided too late or differed from the original. (A:355).

III.  Presentation of Child Exploitation Evidence at Trial

As relevant to the child exploitation charges at issue here, the government presented evidence at trial that a folder on the Western Digital Hard Drive contained a subfolder titled "BACKUPS," within which was a further subfolder titled "Studies." (A:321-22; GA:17). Within the "Studies" folder were approximately twelve additional subfolders containing nude photographs of females, including Camila, with whom Raniere had sexual relationships. (*Id.*; GX:252); *see also Raniere*, 2022 WL 17544087, at *3. Each subfolder was titled with the initials of the individual (or her nickname) and a series of numerals indicating a date in 2005. (GA:17).

The images in the "Studies" collection were similar in content. Each subfolder contained images of a nude female on a bed and close-up photographs of the individual's pubic hair and vaginal area—images

15

which the evidence at trial demonstrated were consistent with Raniere's sexual preferences. (T:2376-77, 4025, 5149). Among the individuals depicted in the "Studies" folder were Raniere's co-defendant Lauren Salzman and Camila's sister, Daniela, both of whom testified as government witnesses at trial.

One of the folders in the "Studies" folder had a "V" in its title, and in that folder were two sets of photographs of Camila. (GA:17). Evidence at trial established that Raniere's nickname for Camila was "V" or "Virgin Camila." (T:2468). The photographs depict Camila lying naked on a bed, and several photographs are close-up images of Camila's genitals.[6]

---

[6]    In his brief, Raniere claims that the government "had an ever-shifting number of alleged illicit photographs." (RBr. 12 n.2). Not so. Government Exhibits 518A-U comprised 21 images of Camila that were recovered from the Western Digital Hard Drive and introduced at trial. Approximately 18 of those images depicted Camila's nude body, and at least nine of those images constituted child pornography, *i.e.*, a "lascivious exhibition" of the genitals. 18 U.S.C. § 2256(2)(A). Government Exhibits 518A-U were introduced at trial but shown only to the district court, the jury, and the parties; they were not published to the public. Upon request, the government can provide those materials to the Court in a sealed supplemental appendix.

16

Salzman testified that around 2005, Raniere took what she described as "up-close crotch shot" photographs of her at the Hale Drive Residence. (T:1534-36). Daniela also testified that in 2005, Raniere approached her with a camera and insisted on taking a nude photograph of her. (T:2422-24). Raniere told Daniela to spread her legs and instructed Daniela on how to position herself. (*Id.*). Daniela also testified that at one point, she discovered other photographs of nude women on Raniere's computer. (T:2571-72). Daniela recalled that prior to fall 2006, she specifically discussed with Raniere his sexual relationship with Camila. (T:2472-74 ("I asked him if he was having sex with my sister [Camila]. He asked me if I minded.")).

As this Court has found in affirming Raniere's conviction, the government introduced "ample evidence" at trial to show that Raniere began sexually abusing Camila in September 2005, two months before he took child pornography photographs of her. *Raniere*, 2022 WL 17544087, at *2. Consistent with that finding, in certain communications Camila refers to her and Raniere's "anniversary"—the date on which they first had sex—as September 18, 2005. (GX:301-R at 17; T:3462-65; *see* A:1592). The government also introduced Camila's gynecological records,

17

which reflected that in 2011, Camila reported to medical professionals that she had been with the same sexual partner for "five years." (T:3312-13; GX:539 at 18).

FBI Special Agent Christopher Mills testified regarding the execution of the search warrant at the Hale Drive Residence and the seizure of the Western Digital Hard Drive and Canon Camera. (T:4289-314). He further testified that the serial number listed on the back of the Canon Camera was 1420908348 and that it read "Canon Incorporated, Made in Japan." (A:303-04). Mills testified that he had no involvement in searching either the Western Digital Hard Drive or the Canon Camera after those devices were provided to FBI CART. (T:4311).

Booth testified about his examination of the Western Digital Hard Drive and the Canon Camera. (A:307-510). Among other things, Booth testified that he created several forensic reports of the "Studies" folder of the Western Digital Hard Drive, including Government Exhibit 504, which was a report of the child pornography images with the images themselves redacted, and Government Exhibit 505, which was a

18

report of the remaining images in the "Studies" folder.[7]   (A:336-38;
GX:504-05).

Booth acknowledged that the metadata associated with at
least some of the files on the Western Digital Hard Drive appeared
anomalous, with a "created" date in 2003, a "modified" date in 2005, and
an "accessed" date in 2010.  (A:357-58).  In response to a question about
what could account for those differences, Booth responded that "[a]ll of
this data" was "derived within the computer file system," and that if files
were moved from one computer to another, they could get a "new created
time" and that "if dates are wrong they can be manipulated."  (A:358).
Booth further testified that the file path of the "Studies" folder referenced
a Dell Dimension computer and that law enforcement agents had not
identified or recovered the Dell Dimension computer in their searches.
(A:438 (Q: That's why there are certain things you can't tell when you
don't have that Dell Dimension computer, correct?  A: Exactly.)).  Booth
testified that the EXIF data—which is a form of metadata associated

---

[7]    Government Exhibits 504 and 505 were reports in HTML
format with hyperlinks.  Partial versions of Government Exhibits 504
and 505 were admitted in evidence as 504A, 505A, and 505B.

19

with an image file—for each child pornography image in the "Studies" folder reflected a "date time original" in November 2005. (A:399-404). Booth explained that relative to other forms of metadata, EXIF data is difficult to modify, though he acknowledged on cross-examination that EXIF data can be "changed and altered." (A:349, 510-11).

Booth's testimony on direct examination regarding his examination of the Canon Camera was brief. (A:354-55, 386-87). Only the third page of his replacement report was published to the jury, which reflected that Booth had conducted a forensic analysis of the Canon Camera.[8] (GA:14). That page reflected that Booth had conducted a forensic analysis of the Canon Camera, but Booth did not testify regarding any images or metadata recovered from that device and no images or metadata from the Canon Camera were published to the jury.

Booth was, however, extensively cross-examined about the Canon Camera. In that regard, Booth acknowledged that the Canon

---

[8]    Booth testified that his trainee, Virginia Donnelly, was the primary examiner who "actually physically put[] her hands and put[] the labels and things on the evidence." (A:316). Raniere's claim in his brief that the government represented to the district court that Booth had not created a second forensic image is not accurate. (RBr. 41).

20

Camera's memory card had been accessed, by a person unknown to Booth, while it was in the custody of the FBI on September 19, 2018. (A:492-98).  Raniere's trial counsel did not raise this issue with the district court—by way of an objection or otherwise—and took no steps to further develop the record of this apparent access by, for example, questioning any other law enforcement agents, including the FBI case agent who testified immediately after Booth.

On June 19, 2019, the jury convicted Raniere of all seven counts submitted to the jury and found that the government had proven all 11 racketeering acts identified in the indictment.  (DE:735).

IV.  Sentencing

Although Camila did not testify at trial, she appeared at Raniere's sentencing and submitted a four-page victim impact statement, in which she stated that, in September 2005, "when [she] was still fifteen, [Raniere] took naked pictures of [her.]"  (DE:965-1).[9]  She added:

---

[9]    In a declaration, Camila explained that she had been contacted by an FBI special agent and an FBI victim specialist in March 2019 and wished to speak with the FBI, but Raniere's counsel referred Camila to an attorney who strongly discouraged her on multiple occasions from doing so.  (A:1591).  Camila further stated that the attorney was "regularly communicating with Raniere's counsel about

21

> He first had sex with me on September 18, 2005. . . . During these secret meetings, when I was still fifteen, he took naked pictures of me. The experience of being photographed is seared into my memory. As a fifteen year old, this is not something you easily forget. We had sexual contact during every meeting we ever had; when he took the photos was no exception.

(*Id.*). At Raniere's sentencing hearing, the district court acknowledged Camila's victim impact statement, observing that "had she testified, it would have taken the jury ten minutes to convict [Raniere], because . . . she was groomed from age 13 to age 15, and then she was seduced by Mr. Raniere and kept in an apartment and used for his sexual pleasure." (DE:1002 at 110). On October 27, 2020, the court sentenced Raniere principally to a term of 120 years' imprisonment. (DE:969).

V.   Post-Trial Litigation

    A.   Prior Motions for a New Trial

        On March 9, 2020, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Raniere filed a motion for a new trial based on purported newly discovered evidence relating to alleged perjury

---

[her]" and that she firmly believed the attorney, whose fees were paid by someone else, "intentionally prevented [her] from having an opportunity to be a witness and have a voice [at] Raniere's criminal trial." (A:1591).

22

committed by two of his victims, identified as Daniela and Nicole. (DE:851-53). The district court denied that motion on July 17, 2020. (DE:902). On October 19, 2020, Raniere filed a second Rule 33 motion, again based on purported newly discovered evidence, this time related to the government's alleged intimidation of two potential witnesses, Michele Hatchette and Nicole Clyne. (DE:956). The district court denied that motion on October 23, 2020. (DE:963).

B.  Raniere's Direct Appeal of his Conviction and Sentence

As relevant here, Raniere contended on direct appeal that the evidence had been insufficient to prove the racketeering acts of child exploitation of Camila. *Raniere*, 2022 WL 17544087, at *3. This Court rejected that argument, holding that "[e]ven without Camila's testimony, the jury was presented with ample evidence showing that Raniere began sexually abusing Camila in September 2005" and that "the jury was presented with sufficient evidence to conclude beyond a reasonable doubt that Raniere was guilty of sexually exploiting Camila." *Id.*

Raniere also argued that the district court had improperly terminated the cross-examination of Salzman, a cooperating witness. *Id.* at *7. This Court disagreed, noting that the district court had explained

that counsel went "way over the line" by continuing to ask the same and similar questions, including questions concerning whether the witness had the mental state to have committed the crimes to which she had pleaded guilty. *Id.* Given that counsel's cross-examination had been "lengthy" and "included many questions on related topics," this Court concluded that "any arguable error was harmless." *Id.*

    C.    <u>The Appealed-From Orders</u>

        1.    <u>Motion for Recusal</u>

On May 6, 2022, with his direct appeal pending, Raniere filed a motion for recusal in the district court. (SPA:2; DE:1171). As described more fully below, the motion claimed that the district court had demonstrated "deep-seated, unequivocal hostility and personal bias against" Raniere by: (1) curtailing Salzman's cross-examination at trial; (2) making certain comments to Raniere's counsel during a restitution hearing; and (3) vindictively sentencing co-defendant Clare Bronfman based on her refusal to disavow Raniere and Nxivm. (A:1182-87).

Following the Court's affirmance of Raniere's judgment, on April 26, 2023, the district court denied Raniere's motion for recusal in a

written memorandum and order.  (SPA:1-11).[10]  The court explained that Raniere's motion had "exhibit[ed] a foundational misunderstanding of what constitutes personal, extra-judicial bias, rather than honestly held viewpoints gained throughout presiding over a trial," and "fail[ed] to recognize the wide discretion granted to judges in the administration of a trial."  (SPA:6-7).

With respect to Raniere's claim regarding the cross-examination of Salzman, the district court explained that its "choice to curtail cross-examination of a witness to avoid needless harassment and attend to the witness's wellbeing was well within the bounds of [its] discretion."  (SPA:7).  To the extent the district court's comments at any point "evinced not just frustration and impatience, but some sort of distaste for the defendant, no reasonable observer would, after witnessing the trial over which the court was then presiding, earnestly

---

[10]    Earlier, on May 9, 2022, the district court acknowledged receipt of Raniere's recusal motion and indicated that the court would defer consideration of the motion until this Court resolved Raniere's direct appeal.  (DE dated May 9, 2022).  Raniere then filed a mandamus petition, which this Court denied.  (SPA:2).

25

believe that the distaste was the result of some sort of extrajudicial bias or deep-seated antagonism." (SPA:8).

With respect to Raniere's claim regarding the court's conduct at the restitution hearing, the district court explained that the "allegedly biased conduct was directed only toward one of a series of lawyers representing the defendant" who was hired only after the conclusion of trial, and there was "no evidence that any disagreement between the court and that counsel reflected a broader issue between the court and the defendant." (*Id.*). Lastly, citing this Court's affirmance of Bronfman's sentence, the district court concluded that consideration of Bronfman's relationship with Raniere at Bronfman's sentencing was appropriate and did not indicate impermissible bias. (SPA:10).

### 2. Third Motion for a New Trial and Motion for Post-Conviction Discovery

Three years after his conviction, in May and June of 2022, Raniere filed a third motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. (DE:1168-69, 1178). Before that motion was fully briefed, on April 14, 2023, Raniere filed a motion to compel the production of evidence relating to the child exploitation and child

26

pornography offenses upon which his racketeering conviction had been predicated. (DE:1192).

In his third motion for a new trial, Raniere claimed that purported "newly discovered evidence" demonstrated that "the government manufactured child pornography and planted it on a computer hard drive to tie it to him" and that the government "falsified, fabricated, and manipulated all the key evidence it used" to establish Raniere's commission of the child exploitation and child pornography predicate offenses. (A:770-71). The assertedly new evidence upon which Raniere relied consisted principally of a post hoc report by retired FBI agent James Richard Kiper, dated April 25, 2022 (*i.e.*, more than a year after Raniere's trial conviction), purporting to raise issues with Booth's examination of the Western Digital Hard Drive and Canon Camera, and suggesting that the government fabricated the evidence used to convict Raniere of the child-exploitation predicate acts. (*Id.*; A:1003-60). Based largely on Kiper's analysis, Raniere sought to compel the government to provide him with digital evidence related to the electronic devices, FBI examination notes, and other information pertaining to the FBI

27

personnel who accessed the Canon Camera's memory card.  (*See* SPA:15 at n.1).

On July 21, 2023, the government filed a response to both the motion to compel and the motion for a new trial.  (A:1568).  With its response, the government attached a sworn declaration by Camila, in which she affirmed that she reviewed Government Exhibits 518A-U, the child pornography images at issue, and was certain that she is the subject of each of them.  Camila further confirmed that the photographs were taken when she was 15 years old.   (A:1591-93).  Camila's declaration states that she "vividly recall[s]" being photographed by Raniere in 2005, when she was 15 years old, and that it was an "unforgettably humiliating and degrading experience."  (A:1592).  Camila's declaration further stated that "[e]ach exhibit, GX 518-A to GX 518-U, is a photograph of me. I recognize my body, and I recall one of the poses he placed me in and where he was with the camera in relation to my body.  I recognize the surroundings, and I remember the feelings of shame and confusion, not understanding why he was doing that to me."  (*Id.*).

The government also filed a sworn declaration from a senior computer scientist with the FBI, David Loveall II, who was not involved

28

in Raniere's prosecution.  (A:1618-25).  After reviewing Kiper's report, Loveall concluded that many elements of Kiper's analysis were "misleading or erroneous," and that his report "repeatedly ignore[d] plausible explanations for observed phenomena in favor of allegations of tampering." (A:1619).

On November 6, 2023, the district court denied Raniere's motion to compel.  (A:1680-91).  The court concluded that Raniere had provided "no legal justification for his argument that he has a post-conviction right to access the evidence he requests." (A:1684).  The district court concluded that Raniere's motion was frivolous, and it explained in detail why Raniere was not entitled to access to the digital material under *Brady v. Maryland*, 373 U.S. 83 (1963), under post-conviction due process rights, or under principles of "elemental fairness." (A:1684-91).

The district court first explained that neither *Brady* nor post-conviction due process rights governs the disclosure of the evidence Raniere requested, that is, "photo metadata whose alleged anomalies the Government thoroughly explained." (A:1686).  The district court also found that principles of "elemental fairness" did not support Raniere's

29

motion since Raniere came "nowhere close" to meeting a requirement that the production of such evidence would demonstrate that he did not commit the relevant offenses (A:1687-88), or that such evidence, even if provided to him, would amply support his request for a new trial (A:1689).

Two weeks later, Raniere moved for reconsideration of the court's denial of his motion to compel (DE:1227), and then, on December 21, 2023, Raniere filed a second, separate request for the court to compel production of evidence (DE:1230, 1233, 1235). The district court denied both motions in a written memorandum and order entered on March 7, 2024. (SPA:12-19). As to the motion for reconsideration, the district court found that Raniere had not cited to any controlling law that the court had overlooked, and as to the second post-conviction motion to compel, the district court held that Raniere had again failed to cite any authority demonstrating that he had a right to the materials and evidence he requested. (SPA:15-16).

On April 29, 2024, the district court denied Raniere's third motion for a new trial in a written memorandum and order. (SPA:20-30). In doing so, the court first noted that Raniere's representations in his

30

motions for a new trial were contradictory. (SPA:26). The court held that Raniere's "allegations of data manipulation do not constitute newly discovered evidence under Rule 33" and highlighted the fact that Raniere was made aware of the metadata evidence in "the leadup to trial and during trial." (SPA:26-27). The district court concluded that Raniere "seeks to have a new trial to challenge evidence that he previously stated he was ready to challenge, that he had the opportunity to challenge, and that he did in fact challenge during his trial." (SPA:27-28).

The district court responded to Raniere's argument that it had been "impossible" for him to discover evidence of government "tampering" by observing that Raniere had "provide[d] no persuasive argument that he could not have discovered this evidence with diligence or that the evidence now in focus demonstrates manipulation or falsification of metadata that would support an acquittal." (SPA:28).

The district court also found that Raniere's motion for a new trial failed for the independent reason that Raniere could not "demonstrate that the purportedly newly discovered evidence would result in an acquittal or otherwise demonstrate that a new trial is necessary to prevent a manifest injustice." (SPA:29). In that regard, the

31

court explained that it found "the evidence presented at trial, the Loveall report, and the affidavit submitted by [Camila] verifying her identity and age in the photos" to be a "far more plausible explanation for the discrepancy in the metadata" than any speculation offered by Kiper. (SPA:29). And on the record before it, the district court found that an evidentiary hearing was not necessary to resolve Raniere's motions. (SPA:30 n.6).

This timely appeal ensued.

32

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in denying Raniere's third motion for a new trial, motion for post-conviction discovery, and motion for recusal.

Like his motions below, Raniere's brief on appeal is replete with false and misleading factual claims and baseless accusations that numerous unrelated law enforcement personnel committed perjury and were involved "in the falsification of the digital evidence" of the child pornography and child exploitation racketeering acts of which Raniere was convicted at trial. (RBr. 21). But Raniere never meaningfully grapples with the legal authorities cited by the district court, and, indeed, cites little—if any—relevant caselaw in support of his own positions.

More fundamentally, however, Raniere fails to identify any material that would constitute "newly discovered evidence" within the meaning of Federal Rule of Criminal Procedure 33 or that such evidence, if available at trial, would have resulted in an acquittal. He fails to establish, as he must to obtain a new trial, that the jury's verdict represents a manifest injustice in light of the overwhelming evidence of his guilt. And he fails to establish any abuse of the district court's

33

discretion in its refusal to grant him post-conviction access to evidence or to recuse itself from the proceedings below.

        The appealed-from orders must be affirmed in their entirety.

34

# ARGUMENT

## POINT ONE

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING RANIERE'S MOTIONS FOR A NEW TRIAL AND POST-CONVICTION DISCOVERY

## I.    Standard of Review

This Court reviews the district court's denial of a Rule 33 motion for abuse of discretion and the factual findings in support of its ruling for clear error. *See, e.g.*, *United States v. Rigas*, 583 F.3d 108, 125 (2d Cir. 2009).[11] "[T]he trial court's discretion to decide whether newly discovered evidence warrants a new trial is broad because its vantage point as to the determinative factor—whether newly discovered evidence would have influenced the jury—has been informed by the trial over which it presided." *United States v. Stewart*, 433 F.3d 273, 296; *see also United States v. Rowland*, 826 F.3d 100, 112 (2d Cir. 2016) ("The trial judge's assessment of the effect of nondisclosure is entitled to great weight.").

---

[11]    Unless otherwise noted, citations, internal quotation marks, and footnotes are omitted, and all alterations are adopted.

35

II.    Applicable Law

A district court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). In light of the deference owed to a jury's verdict, this Court has cautioned that district courts should exercise their Rule 33 authority only "sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009), and the crucial question for the court is whether "it would be a manifest injustice to let the guilty verdict stand," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted." *Id.*

A defendant moving for a new trial based on newly discovered evidence must establish that "(1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material;

36

(4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007); *see also United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015). This Court has "long held that in order to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence could not with due diligence have been discovered before or during trial." *Id.* at 408-09.

Whether to conduct an evidentiary hearing on a new-trial motion rests in the district court's sound discretion. *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir. 1995). "No hearing is required on a new trial motion if the moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing." *United States v. Helmsley*, 985 F.2d 1202, 1209-10 (2d Cir. 1993). Where a defendant fails to present an adequate factual basis in support of a discovery request, it is "well within the discretion of the district court to deny [that] discovery request." *United States v. Fares*, 978 F.2d 52, 60 (2d Cir. 1992). "A hearing is not held to afford a convicted defendant the opportunity to conduct a fishing

37

expedition." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983).

III.  The District Court Properly Denied Raniere's
      <u>Motions for a New Trial and Post-Conviction Discovery</u>

Raniere claims the district court exceeded its discretion when it denied: (1) his third motion for a new trial based on allegations of government misconduct affecting certain digital evidence; and (2) his related motion for post-conviction discovery seeking access to information concerning the same digital evidence he attacked under Rule 33. (RBr. 24-54).

A.    <u>Raniere Identifies No Newly Discovered Evidence</u>

The district court properly denied Raniere's third motion for a new trial because Raniere failed to identify any "newly discovered" evidence within the meaning of Federal Rule of Criminal Procedure 33. As the district court explained, Raniere was made aware that the government would seek to introduce digital evidence at trial, including metadata evidence, soon after the government discovered the photographs of Camila on the Western Digital Hard Drive. (SPA:27). Raniere had the opportunity to test and challenge the government's evidence prior to trial and, in fact, availed himself of that opportunity by

38

hiring a forensic expert who visited FBI CART to inspect the digital evidence. (*See supra* 10-11). The defense team also had a full and fair opportunity to cross-examine Booth, who examined the Western Digital Hard Drive and re-examined the Canon Camera; defense counsel cross-examined Booth at length about the very metadata at the heart of this appeal and its capacity to be altered. (SPA:27). As the district court rightly concluded, under these circumstances, "[t]he jury considered this evidence alongside other evidence presented at trial" to convict Raniere. (*Id.*).

The district court also noted that Raniere's post hoc claim that his experts had insufficient time to analyze the data is "in conflict with [his] trial counsel clearly stating multiple times after the photographs were discovered and the new charges were added . . . that he was ready for trial." (SPA:27). The record similarly establishes that the government offered to adjourn the trial date to allow Raniere more time to review the evidence related to the child pornography and child exploitation charges, which Raniere rejected. (*Id.*).

On appeal, Raniere argues that: (1) the duplicate forensic image on which Booth relied to conduct his examination is newly

39

discovered evidence and a violation of the government's obligation to turn over favorable evidence under *Brady*; (2) the fact that the Canon Camera's memory card was accessed while in FBI custody is both newly discovered evidence and a *Brady* violation; and (3) the government "facilitate[d] and conceal[ed] the falsification of key evidence" and elicited "uncontested, material perjury . . . about the integrity and authenticity of the digital evidence[.]" (RBr. 38-48). These claims are entirely baseless. None of the evidence Raniere cites was newly discovered or suppressed, and there was no *Brady* violation.

To obtain a new trial based on a *Brady* violation, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001). Evidence is not "suppressed," however, "if a defendant either knew, or should have known, of the essential facts permitting him to take advantage" of the evidence. *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993).

40

1.  <u>Duplicate Forensic Image of the Canon Camera Memory
    Card</u>

The duplicate forensic image of the Canon Camera cannot
constitute newly discovered evidence because it was known to Raniere,
or, at a minimum, reflected in exhibits introduced at trial and in
materials available to the defense before and during the trial. As Kiper's
own report indicates, the fact that Booth relied on a second forensic copy
of the camera card is evident from the face of his report, which was in
evidence at trial as Government Exhibit 521. (GA:14 (reflecting evidence
path and ID number); A:1038 ("By creating a new forensic copy of the CF
card (named NYC024299_1B15a.E01) FE [Booth] conducted a "re-
examination")). Raniere's claim throughout his brief that the
government "concealed the existence" of the second forensic image
(RBr. 41) is false and misleading. The Canon Camera was forensically
imaged a second time after it became clear that Steven Flatley, the CART
analyst who originally examined the camera, would be unavailable for
trial. (T:4986-87). The government disclosed to Raniere the forensic
reports generated from each image, which made plain that those reports
were created from separate images. Although Raniere elected to inspect

41

the forensic image of the Western Digital Hard Drive, Raniere's defense team neither inspected the duplicate forensic image of the Canon Camera memory card (or, for that matter, the original forensic image, as to which no claim is raised on appeal), nor requested to do so. Contrary to Raniere's insinuations, there is nothing improper about creating a duplicate forensic image of an electronic device, and Booth was cross-examined extensively about his re-examination of the Canon Camera.

Even if Raniere could demonstrate that the evidence was suppressed by the government, which he cannot, Raniere fails to establish that there is a "reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) ("[U]ndisclosed evidence will be deemed material only if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."). The original and duplicate forensic images of the Canon Camera were identical, as determined by Loveall, an FBI computer scientist who was not involved in Raniere's prosecution. (A:1622 ¶ 9). On appeal, Raniere struggles to articulate any grounds on which the existence of a duplicate forensic

42

image of the Canon Camera could have affected the outcome of this case. His best attempt is that the defense "would have had it analyzed by a forensic expert," which "should have revealed" that the card had been falsified and then might have "led to" an application for suppression. (RBr. 43). But this speculation falls well short of Raniere's burden to establish that the duplicate forensic copy was favorable evidence to him, let alone material within the meaning of *Brady*.

The record makes plain that, even without the Canon Camera, the jury was presented with more than enough evidence to convict Raniere of the predicate acts in question. To be sure, the government relied on the Canon Camera evidence primarily to establish federal jurisdiction based on the device's foreign provenance. (*See supra* n.5). And even as to that issue, the government did not require the metadata on the Canon Camera to prove the interstate or foreign commerce nexus of the child exploitation and child pornography conduct. The EXIF data from the images recovered from the Western Digital Hard Drive reflected the make, model, and serial number of the camera used to take the child pornography photographs; the exterior of the Canon Camera also contained the same serial number, 1420908348, of the

43

device used to create the child pornography and reflected that the camera was made in Japan. (A:303-04, 352; GX:504B at 1, 6; GX:520). Under these circumstances, it can hardly be said that the metadata on the Canon Camera was material to the child exploitation offenses within the meaning of *Brady*.

That is borne out in the record. In summation, the government made no mention of the metadata associated with the images on the Canon Camera. (T:5372 ("You can see that right on [Government Exhibit 520], it says that it was made in Japan . . . [E]very single photograph taken from the defendant's [S]tudies folder [on the Western Digital Hard Drive] showed the photograph was taken by this camera with this serial number 1420908348.")). Raniere contends that without evidence from the Canon Camera's memory card, the government would have been "unable to link" the child pornography photographs to him. (RBr. 43). But that suggestion strains credulity. At trial, the government adduced overwhelming evidence that Raniere was sexually abusing Camila at the time the photographs were taken, and not only do the photographs themselves suggest that Camila engaged in sexual activity with the photographer—Raniere—but the photographs were also located

44

in a folder on the Western Digital Hard Drive containing other nude photographs of numerous women with whom Raniere had sexual relationships at that time. (T:5367-72; GA:17). As reflected in the government's remarks in summation, the Canon Camera was not significant evidence "linking" Raniere to the photographs and, even apart from evidence derived from the camera itself, there was overwhelming evidence that Raniere took the photographs.

Raniere's claim fails for the additional (and obvious) reason that the child pornography and child exploitation offenses constituted only three of the 11 predicate acts the jury found Raniere to have committed in convicting him of racketeering. As noted above, any standalone counts charging Raniere with substantive child pornography and child exploitation offenses had been dismissed prior to trial for lack of venue. Therefore, Raniere's entire basis for Rule 33 relief fails at the threshold because even if, at a new trial, a jury were to find that the government failed to prove those acts, there is no basis to conclude that the remaining nine predicates would not have sustained Raniere's racketeering conviction.

45

2.   Access of the Canon Camera Memory Card

Raniere's argument concerning the FBI's supposedly "secret" access to the Canon Camera's memory card is equally unavailing. Raniere was clearly aware at the time of trial that law enforcement agents had accessed the camera's memory card without a so-called write blocker—a tool to prevent modifications to data during investigations of media—on September 19, 2018 because, as noted, Raniere's trial counsel cross-examined Booth extensively regarding that access. (A:492-98). Booth specifically testified on cross-examination that the memory card had been accessed "while it was in the possession of the FBI." (A:495-96). But after eliciting that fact, Raniere's counsel raised no objection, made no application respecting the evidence, and declined to question any other law enforcement agents regarding the access, including the FBI case agent who testified after Booth.[12]

---

[12]   Raniere's misleading claim that counsel "repeatedly requested all materials relating to the digital evidence" (RBr. 45-46) is not accompanied by any citation to the record because Raniere's trial counsel made no such request. To the extent Raniere is referring to post-conviction discovery requests in connection with the motions that are the subject of this appeal, those requests cannot establish that the evidence was unavailable to Raniere before or during trial.

46

Nor, tellingly, did Raniere's trial counsel make any argument, in summation or otherwise, that the child pornography evidence had been fabricated or planted by law enforcement agents. Given the weight of the evidence against Raniere and the relative insignificance of the Canon Camera, it is not surprising that trial counsel made the strategic decision not to present such arguments to the jury.

Because there is no genuine dispute that Raniere and his trial counsel were aware of "the essential facts permitting him to take advantage" of the evidence he now claims is exculpatory, Raniere cannot establish the first element of a *Brady* violation. *Zackson*, 6 F.3d at 918.

Even if Raniere could show that the government failed to turn over any favorable evidence, however, he does not argue, let alone prove, that the purportedly newly discovered evidence could have produced a different verdict. Instead, Raniere claims that the failure to disclose the identity of the FBI photo technician who accessed the photographs while the Canon Camera was in FBI custody "deprived the defense from impeaching Mills and Booth" and "using it to seek suppression." (RBr. 46-47). But nothing prevented Raniere from cross-examining Mills or Booth about the documented access of the Canon Camera's memory

47

card. Indeed, Booth *was* cross-examined at length on the topic. And, for the same reasons as discussed above, Raniere's suppression of the Canon Camera, even if successful, would not have affected the verdict because the Canon Camera was not critical to the proof of the child pornography predicate acts, and, in any event, his racketeering conviction is predicated on nine racketeering acts that are unaffected by his arguments in this appeal. In short, Raniere cannot establish that law enforcement agents' access of the Canon Camera's memory card, with or without a write blocker, constituted "newly discovered evidence" warranting a new trial.

### 3.   Expert Reports

Lastly, Raniere argues that Kiper's report purportedly exposing government malfeasance—which he contends is "independently verified and agreed with by six (6) additional forensic experts" (RBr. 17)—was both "newly discovered and suppressed under *Brady*" (RBr. 47). As the district court rightly found, however, those purported expert opinions cannot constitute "newly discovered" evidence under Rule 33 because the information and material underpinning the opinions were provided to Raniere or known to Raniere at the time of trial. Courts

48

in this Circuit have consistently held that post-trial expert reports cannot constitute "newly discovered evidence" when such reports were based on materials "available to the defense before and during the trial." *Pri-har v. United States*, 83 F. Supp. 2d 393, 401 (S.D.N.Y. 2000), *aff'd,* 10 F. App'x 4 (2d Cir. 2001); *see also United States v. Bout*, 144 F. Supp. 3d 477, 487 (S.D.N.Y. 2015) ("Rule 33 does not allow for a new trial based on evidence that could have been discovered before trial, let alone evidence that was part of the trial record."), *aff'd,* 666 F. App'x 34 (2d Cir. 2016); *Massaro v. United States*, No. 97-CV-2971 (MGC), 1998 WL 241625, at *2 (S.D.N.Y. May 12, 1998) ("[T]he only thing that is 'new' about [new expert tests on the government's forensic evidence] is the team of experts reviewing it.  Such evidence is not 'newly discovered' within the meaning of Rule 33.").[13]

---

[13]      Raniere's claim that this evidence is "newly discovered" is particularly disingenuous because even prior to Raniere's sentencing, Raniere apparently sought to make a motion that the evidence in his case had been fabricated, a motion that Raniere's counsel at that time chose not to file.  For instance, in an April 6, 2020 call with one of his supporters, Raniere referred to a motion he intended to file based on an allegedly "tampered" drive.  (A:1631).

49

Raniere's false and inflammatory accusation that Mills and Booth committed "uncontested, material perjury" (RBr. 48) is entirely unsupported by the record. As to Mills, Raniere's sole citation to the record with respect to this claim is testimony by Mills that "when [an FBI agent] recover[s] digital evidence, we have a process in which we bring the digital evidence back to our office and if want the evidence to be reviewed, we would submit a request to our CART team," and that this usual process was followed with respect to the digital evidence in Raniere's case. (A:304). There is nothing inaccurate, let alone perjurious, about Mills's testimony. In addition, Raniere misleadingly omits from his appendix the page of Mills's testimony in which Mills testified that he had no involvement in searching either the Western Digital Hard Drive or the Canon Camera after those items were provided to FBI CART. (T:4311).

As to Booth, Raniere claims that "Booth committed perjury regarding the reliability of EXIF metadata and that receiving unsealed evidence is not extraordinary." (RBr. 33). This accusation is indefensible. As the government noted in its response to Raniere's motion for a new trial (A:1586), and as the district court found (SPA:27),

50

on cross-examination Booth testified that EXIF data, like other metadata, can be changed and altered:

> COUNSEL: You agree that any metadata, whether it's EXIF data or other data can be changed and altered; correct?
>
> BOOTH: Yes, EXIF data can be altered.
>
> COUNSEL: And there's a variety of different way that that can happen; correct?
>
> BOOTH: Yes, it can.
>
> COUNSEL: Companies can remove—if you send a photo to Facebook, do they take off that data?
>
> BOOTH: Yes, they actually strip off the data.

(A:510-11).

Raniere's continued insistence on appeal that Booth's testimony regarding the reliability of EXIF data constitutes "perjury" reflects the baseless accusations and indifference to the facts that characterize the bulk of his brief.

Lastly, it is specious to argue, as Raniere appears to do for the first time on this appeal, that Raniere was somehow precluded from raising claims of government misconduct because of the district court's

51

ruling on a motion in limine.   (*See* RBr. 2 ("Some of this fraudulent conduct took place during the trial, after the government sought and obtained a prohibition against 'presenting evidence or arguments concerning alleged government misconduct in this prosecution.'"), 47 n.23 (arguing that to seek suppression of evidence, counsel would have had to "challenge the [c]ourt's prohibition on presenting evidence or argument concerning government misconduct")).

Prior to trial, the government sought an in limine ruling precluding Raniere from presenting evidence or arguments concerning the government's alleged motive for prosecution, alleged misconduct in the course of the prosecution, or the existence or outcome of any previous investigation.   (DE:567 at 11 & n.5 (noting that the defendant and his co-defendants had "raised allegations of this sort," including suggestions of government overreach, in their pretrial motions")).   Such claims, the government contended, were appropriately addressed to the court, not to the jury.   (*Id.* at 12).   The district court agreed (DE:622), but its ruling on that motion pertained to unfounded allegations of selective prosecution, not legitimate efforts to attack the reliability of the government's evidence.   The ruling did not purport to constrain Raniere from raising

52

claims of government misconduct to the court (rather than the jury), if any such issue should plausibly arise (none did). To be sure, if Raniere's counsel had any genuine interest in pressing a claim of government malfeasance based on law enforcement agents' access to the Canon Camera's memory card, Raniere could have raised the issue to the prosecutors or to the district court, inquired of the FBI agent who testified after Booth, sought to call any law enforcement agent in a defense case, or argued to the jury that the metadata was unreliable. Counsel for Raniere did none of those things. Rather, in summation, Raniere's trial counsel commented that "the FBI CART examiner . . . was very good at what he does, he's very smart, he's very experienced," but argued simply that there was "no testimony that these [photographs] were ever sent anywhere." (T:5516). Raniere cannot now be heard to complain that he was hamstrung in his efforts to make his case in the district court.

In fact, Raniere's claim that the district court's ruling prevented him from raising allegations of government misconduct at the time of trial only underscores that he *was* aware of the facts underlying

53

what he now claims is newly discovered evidence. This concession is fatal to his claim that the evidence was newly discovered.

> B. Raniere Cannot Demonstrate That Any Purported Newly Discovered Evidence Would Result in Acquittal

The district court correctly concluded that Raniere failed to demonstrate that any purported newly discovered evidence would result in acquittal or that a new trial is otherwise necessary to prevent a manifest injustice. (SPA:29). In this regard, the district court found that Raniere was "unable to show that the [challenged digital] evidence raise[d] a reasonable probability as to his innocence in light of substantial evidence supporting the relevant charges." (SPA:16-17 (cataloguing additional trial evidence supporting child exploitation and child pornography charges)). Rather, having presided over Raniere's trial, the district court determined that Loveall's report provided a "far more plausible explanation for the discrepancy in the metadata than the Defendant," and that, considering the evidence at trial and the affidavit submitted by Camila confirming that the photographs at issue were of her and were taken when she was 15, Raniere had failed to demonstrate

54

that any purported newly discovered evidence would "likely result in an acquittal." (SPA:29 (quoting *Forbes*, 790 F.3d at 407)).

Raniere provides no principled basis to disturb that finding on appeal. By arguing that the district court erred in considering Loveall's declaration and Camila's affidavit, Raniere misapprehends his burden to establish that "it would be a manifest injustice to let the guilty verdict stand," *Sanchez*, 969 F.2d at 1414, as required under the law. Raniere argues that reliance on Loveall's declaration and Camila's affidavit violated his rights under the Confrontation Clause. (RBr. 24-28). He is wrong. The district court's consideration of materials submitted by the government in response to Raniere's motion for a new trial does not implicate the Confrontation Clause. *See United States v. Franzese*, 525 F.2d 27, 30-31 (2d Cir. 1975) (noting that affidavits submitted by the government "may be considered in assessing the sufficiency" of a petitioner's claims in post-conviction proceedings); *see also United States v. Boyd*, 131 F.3d 951, 954 (11th Cir. 1997) (per curiam) (holding that the Confrontation Clause does not apply to hearings on new trial motions). Raniere cites no authority for the proposition that reliance on affidavits

55

submitted by the government in post-conviction proceedings violates the

Confrontation Clause, and the government is not aware of any.[14]

In any event, to the extent the district court could be said to

have relied on Loveall's declaration or Camila's affidavit in denying

Raniere's motions, it did so only in the context of assessing whether

Raniere had met his burden to demonstrate that the evidence he claims

is newly discovered would have resulted in an acquittal. The district

---

[14] Nor does Raniere identify any authority supporting the proposition that a district court abuses its discretion by relying on affidavits from non-testifying witnesses to deny a defendant's motion for a new trial. This is of a piece with Raniere's pattern on appeal of nitpicking alleged technical defects in the papers below (*e.g.*, Loveall's report being undated; Loveall's report allegedly not meeting the *Daubert* requirements (RBr. 30-32)) and, despite failing to raise such defects in the district court, now claiming they were so significant as to amount to an abuse of discretion. The district court could not have abused its discretion by failing to consider arguments that Raniere never made before it. *United States v. Garcia*, 948 F.3d 789, 805 (7th Cir. 2020) (district court did not abuse discretion by failing to record trial when defendant never requested that trial be recorded); *United States v. Eggleston*, 823 F. App'x 340, 345-46 (6th Cir. 2020) (district court did not abuse discretion by failing to give jury instruction defendant never requested); *see Kosovich v. Metro Homes, LLC*, 405 F. App'x 540, 542 (2d Cir. 2010) (district court did not abuse discretion by dismissing complaint without leave to amend when plaintiff did not request such leave; noting arguments raised for the first time on appeal are "not properly before this Court").

56

court made clear that it evaluated Loveall's declaration in determining that the technical findings in the report by Kiper "do not support the conclusion that Mr. Kiper and Mr. Raniere draw from it." (A:1688). As Loveall stated in his declaration, Kiper's report "repeatedly ignores plausible explanations for observed phenomena in favor of allegations of tampering." (A:1619-25).[15] The district court also identified additional defects in Kiper's report, including that it raised "speculative questions, stating at one point that 'it leaves me to ponder: What else were they lying about?'" (A:1688). The district court concluded that the "evidence presented at trial, the Loveall report, and the affidavit submitted by the victim verifying her identity and age in the photos provide a far more

---

[15]    The anomalies in the metadata of the images recovered from the Western Digital Hard Drive are not surprising, given that they were recovered by law enforcement over a decade after they were created on a computer drive onto which the Dell computer had apparently been backed up, and had been sorted into folders (presumably by Raniere) with folder names corresponding to the names of Raniere's sexual partners. The government put forth no evidence at trial regarding the way in which the images had been copied onto the Western Digital Hard Drive. Although Kiper and the other purported experts retained by Raniere repeatedly use the words "manipulated" and "altered," as Loveall makes clear, they make no compelling argument to support Raniere's central claim that the child pornography images on the Western Digital Hard Drive were "falsified" by law enforcement. (RBr. 1).

57

plausible explanation for the discrepancy in the metadata than" Raniere. (SPA:29).[16]

Raniere fails to plausibly assert any grounds upon which to conclude that "it would be a manifest injustice to let the guilty verdict stand," because there is no concern that "an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. After all, Raniere was convicted of all seven counts and all 11 predicate racketeering acts submitted to the jury. Nowhere does Raniere claim that he is innocent of the child exploitation racketeering acts or deny that he took pornographic photos of Camila when she was 15 years old. Nor can he credibly do so. This Court, in affirming Raniere's conviction and sentence, determined that the government had proved the racketeering acts of child exploitation of Camila without making any reference to the metadata of the electronic files on the Western Digital Hard Drive or the Canon Camera:

> Even without Camila's testimony, the jury was presented with ample evidence showing that

---

[16]    As described below (*see infra* 60-61), the district court did not abuse its discretion by reaching this decision without holding an evidentiary hearing.

58

> Raniere began sexually abusing Camila in September 2005. *See, e.g.*, Gov. App'x 710-1–10-4, 1171, 1268 (emails and text messages between Camila and Raniere referring to the beginning of their sexual relationship as around September 2005); Gov. App'x 416–17 (testimony from Daniela that she had spoken to Raniere about his sexual relationship with Camila at some point before the fall of 2006). Moreover, the jury was shown messages between Camila and Raniere specifically referencing Raniere's creation and possession of the November 2005 photographs. *See, e.g.*, Gov. App'x 1173. And the electronic folder containing the photographs of Camila also contained nude photographs of other women with whom Raniere had a contemporaneous sexual relationship. In sum, the jury was presented with sufficient evidence to conclude beyond a reasonable doubt that Raniere was guilty of sexually exploiting Camila.

*Raniere*, 2022 WL 17544087, at *3.

Raniere's arguments on appeal altogether ignore the jury's considered judgment that Raniere committed all 11 charged racketeering acts, and that even without the child exploitation and child pornography conduct at issue in this appeal, Raniere's trial convictions would be undisturbed.

C.    The District Court Properly Denied
      Raniere's Motion for Post-Conviction Discovery

For the same reasons, Raniere fails to demonstrate that the district court abused its discretion in denying post-conviction access to digital evidence that was available to Raniere before and during trial, and which he could have adequately reviewed with diligence. (A:1684-90).

Raniere does not meaningfully address any of the district court's analysis or conclusions in the pages of his brief dedicated to this issue. (RBr. 22-23, 52-53). Raniere argues that the district court erred in reasoning that the digital evidence at issue is different than DNA evidence since the latter is capable of conclusively demonstrating a petitioner's innocence, because, as Raniere argues, a comparison of the two forensic images "could, with virtually 100% accuracy, verify or disprove Loveall's claim about the 37 photo files not being planted[.]" (RBr. 53).    But "verify[ing] and disprov[ing]" the assessment of a computer scientist who had no involvement in Raniere's prosecution has no bearing on Raniere's *innocence,* and, as the district court explained, Loveall's report offered a "more plausible and convincing explanation of

60

anomalies in the photos' metadata . . . [and] is further supported by the ample evidence presented at trial and Camila's declaration that she is certain of the circumstances and timing of the photos." (A:1689). And, as described above, even without the child exploitation and child pornography predicate acts, Raniere's trial convictions would remain the same.

Nor, contrary to Raniere's assertions, did the district court err in declining to hold an evidentiary hearing on this issue. Having presided over the trial and Raniere's extensive post-trial litigation, the district court was uniquely familiar with the issues and the evidentiary claims Raniere raised. Based on that familiarity, the district court determined that Kiper's opinions—despite being adopted by other purported experts offered by Raniere—were not sufficiently reliable to create a material issue of fact warranting a hearing. *See United States v. Gershman*, 31 F.4th 80, 93 (2d Cir. 2022) (district court has discretion to deny hearing unless movant "shows disputed issues of definite, specific, and nonconjectural material fact"). Other than registering his subjective disagreement with that conclusion, Raniere's brief offers no basis to conclude that the district court's decision was outside the permissible

61

bounds of its discretion. Given district courts' latitude to determine whether an evidentiary is hearing is necessary, coupled with the deference owed to trial judges who have superior first-hand knowledge of the cases before them, there is no legal or factual basis here to second-guess the district court's conclusion that Kiper's report failed to raise any material issue warranting an evidentiary hearing on Raniere's attempts to receive post-conviction discovery.

\*     \*     \*

Based on the foregoing, the district court acted well within its discretion to deny, *first*, Raniere's third motion for a new trial and, *second*, his related motion for post-conviction discovery seeking access to the same electronic evidence he unconvincingly attacked under Rule 33. Having presided over Raniere's trial and gaining unique familiarity with the evidence and issues in question, and further having before it an expanded record comprised of briefs and sworn witness statements, the district court was under no obligation to grant Raniere a full-blown hearing to further explore his baseless conspiracy theories. Raniere's brief to this Court fails to set forth any credible argument to the contrary.

62

## POINT TWO

### THE DISTRICT COURT DID NOT ABUSE ITS
### DISCRETION IN DENYING RANIERE'S MOTION FOR RECUSAL

I.  Standard of Review

"Recusal motions are committed to the sound discretion of the district court, and this Court will reverse a decision denying such a motion only for abuse of discretion." *LoCascio v. United States*, 473 F.3d 493, 495 (2d Cir. 2007); *see ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 107 (2d Cir. 2012) (it is "rare" for a district judge's denial of a motion to recuse to be "disturbed by an appellate court").

II. Applicable Law

A federal judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), and "[w]here he has a personal bias or prejudice concerning a party," *id.* § 455(b)(1). Under these provisions, "the substantive standard for recusal is whether a reasonable person, knowing all the facts, would conclude that the court's impartiality might reasonably be questioned." *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). Recusal is not appropriate "on the basis of remote, contingent, indirect or

63

speculative interests." *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996).

"[O]pinions formed by [a] judge on the basis of facts introduced or events occurring during current or prior proceedings are not grounds for a recusal motion" absent a showing of "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 541 (1994); *accord United States v. Conte*, 99 F.3d 60, 65 (2d Cir. 1996). For this reason, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555.

Motions for recusal under both Sections 144 and 455 must be made in a timely fashion, meaning "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple*, 829 F.2d at 333.

III.    The District Court Properly Denied Raniere's Motion for Recusal

Contrary to Raniere's contentions, the district court also properly declined to recuse itself from the proceedings below. (*See* RBr. 54-61). Raniere's allegations that the district court exhibited any

64

form of bias or prejudice against him are wholly unsupported by the record.

Raniere principally argues that the district court erred by citing to *Liteky* for the proposition that a judge who "presides at a trial may, upon completion of the evidence, be exceedingly ill disposed toward the defendant" as a result of the evidence adduced at trial, but is "not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings[.]" *Liteky*, 510 U.S. at 550-51. (*See* RBr. 55-56). Raniere claims that the Supreme Court's reasoning in *Liteky* turned on the inclusion of the phrase "upon completion of the evidence," and since some of the district court's comments that Raniere claims evince bias occurred during the presentation of the evidence, *Liteky* is inapposite. (*Id.*). This argument is nonsensical. *Liteky* makes clear that such opinions and judgments are "properly and necessarily acquired in the course of the proceedings" and that impartiality is not "gullibility" or "child-like innocence." *Liteky*, 510 U.S. at 551

Each of the other arguments Raniere makes in support of recusal—namely, the district court's alleged interference with the cross-

65

examination of Salzman and its exchange with Raniere's counsel during a restitution hearing—were raised below, carefully considered by the district court, and, in a thoughtful and reasoned opinion, deemed insufficient to justify the relief Raniere sought. (SPA:6-9; *see also* SPA:9-11). In his brief, Raniere does little more than register his continued disagreement with the district court's decision to keep the case, recycling a threadbare version of his arguments below without any explanation for why the district court's ruling amounted to an abuse of discretion.

Raniere's argument that the district court demonstrated bias and prejudice by curtailing the cross-examination of Salzman because "its intent was to prevent the jury from hearing testimony that was favorable to the defense" is meritless. (RBr. 58). As this Court has already found in adjudicating the appeal of Raniere's conviction, Raniere failed to establish how any additional questioning, "after an already lengthy cross-examination that included many questions on related topics" prevented him from "test[ing] the veracity of Lauren Salzman's testimony." *Raniere*, 2022 WL 17544087, at *7. And, as the district court explained, its decision to curtail cross-examination of a witness "to avoid needless harassment and attend to the witness's wellbeing" was well

66

within its discretion and in no way evinced "deep-seated antagonism" towards Raniere. (SPA:7).

Raniere's further claim that the district court's comments to one of the attorneys who represented him at the restitution hearing reflected the court's bias toward Raniere is equally meritless. Even if "expressions of impatience, dissatisfaction, annoyance, and even anger" were directed to counsel at the hearing, none of those is a ground for recusal if it is "within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky*, 510 U.S. at 555-56. And the district court was hardly stern or short-tempered with Raniere at the hearing in question. To the contrary, the record makes clear that the court exhibited patience with Raniere, asking Raniere (who appeared remotely at the hearing) several times if he could see and hear the proceedings clearly and if he consented to appear remotely, and allowing him opportunities to address the court and consult with counsel. (A:535-50). Raniere makes no argument, let alone establishes, that any

67

admonishment directed to his counsel reflected any "broader issue between the court and the defendant." (SPA:8).

Notably, nowhere does Raniere allege that he has been prejudiced by the district court's denial of his recusal motion by, for instance, alleging that the district court's supposed animosity toward him affected any rulings. Nor could he make such a showing. Rather, the record makes clear that the district court acted well within the bounds of its discretion in denying Raniere's recusal motion and Raniere has not established that he has been prejudiced by its denial in any way.

\*     \*     \*

The district court provided Raniere a full and fair opportunity to establish a basis for judicial recusal and undertook a clear-eyed assessment of its own conduct in the light of the relevant legal authorities. Raniere's subjective disagreement with the outcome that process produced is neither a substitute for legal argument nor a basis for reversal.

68

<u>CONCLUSION</u>

For the reasons stated above, the appealed-from orders should

be affirmed in all respects.

Dated:     Brooklyn, New York
           January 27, 2025

                              Respectfully submitted,

                              JOHN J. DURHAM
                              *United States Attorney,*
                              *Eastern District of New York.*

                    By:   <u>/s/ TANYA HAJJAR      </u>
                              TANYA HAJJAR
                              Assistant U.S. Attorney

ANTHONY BAGNUOLA,
TANYA HAJJAR,
*Assistant United States Attorneys,*
     *(Of Counsel).*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 12,476 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: Brooklyn, New York
    January 27, 2025

        /s/ ANTHONY BAGNUOLA
        ANTHONY BAGNUOLA
        Assistant U.S. Attorney

A P P E N D I X

## TABLE OF CONTENTS

Page

Exhibit List (excerpt),
*United States v. Raniere, et al.*, No. 18-CR-204 (NGG)
April 30, 2019 ....................................................................GA1

Memorandum and Order Denying Motion to Suppress,
*United States v. Raniere, et al.*, No. 18-CR-204 (NGG)
May 3, 2019 ........................................................................GA4

Trial Exhibits,
*United States v. Raniere, et al.*, No. 18-CR-204 (NGG)

GX521A (excerpt) ..............................................................GA12

GX550 ................................................................................GA17

GA01

*As of April 30, 2019*

| Exhibit Number | Description | Witness | Date Admitted | Admitting Party |
|---|---|---|---|---|
| 481 | Video | | | |
| 482 | Video | | | |
| 483 | Video | | | |
| 484 | Video | | | |
| 485 | Video | | | |
| 486 | Video | | | |
| 487 | Video | | | |
| 488 | Video | | | |
| 489 | Video | | | |
| 490 | Photograph | | | |
| 491 | Photograph | | | |
| 492 | Conversation with Lauren Salzman | | | |
| 493 | ESP Community Meeting | | | |
| 494 | KR DOS Crafts and Circles | | | |
| 495 | KR June 12, 2016 Recording Part I | | | |
| 496 | KR June 12, 2016 Recording Part II | | | |
| 497 | Branding Recording | | | |
| | *INTENTIONALLY OMITTED* | | | |
| 501 | Sketch of Interior of 8 Hale Drive | | | |
| 502 | Photographic Log | | | |
| 502A-V | Photos of 8 Hale Drive | | | |
| 503 | Western Digital storage device, serial number WCAS81365334 | | | |

11

GA02

*As of April 30, 2019*

| Exhibit Number | Description | Witness | Date Admitted | Admitting Party |
|---|---|---|---|---|
| 504 | Compact Disc containing FTK report for images of child pornography from GX503 | | | |
| 504A | Hard Copy of FTK Report marked as GX504 | | | |
| 505 | Compact Disc containing FTK report for "Studies Folder" images from GX503 | | | |
| 505A | Hard Copy of FTK report for "Studies Folder" images from GX503 | | | |
| 506 | Compact Disc containing FTK report for images from GX503 containing child pornography[1] | | | |
| 507 | Hard Copy of FTK report for images from GX503 containing child pornography | | | |
| 508A-F | Photographs from GX503 - Studies Folder 4L122505 | | | |
| 509A-O | Photographs from GX503 - Studies Folder A111005 | | | |
| 510A-L | Photographs from GX503 - Studies Folder BJ103005 | | | |
| 511A-L | Photographs from GX503 - Studies Folder D101705 | | | |
| 512A-I | Photographs from GX503 - Studies Folder Df101905 | | | |
| 513A-P | Photographs from GX503 - Studies Folder J101605 | | | |
| 514A-P | Photographs from GX503 - Studies Folder L102805 | | | |

---

[1]    Pursuant to the Adam Walsh Act, the government cannot provide copies of GX506, GX507, and GX518 to the defendant.  However, these exhibits are available to the defendant for review at a government facility.

12

GA03

*As of April 30, 2019*

| Exhibit Number | Description | Witness | Date Admitted | Admitting Party |
|---|---|---|---|---|
| 515A-KK | Photographs from GX503 - Studies Folder Mnp102005 | | | |
| 516A-H | Photographs from GX503 - Sudies Folder Mo101805 | | | |
| 517A-O | Photographs from GX503 - Sudies Folder Msk101905 | | | |
| 518 A-U | Child pornography images from GX503 | | | |
| 519A-HH | Carved Images from GX503 | | | |
| 520 | Cannon Ultrasonic camera, serial number 1420908348 | | | |
| 521 | Compact Disc containing FTK report for images from GX520 | | | |
| 521A | Hard Copy of FTK report for images from GX520 | | | |
| 522A-P | Photographs from GX520 | | | |
| 523A-IIII | Deleted photographs from GX520 | | | |
| 524 | Toshiba Memory Card | | | |
| *INTENTIONALLY OMITTED* | | | | |
| 526 | Camila ▉▉▉ X-rays | | | |
| 527 | Data Relating to GX528-451 | | | |
| 528 | Camila ▉▉▉ Photograph | | | |
| 529 | Camila ▉▉▉ Photograph | | | |
| 530 | Camila ▉▉▉ Photograph | | | |
| 531 | Camila ▉▉▉ Photograph | | | |
| 532 | Camila ▉▉▉ Photograph | | | |

13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

UNITED STATES OF AMERICA,

              -against-

KEITH RANIERE,

                       Defendant.
-------------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**18-CR-204-1 (NGG) (VMS)**

     Defendant Keith Raniere moves to suppress images (the "Images") seized from a hard

drive, which are allegedly child pornography, arguing that the Images fell outside the scope of

the Government's search warrant. (Raniere Second Mot. to Suppress ("Mot.") (Dkt. 574).) For

the following reasons, the court DENIES Raniere's motion.

**I.     BACKGROUND[1]**

     On March 26, 2018, Raniere was arrested. (See Mar. 26, 2018 ECF Entry.) That same

day, Magistrate Judge Daniel J. Stewart of the Northern District of New York signed a search

and seizure warrant (the "8 Hale Warrant") permitting agents to search a house at 8 Hale Drive,

Halfmoon, New York 12065 ("8 Hale Drive"), including any locked and closed containers and

closed items at that location. (8 Hale Warrant (Dkt. 594-1) at 1.) The warrant also authorized

the seizure of certain items that are "evidence, fruits and instrumentalities" of certain offenses—

sex trafficking, forced labor, extortion, and racketeering (collectively, the "Subject Offenses")—

involving Keith Raniere that occurred in or after January 1, 2015. (Id. at 5.) The items listed in

the warrant included: "Computers or storage media used as a means to commit or facilitate the

commission of the Subject Offenses (including to store 'collateral,' as described in the

---

[1] The court presumes familiarity with the record in this case and only discusses the aspects of the case relevant to the instant motion.

GA05

[Government's] affidavit[2]." (Id.)  The affidavit described explicit photographs and videos from

DOS "slaves" as collateral (Lever Aff. ¶¶ 21-22, 47), and notes that the collateral was given to

Raniere (id. ¶ 47) and would likely be found at 8 Hale Drive (id. ¶¶ 50, 51).  Additionally, the

Government's complaint against Raniere—which was attached to Lever's affidavit—alleged that

Raniere collected similar nude photographs of DOS slaves in connection with sex-trafficking and

forced-labor crimes.  (Compl. (Dkt. 594-1 at ECF p. 41) ¶ 48).

 The next day, the Government searched 8 Hale Drive (Gov't Mem. in Opp'n to Mot. to

Supp. ("Opp'n") at 3) and seized a hard drive (the "Device"), among other items (id. at 2).  The

Government produced the Device to Raniere and his co-defendants on October 5, 2018.  (Gov't

Oct. 5, 2018 Letter (Dkt. 593-2); Raniere Mem. in Supp. of Mot. to Supp. ("Raniere Mem.")

(Dkt. 580) at 3.)

 On February 21, 2019,[3] while searching the Device pursuant to the 8 Hale Warrant, FBI

agents found the Images, i.e., two digital images of a nude female whom the agents believed to

be under the age of eighteen.  (Second Lever Aff. ¶¶ 11-12.)  The agents recognized this female

as a DOS slave who they believed had sex with Raniere when she was fifteen.  (Id. ¶¶ 9-11.)

The Images' metadata indicate that they were taken on or before November 2, 2005—a date on

which the DOS slave in question was fifteen years old—and that they were taken on a camera

seized from 8 Hale.[4]  (Id. ¶¶ 12-14.)  The Images were also in a folder dated November 2, 2005.

(Id. ¶ 13.)

---

[2] The affidavit was submitted with the Government's application for the search warrant. (Mar. 26, 2018 Aff. of Michael Lever (Dkt. 594-1 at p. 10) ("First Lever Aff.").)

[3] In Michael Lever's affidavit, he states that this took place on February 21, 2018. (Feb. 21, 2019 Aff. of Michael Lever (Dkt. 594-2 at p. 2) ("Second Lever Aff.") ¶ 11.)  That appears to be a typographical error; Lever meant to say 2019, not 2018.

[4] This same camera was used to take many pictures of Raniere and his other alleged sexual partners.  (Second Lever Aff. ¶ 14.)

2

Also on February 21, 2019, the Government informed Raniere and his co-defendants that it had found "at least one image of child pornography" on the Device. (Gov't Feb. 21, 2019 Letter (Dkt. 362).) Raniere's counsel deleted all copies of the Device and returned it to the Government, in compliance with the Government's request. (Raniere Mem. at 3.) The next day, Magistrate Judge Peggy Kuo authorized a warrant to search the Device for additional evidence of child pornography and sexual exploitation of children. (Feb. 22, 2019 Warrant (Dkt. 594-2).) The Government provided the remaining defendants with a new copy of the Device on March 21, 2019, and then—after Raniere's counsel pointed out that the Images were still on this new copy of the Device—a sanitized copy on April 6, 2019. (Raniere Mem. at 4.)

In a March 29, 2019 brief opposing Raniere's motion to dismiss the indictment, the Government gave the following description of the Images:

> The sexually explicit photographs of Jane Doe 2 were found on a hard drive seized from 8 Hale Drive, in a folder titled "BACKUPS," in a subfolder titled "Studies," which in turn contained 12 subfolders, each of which contained numerous sexually explicit photographs of other members and associates of the Enterprise with whom Raniere had sexual relationships, including Raniere's codefendants Lauren Salzman and Kathy Russell. The photographs in each of the 12 subfolders were taken contemporaneously with the photographs of Jane Doe 2, and the women in all of the photographs – including Jane Doe 2 – were photographed in many of the same poses.

(Gov't Mem. in Opp'n to Mots. to Dismiss (Dkt. 485) at 12.) According to Raniere, it is clear from the face of each of the 12 subfolders that they contain photographs taken in 2005. (Raniere Mem. at 4.) As of the filing of the instant motion, Raniere had not received FBI reports from the Government detailing the search of the Device that led to FBI agents discovering the pornography. (Id.)

Raniere filed this motion on April 22, 2019. (Mot.) He claims to have a Fourth Amendment interest in 8 Hale Drive because it was his study, he renovated it, he stored books

3

and computers there, and he engaged in sexual activity there.[5]  (Raniere Mem. at 5-6.)  He argues

that, in reviewing pornographic photographs from 2005, the Government exceeded the scope of

the 8 Hale Warrant, which only permitted the Government to search "evidence, fruits and

instrumentalities" of the Subject Offenses (none of which are child pornography) "occurring in

or after January 1, 2015." (Id. at 7-9.)  As Raniere says, "[t]he warrant has a clear time

limitation." (Id. at 8.)  The Government opposes Raniere's motion, positing that (1) it is

untimely, (2) the Images are within the scope of the 8 Hale Warrant, and (3) even if they were

not, the Images fall within the "plain view exception" to the Fourth Amendment's warrant

requirement.  (Opp'n at 3-7.)

## II.    DISCUSSION

### A.    Whether Raniere's Motion is Timely

The Government contends that Raniere's motion is untimely to the extent that he

challenges the 8 Hale Warrant as facially overbroad.  (Id. at 1, 3-4.)  But the Government

concedes that Raniere's motion is timely to the extent that he challenges the execution of the 8

Hale Warrant with respect to the Images.  (Id. at 2.)  That is clearly what Raniere is doing.

(Mem. at 7-9; Raniere Reply in Supp. of Mot. to Supp. ("Reply") (Dkt. 605) at 1.)  He did not

receive notice that the Government had found the Images on the Device until February 21, 2019

(Gov't Feb. 21, 2019 Letter)—six weeks after the court's January 9, 2019 deadline for motions

to suppress (Jan. 7, 2019 Order).  His motion is timely.

---

[5] The Government does not dispute that Raniere has a Fourth Amendment interest in 8 Hale Drive.

**B.    Whether the Images are Within the Scope of the 8 Hale Warrant**

1.    Legal Standard

"Like all activities governed by the Fourth Amendment, the execution of a search warrant

must be reasonable." United States v. Lustyik, 57 F. Supp. 3d 213, 230 (S.D.N.Y. 2014) (citing

United States v. Ramirez, 523 U.S. 65, 71 (1998)). Accordingly, "[a] search must be confined to

the terms and limitations of the warrant authorizing it" and "must be 'conducted in a manner that

minimizes unwarranted intrusions upon privacy.'" United States v. Matias, 836 F.2d 744, 747

(2d Cir. 1988) (citing Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976)). Items outside the

scope of a valid warrant must be suppressed unless they fall within an exception to the Fourth

Amendment's warrant requirement. Lustyik, 57 F. Supp. 3d at 230 (citing, inter alia, Matias,

836 F.2d at 747).

2.    Application

Raniere contends that, before opening the Images, the FBI agents knew they were from

2005 and were outside the scope of the 8 Hale Warrant, "which was limited to a very specific

time period, namely after 2015." (Reply at 1-2.) Therefore, Raniere argues, the Government's

execution of the 8 Hale Warrant violated the Fourth Amendment. (Mem. at 7-9; Reply at 1-2.)

Raniere is wrong because he misreads the 8 Hale Warrant. The warrant permitted the

Government to review materials created before 2015, so long as the materials were evidence,

fruits, or instrumentalities of Subject Offenses involving Raniere that occurred in 2015 or later.

(8 Hale Warrant at 5.)

Although the Images were created in 2005, they are within the scope of the 8 Hale

Warrant because they are evidence of multiple Subject Offenses involving Raniere that occurred

in 2015 or later. First, racketeering is a Subject Offense (id.), and the Images are the basis for

three predicate acts of an alleged racketeering pattern that lasted through March 2018 (Second Superseding Indictment (Dkt. 430) ¶¶ 17, 21-23). <u>Second</u>, the female in the Images allegedly became a DOS slave and the Images share similarities with the collateral provided by other DOS slaves (Opp'n at 5), so the Images may be relevant to Raniere's motive, intent, or modus operandi in forming DOS. Thus, the Images are "evidence regarding the formation and structure of DOS," which makes them evidence of Subject Offenses (sex trafficking, forced labor, and extortion) occurring in 2015 or later. (8 Hale Warrant at 5.)

Even if the Images were outside the scope of the 8 Hale Warrant—<u>e.g.</u>, they were not evidence, fruits, or instrumentalities of Subject Offenses involving Raniere that occurred in 2015 or later—the court would not suppress them because they fall within the plain view exception to the Fourth Amendment's warrant requirement.

### C.    Whether the Images Fall Within the Plain View Exception

#### 1.    Legal Standard

"The plain view exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." <u>United States v. Gamble</u>, 388 F.3d 74, 76 (2d Cir. 2004) (citation and quotation marks omitted). "Probable cause exists to believe that a certain item is evidence of a crime 'if the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be useful as evidence of a crime.'" <u>Lustyik</u>, 57 F. Supp. 3d at 231 (alteration adopted) (quoting, <u>inter alia</u>, <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983) (plurality opinion)). "The belief that an item in plain view is evidence of a crime need not 'be correct or more likely true than false. A

6

practical, nontechnical probability that incriminating evidence is involved is all that is required.'" Id. (quoting Brown, 460 U.S. at 742).

Furthermore, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976). "Courts have applied this principle in analyzing the method used by the police in searching computers and have afforded them leeway in searching computers for incriminating evidence within the scope of materials specified in the warrant." United States v. Graziano, 558 F. Supp. 2d 304, 317 (E.D.N.Y. 2008) (citations omitted); see United States v. Fumo, No. 06-319, 2007 WL 3232112, at *6 (E.D. Pa. Oct. 30, 2007) ("Regardless of the search protocols or keywords used by the government, the government may open and briefly examine each computer file to determine whether it is within the description recited in the warrant.").

  2. <u>Application</u>

The Government contends that "it was plain to agents cursorily reviewing the contents of the hard drive that the images were evidence, fruits and instrumentalities of a host of crimes, including those identified in the warrant, as well as [sexual exploitation of children and child pornography]." (Opp'n at 6.) Raniere retorts that the agents should never have opened the images in the first place because "[a]s soon as the agents saw the folders dated 2005, they were outside of the time-period permitted by the warrant and they had a duty, imposed by the constitution, to stop searching." (Reply at 2.)

As explained above, materials created in 2005 may be evidence, fruits, or instrumentalities of crimes that occurred in 2015 or later. FBI agents were not required to stop reviewing a folder once they saw that it was dated 2005. The agents were permitted to "engage

7

in a cursory review of files [in the folder dated 2005], by opening them, to determine whether they contained evidence . . . that was within the scope of the warrant." Graziano, 558 F. Supp. at 317; see Fumo, 2007 WL 3232112, at *6 ("[T]he government may open and briefly examine each computer file to determine whether it is within the description recited in the warrant.").

Once the agents opened the two Images, they recognized the depicted nude female as a DOS slave who they believed Raniere had sex with when she was fifteen. (Second Lever Aff. ¶¶ 9-11.) Given what the agents knew at the time they opened the Images, "a person of 'reasonable caution' would have believed [the Images] constituted evidence of a crime"—specifically, sexual exploitation of children in violation of 18 U.S.C. § 2251(a) and possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(b). See Lustyik, 57 F. Supp. 3d at 233 (quoting, inter alia, Brown, 460 U.S. at 742). Therefore, the Images fall within the plain view exception.

III.   **CONCLUSION**

For the foregoing reasons, Keith Raniere's (Dkt. 574) motion to suppress the Images is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York          NICHOLAS G. GARAUFIS
      May 3, 2019                  United States District Judge

8

GA12

## Case Summary

Case Information..................................................................................................................2
File Overview......................................................................................................................2
Evidence List......................................................................................................................3

## Bookmarks

Shared..................................................................................................................................4
   Photos.............................................................................................................................4

## Graphics

## File Paths

Checked Items..................................................................................................................131

## File Properties

Checked Items..................................................................................................................139



GOVERNMENT
EXHIBIT
**GX 521A**
18 CR 204 (S-2) (NGG)

GA13

## Case Summary



## File Overview

6/11/2019

### Evidence Groups
Ungrouped: 433

### File Items
Evidence Items: 1
Checked Items: 329
Unchecked Items: 104

### File Category
Archives: 0
Databases: 0
Documents: 72
Email: 0
Executable: 2
Folders: 11
Graphics: 222
Internet/Chat Files: 0
Mobile Phone: 0
Multimedia: 0
OS/File System Files: 3
Other Encryption Files: 0
Other Known Types: 0
Presentations: 0
Slack/Free Space: 79
Spreadsheets: 0

GA14

Unknown Types: 44
User Types: 0

## File Status

Bad Extensions: 0
Data Carved Files: 210
Decrypted Files: 0
Deleted Files: 158
Duplicate Items: 162
Email Attachments: 0
Email Related Items (From Email): 0
Encrypted Files: 0
Flagged Ignore: 0
Flagged Privileged: 0
From Recycle Bin: 0
KFF Alert Files: 0
KFF Ignorable: 0
OCR Graphics: 0
OLE Subitems: 0
Project VIC Matches: 0
User-Decrypted Files: 0

## Labels

NFI: 0
Privileged: 0
Relevant: 0
Unprivileged: 0

## Email Status

Email Attachments: 0
Email Related Items (From Email): 0
Email Reply: 0
Forwarded Email: 0

## Evidence List

6/11/2019
### Display Name: Lexar CF 2GB Card
Evidence Path: \\nycart-fs\CASES02\NY-2233091_196817\Evidence\NYC024299_1B15a\NYC024299_1B15a.E01
ID Number/Name: NYC024299_1B15a.E01
Evidence Type: Disk Image
Description:
Time Zone: America/New_York

## All Bookmarks

6/11/2019
Time zone for display: Eastern Daylight Time

## Shared

## Bookmark: Photos

6/11/2019

Note: the following file filter was applied to this list: "Bookmarked"

***Comments:***
***Creator:*** bsbooth
***File Count:*** 329

***Files***

| File Comments | |
|---|---|
| Name | !MG_0021.exif.html |
| Extension | html |
| Item Number | 2201 |
| Path | Lexar CF 2GB Card/Partition 1/LEXAR MEDIA [FAT16]/[root]/DCIM/100CANON/!MG_0021.JPG»!MG_0021.exif.html |
| Created Date | n/a |
| Accessed Date | n/a |
| Modified Date | n/a |
| MD5 Hash | |
| Deleted | True |
| Carved | False |
| Exported as | Report_Files/files/!MG_0021.exif.html |

| File Comments | |
|---|---|
| Name | !MG_0021.JPG |
| Extension | jpg |
| Item Number | 1272 |
| Path | Lexar CF 2GB Card/Partition 1/LEXAR MEDIA [FAT16]/[root]/DCIM/100CANON/!MG_0021.JPG |
| Created Date | 10/14/2005 6:09:24 PM (2005-10-14 22:09:24 UTC) |
| Accessed Date | 10/16/2005 |
| Modified Date | 10/14/2005 6:09:24 PM (2005-10-14 22:09:24 UTC) |
| MD5 Hash | 8b45ea7d2019e819a461d3b9cf827d09 |
| Deleted | True |
| Carved | False |
| Exported as | Report_Files/files/!MG_0021.JPG |

| File Comments | |
|---|---|
| Name | !MG_0022.exif.html |
| Extension | html |
| Item Number | 2301 |
| Path | Lexar CF 2GB Card/Partition 1/LEXAR MEDIA [FAT16]/[root]/DCIM/100CANON/!MG_0022.JPG»!MG_0022.exif.html |

GA16

| | |
|---|---|
| **Created Date** | n/a |
| **Accessed Date** | n/a |
| **Modified Date** | n/a |
| **MD5 Hash** | |
| **Deleted** | True |
| **Carved** | False |
| **Exported as** | Report_Files/files/!MG_0022.exif.html |

| | |
|---|---|
| **File Comments** | |
| **Name** | !MG_0022.JPG |
| **Extension** | jpg |
| **Item Number** | 1273 |
| **Path** | Lexar CF 2GB Card/Partition 1/LEXAR MEDIA [FAT16]/[root]/DCIM/100CANON/!MG_0022.JPG |
| **Created Date** | 10/14/2005 6:09:56 PM (2005-10-14 22:09:56 UTC) |
| **Accessed Date** | 10/16/2005 |
| **Modified Date** | 10/14/2005 6:09:56 PM (2005-10-14 22:09:56 UTC) |
| **MD5 Hash** | 83a63e110e41d26bf784ae50b6b0c6a1 |
| **Deleted** | True |
| **Carved** | False |
| **Exported as** | Report_Files/files/!MG_0022.JPG |

| | |
|---|---|
| **File Comments** | |
| **Name** | !MG_0023.exif.html |
| **Extension** | html |
| **Item Number** | 2351 |
| **Path** | Lexar CF 2GB Card/Partition 1/LEXAR MEDIA [FAT16]/[root]/DCIM/100CANON/!MG_0023.JPG»!MG_0023.exif.html |
| **Created Date** | n/a |
| **Accessed Date** | n/a |
| **Modified Date** | n/a |
| **MD5 Hash** | |
| **Deleted** | True |
| **Carved** | False |
| **Exported as** | Report_Files/files/!MG_0023.exif.html |

| | |
|---|---|
| **File Comments** | |
| **Name** | !MG_0023.JPG |
| **Extension** | jpg |
| **Item Number** | 1274 |
| **Path** | Lexar CF 2GB Card/Partition 1/LEXAR MEDIA [FAT16]/[root]/DCIM/100CANON/!MG_0023.JPG |
| **Created Date** | 10/14/2005 6:09:58 PM (2005-10-14 22:09:58 UTC) |
| **Accessed Date** | 10/16/2005 |
| **Modified Date** | 10/14/2005 6:09:58 PM (2005-10-14 22:09:58 UTC) |
| **MD5 Hash** | 4cd1ea7f2e533f8e5a35b807fb06a71b |
| **Deleted** | True |
| **Carved** | False |
| **Exported as** | Report_Files/files/!MG_0023.JPG |

| | |
|---|---|
| **File Comments** | |
| **Name** | !MG_0024.exif.html |

GA17

