# Exhibit A

# DEBORAH J. BLUM, ESQ.

### 225 Broadway, Suite 715 • New York, NY 10007

Patrick Fan, MBA *Legal Intern*
Ariella Rubin *Legal Assistant*

T • (646) 398-3232
M • (845) 304-5312
F • (212) 409-8279

November 22, 2024

**Via Hand Delivery and Email**
The Honorable Breon S. Peace
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
E: BreonPeace@usdoj.gov

Re: **United States v. Keith Raniere et al. (1:18-CR-00204 (NGG))**

Dear Hon. Peace:

  We, members of the defense team, write to bring your direct attention to credible and troubling evidence of systematic government malfeasance in *United States v. Keith Raniere*[1], which occurred under the tenure of your predecessors. Below are key findings from 8 independent post-conviction experts, including 5 former members of the FBI, which support this conclusion. **These experts attest that their findings of government malfeasance in this case are unprecedented in their 170+ years of combined experience**.

- **Government Involvement in Falsification of Digital Evidence:**
  The 7 post-conviction digital forensic experts, including 4 former FBI Computer Analysis Response Team (CART) examiners, concluded that the digital evidence that the government used in Mr. Raniere's trial to support "the heart of" their case[2] was extensively falsified. They determined that alleged contraband was planted on the hard drive, corroborating files were planted on the camera's memory card, and timestamps were manipulated across both devices to create the impression of

---

[1] Please also accept this correspondence as a Notice to Preserve all digital evidence, including but not limited to the digital evidence referred to in Mr. Raniere's Rule 33 and related Motions to Compel (Docs. 1169, 1176, 1178, 1192, 1230, & 1253) and their pending Consolidated Appeal (*US v. Raniere*, 2d Cir., 24-778-CR(L), 24-1285-CR(CON), & 24-1317-CR(CON)).

[2] Pre-Trial T. (3/18/2019) at 19:14-16

1

Bates 1

illegality.[3] Based upon their findings of government misconduct, they jointly concluded that "the involvement of government personnel in this evidentiary fraud is inescapable".[4]

- **Prohibited and Concealed Second Forensic Image, Violating CART Protocol:**
  During trial, FBI Senior Forensic Examiner Brian Booth (hereinafter "SFE Booth") created a second forensic image of the memory card, violating FBI protocol, and with improper approval from Supervisory Special Agent Trenton Schmatz.[5] AUSA Tanya Hajjar (hereinafter referred to as "AUSA Hajjar") misrepresented to the Court during a sidebar that SFE Booth did not create any forensic images, which she should have known was untrue.[6] The second forensic image was not disclosed by your Office despite Trial Counsel's renewed request, during trial, for Rule 16 and 3500 materials.[7] To date, the government continues to withhold access to the second forensic image. If the defense had access to this second forensic image, we could undeniably corroborate our previous findings of digital evidence falsification.

- **Pre-Choreographed Staging of the Search of 8 Hale:**
  Former FBI Senior Evidence Technician Kenneth DeNardo and Retired FBI and OIG Special Agent Mark Bowling[8] analyzed the search logs and photos and both concluded that Special Agent (hereinafter referred to as "SA") Elliot McGinnis staged the search at 8 Hale by pre-filling recovery logs with key items, their precise locations, and a pre-assigned discovery order before the team even arrived at 8 Hale. Further violations of FBI protocol include: prior to arriving at the search, SA McGinnis signed the names of other agents on the personnel list, including an agent who did not participate in the search and SA McGinnis signed the evidence recovery log as another agent, SA Christopher Mills, for numerous item entries.[9]

- **Manufacturing of Scenes within the Search of 8 Hale:**
  Mr. DeNardo, in the Search Report, concluded that FBI agents manufactured a scene on a bookshelf during the search, using props, including 2 uncollected books on sex

---

[3] Doc. 1253-1 at ¶ 1, 2, & 8; attached.
[4] Doc. 1253-1 at ¶ 16
[5] Doc. 1169-1 at PageID #21386-21387
[6] Trial T. (6/13/19) at 4893:1-4
[7] Trial T. (6/13/19) at 4893:9-11, & 4894:25 - 4895:3
[8] *See* Findings 2 and 5 in the attached report (hereinafter referred to as "Search Report") by Mr. DeNardo, which was independently reviewed and its conclusions agreed with by Mr. Bowling; *see* attached. These critical new revelations regarding the search will be included in an upcoming amendment to Mr. Raniere's 28 U.S.C. §2255, due on November 28, 2024, in which Mr. Raniere is represented by Deborah J. Blum, Esq.
[9] *See* Search Report, Findings 1 and 3.

2

trafficking, to stage photos of electronic devices[10]. These photos were presented to the jury.[11] The Search Report identified SA Mills, SA Tracee Mergen, and Task Force Officer Brett Hochron as complicit, deeming their actions as evidence fabrication that undermined the integrity of the search.[12]

- **Unauthorized Accesses, and Alteration of Unpreserved Original Digital Evidence by Secret FBI "Photograph Technician":**
  At least 3 unauthorized personnel, including SA Maegan Rees[13], SA Michael Lever[14], and an unidentified FBI photograph technician[15] accessed the unpreserved camera, which contained a memory card. The defense's 4 former FBI CART examiners concluded that their accesses were knowing violations of FBI protocol.[16] The photograph technician altered the camera's unpreserved memory card; while the alteration was known at the time of trial, the government only disclosed the technician's existence 4 years post-trial, in a footnote[17], and have refused to disclose their identity.[18] Notably, the same footnote revealed that this unauthorized operation was directed by the prosecution, purportedly for discovery production purposes.[19]

- **Deliberate Omission of Unauthorized Access from Chain of Custody**:
  The 4 former FBI CART examiners found that SA Lever and the photograph technician deliberately omitted the technician's access from the chain of custody, violating protocol.[20] The examiners also noted that "photograph technician" is not a job title within the FBI.[21]

- **False Government Agent Testimony About Evidence Handling:**
  AUSA Hajjar elicited testimony from SA Mills who falsely claimed that the camera was properly handled, solely within CART[22], despite mishandling outside of CART by SA Rees, SA Lever, and the photograph technician. SFE Booth, who received the

---

[10] *See* Search Report, Finding 6.
[11] Trial T. (6/10/19) at 4297:11-17
[12] *See* Search Report, Finding 6.
[13] Doc. 1169-1 at PageID #21383
[14] Doc. 1169-1 at PageID #21383
[15] Doc. 1213 at 11, n.6
[16] Doc. 1235-1 at ¶¶ 4-11
[17] Doc. 1213 at 11, n.6
[18] Doc. 1231
[19] Doc. 1213 at 11, n.6
[20] Doc. 1235-1 ¶ 11
[21] Doc. 1235-1 ¶ 12
[22] Trial T. (6/10/19) at 4307:8-18

3

camera's memory card in an unsealed bag from SA Mills[23], falsely testified that receiving unsealed evidence was not extraordinary.[24]

The majority of these findings[25] were presented in Mr. Raniere's post-conviction filings, vehemently opposed by your Office and denied by Senior District Court Judge Nicholas G. Garaufis, without a hearing.[26]

This situation is extraordinary and unjust. To no avail, members of the defense team previously approached your Office to engage in conversations about these egregious findings and others. We now present this information to you personally and respectfully implore you to investigate and rectify these wrongs. We, and our experts, are happy to answer your questions and provide you with additional information. Thank you in advance for your prompt attention to this matter and please confirm receipt of this letter and its attachments.

It is our hope that you will depart from your predecessors' and assistants' stance and effectuate justice.

*Deborah J. Blum*

_____
Deborah J. Blum, Esq.
Attorney for Keith Raniere


_____
Joseph Tully, Esq.
Tully & Weiss Attorneys at Law
Attorney for Keith Raniere


_____
Gregory Stoltz, Esq.
Former Deputy Pima County Attorney, Tucson, AZ (2011-2014)

---

[23] Trial Transcript (6/13/19) at 4889:14-18
[24] Doc. 1169-1 at Page ID # 21382, 21385
[25] Mr. DeNardo's critical new revelations regarding the search are expected to be included in the upcoming amendment to Mr. Raniere's motion under 28 U.S.C. §2255, due on November 28, 2024.
[26] Doc. 1238, & 1256

4

The following signatories support the conclusions reached in the foregoing letter by counsel and urge the United States Attorney to investigate:

Alan Dershowitz, Esq.
Of Counsel to Keith Raniere

Hon. Richard Mays, Sr.
Retired Supreme Court Justice of Arkansas
*Amicus Filer* in Support of Mr. Raniere's Pending Appeal

Professor Ronald S. Sullivan, Jr., Esq.
Ronald Sullivan Law, PLLC
Attorney for Clare Bronfman

6

*United States v. Keith Raniere et al.*
Eastern District of New York
Case Nos: 18-cr-204-NGG, 1:24-cv-02925-NGG

# Analysis of FBI Search of 8 Hale

## Findings of Planting, Staging, and Related Misconduct

By Kenneth DeNardo

Former FBI Senior Evidence Technician and Evidence Response Team (ERT) Photographer

November 20, 2024

DocuSign Envelope ID: 41838FA -79FD-48BF-9586-0673D6E -9/23

# Table of Contents

**Introduction**................................................................................................................**3**

**Case Background**........................................................................................................ **3**

**Summary of Key Findings**.......................................................................................... **4**

**Findings**.....................................................................................................................**5**

    Finding 1: Before the Team Arrived at 8 Hale, SA Elliot McGinnis Pre-Filled the Personnel List and Signed On Behalf Other Agents, Both in Violation of FBI Protocol....5

    Finding 2: Before Arriving at 8 Hale, SA Elliot McGinnis Pre-Filled the Evidence Recovery Log, Violating FBI Protocol and Choreographing the Search to Fit a Predetermined Narrative.................................................................................. 6

    Finding 3: SA McGinnis Improperly Signed As Other Agents For 80% of the Entries in the Evidence Recovery Log, Further Undermining Its Reliability and Integrity as a Real-Time Record................................................................................. 9

    Finding 4: Failure to Log All Search Personnel, Such as a Canine, Constitutes a Knowing Violation of Protocol by Team Leader SA Doyle and the Canine's Handler, Undermining the Integrity of the Search Records................................................10

    Finding 5: The Canon camera and Western Digital hard drive were deliberately prioritized in the improperly pre-choreographed evidence log, demonstrating foreknowledge of their precise locations and importance. This directly contradicts the FBI's claim of an 'accidental' discovery of their significance 11 months later................12

    Finding 6: Agents manufactured a scene on a bookshelf by adding and arranging items—including two, uncollected incriminating sex trafficking books of unknown origin, likely brought to the scene—and then used this false setup to take evidence photographs.........................................................................................................16

    Finding 7: A second camera of unknown origin, likely planted, was staged, labeled as evidence, and photographed, but deliberately left behind................................................. 22

DocuSign Envelope ID: 41B38FAA-79FD-46BF-9586-0073D6E04B66

Finding 8: The Canon camera and memory card are not clearly visible in any evidence photograph, contrary to FBI protocol...............................................................23

Finding 9: The hard drive was intentionally mislabeled in its evidence photograph........24

Finding 10: There is no record in the chain of custody of what happened to the hard drive after February 22, 2019, months before trial.......................................................25

**Conclusion**.........................................................................................................................27

2

# Introduction

I, Kenneth DeNardo, declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the contents of this report are true and correct.

I served in the FBI for 23 years as a Senior Evidence Technician and Photographer for the Evidence Response Team (ERT), where I ensured recovered evidence was documented, collected, and processed according to strict FBI protocols. I also trained new FBI employees in proper evidentiary procedures and was the Senior ERT member in Evidence Control in the Miami office. Throughout my career, I participated in hundreds of searches and worked on high-profile cases, including the 9/11 South Florida investigation and the Boca Raton anthrax incidents.

**In my expert opinion, based on the FBI's own photos and logs, the search at 8 Hale Drive, Halfmoon, NY was deliberately and premeditatedly staged. Of the 9 search team members, 4 were complicit in this fraudulent conduct, with 2 serving as key orchestrators: Special Agents Elliot McGinnis and Christopher Mills. In my 23 years of experience with the FBI, I have never seen a search with this magnitude of malfeasance.**

This report details my analysis and findings, with annotated diagrams included herein, and the original FBI photos and logs included as exhibits.

# Case Background

On March 27, 2018, FBI agents executed a search warrant at 8 Hale Drive, Halfmoon, NY ("8 Hale") to collect evidence related to alleged sex trafficking and racketeering of alleged adult victims. (Exhibit A, Search Records[1], Pg. DEF-13). The search warrant specifically lists for collection of "computers or storage media" that could contain nude photographs of adults, referred to as "collateral", and sought "sex trafficking paraphernalia." (*Id.*) Nearly 11 months later, the government claimed an accidental discovery of alleged child pornography on a Western Digital hard drive, taken by a Canon camera, reportedly seized during the search. (*US v. Keith Raniere*, 18-CR-204, Doc. 618, Pg. 2-3).This discovery led to new charges.

Post-trial, 7 independent forensic experts, including 4 former FBI examiners, concluded that the hard drive and camera's memory card had been extensively falsified, with the alleged contraband photos being "planted on the hard drive and disguised as a computer backup." (Doc. 1253-1 at ¶ 8). More than 4 years after trial, the government disclosed that the camera's memory card alteration in FBI custody, which was revealed during trial, was done by an unidentified FBI

---

[1] The evidence recovery log is not included in Exhibit A; it is provided separately as Exhibit B for ease of reference.

photograph technician not listed on the chain of custody. (Doc. 1213 at 11, n.6; Doc. 1231 at 1).
My findings of fraudulent conduct before and during the search directly relate to these devices.

# Summary of Key Findings

1. **Pre-Filled Personnel List:** Before arriving at the site, Special Agent ("SA") Elliot
   McGinnis pre-filled the personnel list and further violated FBI protocol by signing the
   personnel list as other agents, including an agent, SA Kevin McGee, who did not
   participate in this search.

2. **Pre-Filled Evidence Recovery Log:** Before even arriving at the search, SA McGinnis
   pre-filled the evidence recovery log with item entries, including room labels, locations,
   and a pre-assigned sequence of discovery. This is evidenced by crossed-out entries on a
   later page of the log that correspond to items already listed on an earlier page, albeit in a
   different sequence, revealing a pre-choreographed effort to fit a predetermined narrative
   rather than the required real-time documentation. This constitutes evidence fabrication.

3. **Improper Log Entries:** SA McGinnis improperly signed as SA Mills for 32 out of 40
   entries (80%) in the evidence recovery log, violating FBI protocol and further eroding the
   log's reliability and enabling potential evidence tampering.

4. **Failure to Log All Search Personnel, Such as a Canine:** A canine present at the search
   was not logged by team leader SA Christine Doyle or its handler, constituting knowing
   violations of FBI protocol that mandates all personnel on-site be documented, for
   accountability.

5. **Choreographed Targeting of Key Evidence:** The Canon camera and Western Digital
   hard drive in the upstairs study, labeled Room F, were intentionally prioritized in the
   staging of the search as the first 2 items collected, even though standard procedure would
   have started with Room A downstairs. Their prioritization demonstrates foreknowledge
   of their locations and importance. This directly contradicts the government's claim of an
   'accidental' discovery of their evidentiary importance 11 months later.

6. **Manufactured Bookshelf Scene:** Agents manufactured a false scene on a bookshelf,
   adding items—including 2 sex trafficking books of unknown origin, due to not being
   photographed "in place", likely planted —to create incriminating evidence photographs.
   These books, directly related to the main alleged crime linked to the search, were not
   collected. In my expert opinion, this constitutes evidence fabrication. Note that the search
   photographs were presented to the jury.

4

7. **Planted and Uncollected Camera:** A second camera, whose origin is unknown due to the lack of an "in place" photograph, was falsely staged, labeled, and photographed as evidence but inexplicably left behind. Leaving a documented camera behind defies logic in a search explicitly focused on collecting photographic evidence, strongly supporting my conclusion that this camera was likely planted.

8. **Incompetent Evidence Photos:** The Canon camera, containing the memory card, is not clearly visible in any evidence photograph, and no photograph of the memory card itself was taken.

9. **Intentional Mislabelling of Evidence:** A silver/gray LaCie hard drive was mislabeled and photographed as Item 2, whereas Item 2 in the log is listed as a black Western Digital hard drive. I determined that this mislabeling was likely intentional.

10. **Chain of Custody Abruptly Ends Following 'Accidental Discovery':** The Western Digital hard drive's chain of custody contains no entries after SA Michael Lever checked it out of Evidence Control on February 22, 2019—months before it was purportedly presented at trial— with no record that it was ever returned, raising serious concerns about the handling and integrity of this critical evidence.

# Findings

**Disclaimer:** The protocols referenced in this report are in the ERT manuals, which are not publicly available.[2] However, as a former senior ERT member with 23 years of FBI experience, I affirm that my representations of these protocols are accurate and reflect the required standards for FBI search photography and evidence collection procedures.

### Finding 1: Before the Team Arrived at 8 Hale, SA Elliot McGinnis Pre-Filled the Personnel List and Signed On Behalf Other Agents, Both in Violation of FBI Protocol.

FBI protocol requires that the evidence recovery log must be completed on-site to ensure a reliable, real-time record of the search. Each agent must personally sign and initial the personnel list on the log's first page. Signing on behalf of another agent is strictly prohibited. These protocols, in which all agents are trained in, are basic and essential to maintaining the integrity of evidence collection, and were knowingly violated by SA McGinnis and other agents.

---

[2] An overview is available at https://www.fbi.gov/news/stories/evidence-response-team-basic-course-100521; see also: Federal Bureau of Investigation, *FBI Handbook of Crime Scene Forensics: The Authoritative Guide to Navigating Crime Scenes* (2015).

5

DocuSign Envelope ID: 41D03FAA-79FD-43DF-9568-0673D66E5A9E9

SA McGinnis signed on behalf of 6 agents: SA Anthony Hingle, SA Michelle Pherson (misspelled on the personnel list as "Phoarson"), SA Tim Coll, SA Tracee Mergen, SA Kevin McGee, and TFO Brett Hochron. Note that McGinnis omitted his own name from the personnel list. Additionally, team leader SA Christine Doyle did not initial her name, another knowing violation of protocol.

| *Figure 1.* **McGinnis improperly signed for other agents** |
| --- |



Exhibit B, Evidence Recovery Log, Pg. DEF-01.

The inclusion of Kevin McGee, who was not present at the search[3], proves that the personnel list was pre-filled before arrival. With such a small search team, it is implausible that McGinnis accidentally included someone absent. It is even more unlikely, SA Christine Doyle, the team leader, would have failed to notice that McGee was listed despite not being part of the search, when later signing her name on the same line as McGee's. This confirms that the personnel list was pre-filled **before the team arrived at 8 Hale**. This undermines the integrity of the log, casting doubt on the authenticity of the process.

### Finding 2: Before Arriving at 8 Hale, SA Elliot McGinnis Pre-Filled the Evidence Recovery Log, Violating FBI Protocol and Choreographing the Search to Fit a Predetermined Narrative

FBI protocol mandates that the evidence recovery log be completed on-site during the search to document the real-time sequence of evidence collection. Items must be logged only after being labeled, photographed, and collected in sequence—even if their significance is known in advance from a confidential source. Pre-filling entries with assigned order, room labels, and specific

---

[3] SA McGee did not sign the Crime Scene Sign-In Log, nor is he listed in the team leader's Administrative Worksheet, which details personnel and their roles, or in the team leader's post-search notes as a participating agent. (Ex. A, Pg. DEF-01, 03, 04). It appears that SA McGee may have been intended to be part of this search team, however he was assigned to a different search, which was part of this same case, that same day at 3 Oregon Trail. This is supported by an evidence bag containing cash from 3 Oregon Trail, with his name written at the top above the cash. (Exhibit C, Photo from 3 Oregon Trail, Pg. DEF-01).

locations before the search is conducted, is strictly prohibited and inherently illegitimate as room labels are determined on-site and the order is based on the actual collection process.

Yet pre-filling entries in this manner is precisely what occurred here, exposing a fraudulent effort to use the search to create a pre-choreographed narrative.

The third page of the evidence recovery log, which should have begun with Item 20, instead starts with a crossed-out entry labeled as Item 1. This is followed by a regular entry for Item 20, another crossed-out entry for Item 3, and then resumes sequentially with Items 21, 22, and so on.



Figure 2. **Page 3 of the Log, Showing Crossed-out Entries for Items 1 and 3**

Ex. B, Pg. DEF-03

The crossed-out entry for Item 1 specifies "Heaven in Exile," Room "G," and "TOP OF FRIDGE"—details that match Item 9 on the first page of the log, where SA McGinnis logged it as collected. (See *Figure 3* below). Similarly, the crossed-out entry for Item 3 specifies "BOOK THE HISTORY OF TORTURE," Room "E," and "DVD SHELF," which matches Item 3 on the first page.

*Figure 3.* **Page 1 of the Log**

Ex. B, Pg. DEF-01

The only plausible explanation for this discrepancy is that these crossed-out entries were pre-filled before the search began and later rewritten onto what became the designated first page, where the "History of Torture" book remained as Item 3 but the "Heaven in Exile" CD was changed from Item 1 to Item 9. This pre-filling, a violation of protocol, undermines the log's reliability as a real-time record and shows an effort to choreograph the search.

The pre-filled sequence reveals deliberate manipulation: SA McGinnis skipped a row for Item 2 and pre-selected Items 1 and 3, which defies protocol requiring items to be logged in the order they are discovered. Neither Item 1 nor Item 3 was in Room A downstairs, where a proper search would begin; instead, they were located in Rooms G and E upstairs, respectively. Moreover, changing the CD from being Item 1 to Item 9 and assigning Item 1 to be the camera in Room F – later pivotal in the case due to a claimed "accidental discovery" – serves no legitimate purpose and reveals an intent to use the search to create a narrative.

This finding, combined with the personnel list finding, confirms that the pre-filling occurred not only before the search began but before anyone arrived at 8 Hale, showing deliberate premeditation:

- The personnel list appears only on the first page of the log, as expected.
- The current Page 3, with crossed-out entries, was originally intended to be Page 1, as it began with Item 1.
- Thus, the personnel list was added to Page 1 **after** the crossed-out entries were written and crossed out; otherwise, it would also have been on the current Page 3.
- Therefore, the entries for Items 1 and 3 on Page 3 were pre-filled before arrival.

This level of premeditation required prior knowledge of these items' existence and precise locations before the search began.[4]

Finally, the pre-filled room labels in the crossed out entries show fraudulent intent. Room labels are only assigned during the search, after the property is secured. Yet SA McGinnis assigned specific room labels—"Room G" for the CD and "Room E" for the book—that matched where these items were later photographed. By pre-filling these details in advance, SA McGinnis clearly intended to create the illusion of a real-time process while staging the search prior to arrival.

### Finding 3: SA McGinnis Improperly Signed As Other Agents For 80% of the Entries in the Evidence Recovery Log, Further Undermining Its Reliability and Integrity as a Real-Time Record

FBI protocol prohibits agents from signing the evidence recovery log on behalf of others, as it undermines the record's integrity and accountability. Yet SA McGinnis signed SA Mills's name in the "Observed By" section for 32 out of 40 the entries[5] in the log – an astounding 80%. TFO Hochron, SA Anthony Hingle, TFO Vincent Augeri, and SA Timothy Coll, who signed the "Collected By" section for these items, were complicit in this breach, as they would have been physically present as SA McGinnis was signing as SA Mills.

---

[4] This foreknowledge of precise locations strikingly aligns with an email I reviewed from civil attorney Neil Glazer, dated November 7, 2017—4 months before the search. Glazer represented government witnesses, 2 of whose claims formed the basis of SA Lever's affidavit in support of the 8 Hale search warrant, as well as another client, Daniela, who testified about her detailed familiarity with the residence, including cataloging its contents. (Trial Transcript, 5/28/19, Daniela, Pg. 2566, Line 10 thru Pg. 2567, Line 2; Pg. 2568, Line 19 thru Pg 2569, line 19; Pg. 2572, Lines 9-17.) In this pre-search email, Glazer stated:

> "I am not working on the civil litigation angle at the moment, there are far more important matters to resolve. There are moving pieces you are unaware of, interested eyes beyond the Albany region... We are learning **precise locations of evidence**, we need time to get **rock solid warrants**." (Exhibit D, Email from Glazer) (emphasis added).

[5] See log entries for Items 2-4, 6-13, 15-18, 20-23, 25, 27-29, 33-34, 36-37, 38-40. (Ex. B).

9



Ex B., Pg. DEF-01

For Item 28, McGinnis also filled in SA Mills' name as the observer and wrote SA Doyle's name as the collecting agent, violating protocol in both sections.

This blatant disregard for protocol undermines the log's reliability, as there is less of an assurance that the person listed actually performed the action documented. This raises serious concerns about potential evidence tampering or swapping—especially with multiple electronic devices collected in this search yet their serial numbers were not photographed.

Based on my experience as an ERT search photographer, I affirm that in every search in which I was involved in, photographing serial numbers was standard procedure to ensure accountability, as it uniquely identified each device, mitigating the risk of error, substitution, or alteration.

### Finding 4: Failure to Log All Search Personnel, Such as a Canine, Constitutes a Knowing Violation of Protocol by Team Leader SA Doyle and the Canine's Handler, Undermining the Integrity of the Search Records

The failure to log a canine present at the search is a clear violation of FBI protocol, which requires all personnel on-site to be logged in, to protect the integrity of the search. Logging in is a fundamental protocol that all search personnel are trained to follow. A canine is considered personnel and must be logged by its handler, along with the reason for its presence.
A paw visible in a search photograph confirms that a dog was present and inside the house, meaning it is considered a part of the search team. However, no dog was logged in or mentioned in any search records. Team leader SA Christine Doyle did not document the canine's presence and purpose in the administrative worksheet, as required.

10



| Figure 5. **Dog's paw in search photo** |
| --- |

Ex B., Pg. GX 502A-68

This breach raises two serious possibilities:

1. **The dog belonged to a logged-in member of the search team**: The handler knowingly violated protocol by failing to log the dog, and SA Doyle knowingly failed to record the dog and its purpose in the administrative worksheet.

2. **The dog belonged to an unlogged individua**l: This scenario constitutes an even greater breach, as it would mean at least one individual accessed the search site without logging in, while SA Doyle knowingly allowed this violation.

Either scenario compromises the integrity of the search. Such a breach in the log allows individuals to access the search site without accountability.

Adding to this concern is a puzzling contradiction: while a dog, for unknown purposes, was brought to the search, the FBI's Computer Analysis Response Team (CART) was not. CART is critical for handling and collecting digital evidence, to ensure its integrity. In my experience conducting hundreds of searches, CART was always present when the warrant targeted digital evidence, as it did here.

In my opinion, the absence of CART, given the search's focus on digital evidence and the high-profile nature of the case, is most likely explained as a deliberate decision to avoid scrutiny of improper actions, of which several are detailed in my findings.

11

**Finding 5: The Canon camera and Western Digital hard drive were deliberately prioritized in the improperly pre-choreographed evidence log, demonstrating foreknowledge of their precise locations and importance. This directly contradicts the FBI's claim of an 'accidental' discovery of their significance 11 months later.**

FBI protocol mandates a systematic approach to evidence collection. Rooms are to be labeled sequentially (A, B, C, etc.), beginning downstairs, with agents proceeding methodically through the property. Evidence must be collected in the order it is discovered, typically with all items in a room documented and processed before moving to the next. These protocols were violated.

The government claims that the Canon camera and hard drive, located upstairs in Room F, had no known evidentiary value at the time of the search[6]. **Yet they were deliberately prioritized in the search**, contradicting this claim. This is summarized in the sequence below.

| | *Figure 6.* **Summary of Sequence of Actions Taken in the Search** |
|---|---|
| 1. | Before arriving at the search site, SA McGinnis pre-filled items in the evidence recovery log, such as Items 1 (the "Heaven in Exile" CD) and 3 (the "History of Torture" book), as discussed in Finding 2. This is fraudulent conduct which itself invalidates the search. |
| 2. | Then the plan changed. The Canon camera was assigned to be Item 1 and the "Heaven in Exile" CD was assigned to be Item 9. |
| 3. | Agents skipped Rooms A thru E and started upstairs in Room F, contrary to standard procedure. |
| 4. | After photographing the camera bag[7], agents ignored numerous nearby devices on and under the desk, choosing instead to immediately proceed to the Western Digital hard drive on a bookshelf and log it as Item 2[8]: |

---

[6] Doc. 1213 at 11, n.6.
[7] The camera is not clearly visible in any search photograph, nor is the memory card. See Finding 7.
[8] In the photograph of Item 2, the label is placed on the wrong device. In my analysis of the specific steps required, I determined that this mislabeling was likely intentional. See Finding 8.

12



Exhibit E, Search Photos, Pg. GX 502A-26, 32, 34, 43-47.

| | |
|---|---|
| 5. | Agents ignored 2 other devices on the same bookshelf, which should have been labeled and collected sequentially as Items 3 and 4, but were not.<br><br><br><br><br>Ex. E, Pg. GX 502A-37 |
| 6. | Instead, next they followed their pre-choreographed script and photographed the book on torture as Item 3:<br><br><br><br>Ex. E, Pg. GX 502A-35 |

13

Bates 19

| | Note: In a proper search, evidence should be secured shortly after being photographed, to maintain accountability and prevent tampering. However, **Item 3 was not collected until at least 21 items later**. This is evident in the photograph of Item 24, where part of Item 3 is still visible. (See below). Agents even left the room and went downstairs in between photographing Items 3 and 24, leaving the book uncollected for an extended period—a clear deviation from protocol that risks errors in evidence handling. <br><br>  <br><br> (Ex. E, Pg. GX 502A-56). |
|---|---|
| 7. | Agents left the room with many relevant electronics untouched and went downstairs, which does not make sense given the warrant's focus on electronics, and only returned to them later. |
| 8. | VHS tapes, less relevant to the warrant's objectives, were logged as Item 4 while downstairs. |
| 9. | They falsely staged a second, likely planted camera (Item 5) of unknown origin, but chose not to collect it. (See Finding 7) |
| 10. | Later in the search, they photographed 2 likely planted sex trafficking books of unknown origin. (See Finding 6). |
| 11. | At the end of the search, they manufactured a staged scene on the bookshelf, adding the Rubik's cube, sex trafficking books, and used it to photograph Items 36 and 37. (See Finding 6). |

The resulting sequence of evidence photos in the staged search is highlighted as follows:

14

Docusign Envelope ID: 41DC8FAA-79FD-4B5F-9566-0673D66BA929

- **Item 1**: Canon camera
- **Item 2**: Western Digital hard drive
- **Item 3**: History of Torture book
- …
- Sex trafficking books (not collected, violating protocol)
- …
- **Item 29:** Sex trafficking DVD (lacking an "in place" photo[9]).
- The search continued from there.

In my professional opinion, this shows that the search was deliberately staged to highlight the most damning evidence upfront, with the Canon camera (Item 1) and Western Digital hard drive (Item 2) intentionally prioritized in the staged presentation.

Not only is such staging extremely improper, it directly undermines the government's claim of an "accidental" discovery 11 months later, revealing that the supposed 'accidental' discovery was, in reality, premeditated and staged.[10]

In my expert opinion, the coordination required to stage this search could not have been planned in the short window between the 3:53 pm issuance of the warrant on March 26, 2018[11], in Albany, and the start of the search at 7:00 am the next day[12]. The operation would have required:

- Reconnaissance inside the property, which is 160 miles away from the EDNY, and would have required an agent or civilian source.
- Pre-choreographing evidence collection.
- Coordination between participating personnel from two FBI offices (EDNY and NDNY).

This strongly suggests the staging was planned before the warrant was obtained. The significance of this is that despite the fact that the camera and hard drive must have been known to be important, the relevant charges and 2005 timeframe were not included in the search warrant. Plausible explanations for this conduct include concealing the source of the reconnaissance

---

[9] Comparing Item 29, a DVD about sex trafficking, a standalone item on an upstairs couch, to the entry photo depicting this couch shows the DVD was not originally there. (Ex. E., GX 502A-28, 61). With no "in place" photo, its origin is unknown, and it appears falsely staged.

[10] The narrative of an 'accidental discovery' is further contradicted by lead prosecutor Moira Penza's statement six weeks earlier: "[T]he government continues to expect a superseding indictment in this case… There are a number of factors that are weighing into the timing considerations for a superseding indictment" (Pre-Trial Transcript, Oral Argument (1/9/2019), Pg. 4, Lines 14-25). The only new charges stemmed from the alleged contraband supposedly discovered by accident. **In essence, it appears AUSA Penza predicted the accident.** Post-trial, however, Penza's narrative shifted during an HBO interview, where she stated, regarding the alleged contraband, "Once we knew about the picture taking, picture keeping, it was a matter of finding those. And when we did, I mean, that is game-changing evidence" (The Vow, S2, Ep. 6, 15:20-15:38 (HBO 2022); Doc. 1253, Pg. 15).

[11] Ex. A., Pg. DEF-11.
[12] Ex. A., Pg. DEF-09.

15

DocuSign Envelope ID: 41D38FAA-79FD-4B97-9568-0673D6E56A9E5

and/or to delay revealing the contents of these devices. It is worth noting that the 7 post-trial digital forensics experts concluded that this evidence was extensively falsified. (Doc. 1253-1).

> ### Finding 6: Agents manufactured a scene on a bookshelf by adding and arranging items—including two, uncollected incriminating sex trafficking books of unknown origin, likely brought to the scene—and then used this false setup to take evidence photographs.

FBI protocol requires evidence to be photographed exactly where it is found ("in place"). If a clearer photo is needed, the item can be moved and re-photographed, but any movement must be documented in the photographic log. Altering a scene or adding objects to create a narrative is strictly prohibited and is fraudulent. However, at 8 Hale, agents blatantly violated these protocols by manufacturing and documenting a false scene on a bookshelf.

At the start of the search, an entry photograph of the upstairs office shows three electronic devices positioned on the far end of a bookshelf. In a subsequent photograph of Item 2, these devices are clearly visible in the same location.



*Figure 7.* **Bookshelf in Study First Shows 3 Devices - See Reference Points**

Entry Photograph
Exhibit E, Search Photos, Pg. GX 502A-26

Photograph of Item 2
Ex. E, Pg. GX 502A-34

Later, the same section of the bookshelf is photographed again for Item 37, confirmed by consistent reference points such as wall brackets, the computer monitor, and wires. In this photograph, the hard drive labeled as Item 37 was previously labeled Item 2 and now is shown alone, with the other two devices missing.

16



*Figure 8.* **Item 37: Same Device, Same Part of Bookshelf - See Reference Points**

Ex. E, Pg. GX502A-34, 72

However, **new objects have been meticulously placed**: a Rubik's cube[13], a DVD, 2 books, and 2 CD cases. The books are placed on top of the DVD, slightly offset, to appear casually left there.



*Figure 9.* **Several Items Added to the Scene on the Bookshelf**

An encased Rubik's Cube

Two books overlapping DVD
A "STEM CELL" DVD

Two CDs

Ex. E, Pg. GX 502A-72

This manufactured scene was then used to photograph Item 36 and Item 37, both of which were among the original 3 devices seen in the first photograph, and should have been collected much earlier.

---

[13] Other Rubik's cubes were photographed at the property, suggesting that agents added this Rubik's cube to the shelf to make the manufactured scene appear more authentic. (See Ex. E, Pg. GX 502A-37)

17

*Figure 10.* **Same Manufactured Scene Used for Both Items 36 and 37**



Ex E., Pg. GX 502A-71



Ex. E, Pg. GX 502A-72

*Figure 11.* **Items 36 and 37 Are Two of Three Devices from First Scene on Same Part of Bookshelf**



Ex E., Pg. GX 502A-34

Note that Items 36 and 37 were photographed back-to-back in the staged setup. The following agents directly complicit in the staging and documentation of this fabricated scene:

- **SA Christopher Mills:** As the search photographer, SA Mills took consecutive photographs of Items 36 and 37 (Photos 71 and 72), demonstrating clear awareness that the same staged setup was used for both items. In my opinion, he was directly complicit, as a primary orchestrator of this manipulation.

18

Docusign Envelope ID: 41D38FAA-79FD-4B5F-9368-0673D6E5A9E5

- **SA Tracee Mergen:** Shadowed SA Mills and logged the consecutive photographs in the photographic log.
- **TFO Brett Hochron:** Collected the staged items immediately after each was individually and consecutively placed in the same staged setup and photographed.

The reenactment diagram[14] below illustrates step-by-step how this scene was deliberately constructed. Re-constructed photos of the intermediate steps are explicitly noted as such.

| Figure 12. Staging Reenactment Sequence | | |
|---|---|---|
| <br>**Step 1.** SA Mills photographed the bookshelf, showing 3 devices.<br><br>Ex. E, Pg. GX 502A-34 | <br>**Step 2.** Some time later, an agent clears off the bookshelf.<br><br>*This photo is a reconstructed scene.* | <br>**Step 4**. An agent places a caseless DVD titled "STEM CELL" on the shelf.<br><br>*This photo is a reconstructed scene.* |
| <br>**Step 5.** An agent positions the 2 books on top of the DVD, slightly offset.<br><br>*This photo is a reconstructed scene.* | <br>**Step 6.** An agent places an encased Rubik's Cube of unknown origin on the shelf.<br><br>*This photo is a reconstructed scene* | <br>**Step 7.** An agent places 2 CDs of unknown origin on the shelf, slightly offset from each other.<br><br>*This photo is a reconstructed scene.* |

---

[14] While the exact order in which the props were added and positioned may have been different, the reenactment highlights the deliberate and meticulous process used to manufacture the scene.

19

DocuSign Envelope ID: 741D58FAA-79FD-4B8F-9568-0673D6654A0E9

| | | |
|---|---|---|
| <br>**Step 8.** An agent places the Sony DVD drive back on the bookshelf. SA Mills photographs it (Photo #71) and SA Mergen logs the shot in the photographic log.<br><br>Ex. E, Pg. GX 502-A71 | <br>**Step 8.** TFO Hochron collects the Sony DVD drive, leaving that space on the bookshelf empty.<br><br>*This photo is a reconstructed scene.* | **Step 9.** An agent adds the LaCie hard drive back on the bookshelf. SA Mills photographs it (Photo #72) and SA Mergen logs the shot in the photographic log.<br><br>Ex. E, Pg. GX 502A-72 |
| <br>**Step 10.** TFO Hochron collects the LaCie hard drive, leaving that space on the bookshelf empty once again.<br><br>*This photo is a reconstructed scene* | .<br><br>*(This cell is intentionally left blank)* | *(This cell is intentionally left blank)* |

Note that these added items lack "in place" photographs, leaving their origin unknown, and they were not collected as evidence. (See *Figures* 12 and 13 below). Notably, the 2 added books were about sex trafficking—the central alleged crime—and were placed on a desk, photographed without an item label, and left uncollected. This defies logic. Given the search warrant specifically sought "sex trafficking paraphernalia," such books would have been deemed highly relevant, photographed in place, and collected, especially since a less relevant book on torture was pre-choreographed and collected as Item 3.

**Based on my experience conducting hundreds of searches, I conclude that the only plausible explanation is that these 2 books on sex trafficking were planted to create an incriminating and prejudicial narrative.** Note that these photos were presented to the jury.

20

| Figure 13. The 2 Added Books Are About Sex Trafficking | |
|---|---|
|  Close-Up of the 2 Books Added to the Shelf Ex E., Pg. GX 502A-72 |  Clear Photograph of the Same 2 Books, on the Desk Ex. E, Pg. GX 502A-65 |

| Figure 14. Sex Trafficking Books Not Originally on Desk in Entry Photo |
|---|
|  Ex. E., Pg. GX 502A-35 |

This manufacturing of a staged scene[15] and use of likely planted items equates to evidence fabrication and undermines the integrity of the search.

---

[15] In my analysis, I identified additional scenes in the search that appear to have been staged; however, this report focuses on the clearest and most compelling examples.

21

## Finding 7: A second camera of unknown origin, likely planted, was staged, labeled as evidence, and photographed, but deliberately left behind.

2 cameras were identified during the search, both highly relevant because the warrant sought digital photos. Both should have been collected. While the first camera was collected, the second camera (Item 5) was not—despite being photographed, labeled, and partially logged.

| *Figure 15.* **Item 5 Was a Second Camera, Documented as Not Taken** | |
| --- | --- |



Ex. E, GX 502A-37

Excerpt of Evidence Recovery Log
Ex B., Pg. DEF-01

Protocol dictates that items are only logged after collection, meaning either the log was pre-filled after photography but before collection, or the item was collected and then left behind. Both scenarios are clear violations of FBI protocol.

Leaving this camera behind defies logic. It is akin to searching for guns in a homicide case, finding 2 guns, and intentionally leaving the second gun behind.

Further, the second camera was not photographed in place, violating FBI protocol. Instead, it was staged on a cluttered countertop with a cord draped over it. Entry photos of the countertop, referencing objects like a blue Sony cassette case and pink Rubik's cube, confirm the camera was not originally there.

22

| Figure 16. Second Camera Added to Counter |
|---|

 

| Ex. E, Pg. GX 502A-6 | Ex. E, Pg. GX 502A-37 |

Based on my professional experience, the only plausible explanation for these actions is that this camera was planted to create a staged and false narrative.

### Finding 8: The Canon camera and memory card are not clearly visible in any evidence photograph, contrary to FBI protocol.

Despite being predetermined to be 'discovered' as Item 1, the Canon camera is not visibly discernible in any search photos. There is a photo of the camera bag under the desk, and a photo of it on the desk. **Standard procedure would have also entailed removing the camera from the bag, placing it on the desk, and taking a clear photo of it, which was not done.**

| Figure 17. Canon Camera Not Visibly Discernible in Any Photos |
|---|

 

| Ex B., Pg. 32 | Ex. B, Pg. 33 |

The only evidence placing this specific camera at the scene comes from McGinnis' evidence recovery log, which lists its serial number (Ex A., Pg. 1), and SA Mills' testimony—both of

23

which are unreliable due to the staged nature of the search and SA Mills' testimony concealing the improper nature of the search.

Similarly, the only evidence that the memory card was inside the camera is SA Mills' testimony. Typically, when documenting a camera, it would be opened to check for a memory card, and if one was present, it would be photographed and noted in the inventory. That procedure was not followed here. In contrast, an audio recorder's memory card was noted in the inventory and even logged as a separate item, albeit without being photographed, which is a violation of protocol: Item 39. (Ex. A, Pg. DEF-06).

The lack of clear photographic documentation raises serious questions about whether the camera, or its memory card, were present at the scene at all. Given that this item was believed to be important, as it was pre-scripted to be Item 1, one would expect that at least it and the card would have been photographed clearly.

### Finding 9: The hard drive was intentionally mislabeled in its evidence photograph.

An additional irregularity appears in the photograph of Item 2. The label is on the leftmost hard drive, which is the silver/gray LaCie hard drive, which was logged as Item 37[16]. However, in the inventory, Item 2 is listed as "Western Digital S/N [serial number] WCAS81365334", which matches the serial number of the black hard drive photographed by the Computer Analysis Response Team (CART). (Ex. C, Pg. DEF-02; Exhibit F, CART Notes, Pg. DEF-35).

| *Figure 18.* **Item 2 Mislabeled, Label Should Have Been on Middle Device** | |
|---|---|
|  |  |
| Left-to-right: LaCie hard drive, Western Digital hard drive, Sony DVD Drive.<br>Ex E., Pg. GX 502A-34 | Photograph of a hard drive with the serial number listed in Item 2, taken by CART, 4+ months after the search.<br>Ex. F, Pg. DEF-32 |

---

[16] We know it is the same LaCie hard drive because only 2 were photographed and logged, the other being Item 14, which is visually distinct. (See Ex. E, Pg. GX 502A-46).

24

DocuSign Envelope ID: 4195AFAA-79FD-4B5F-9568-0673D6658A6E9

While one might initially regard the mislabeling of Item 2 as an innocent mistake, a step-by-step analysis through the lens of standard procedure suggests otherwise.

3 team members were directly involved with Item 2: SA Mills (photographer), TFO Hochron (collector), and SA Mergen (photographic logger).

If the leftmost LaCie drive had been mistakenly labeled as Item 2, either the mistake would have been noticed, corrected, and the Western Digital drive properly labeled and re-photographed, or the mistake would go unnoticed, resulting in the LaCie drive being collected as Item 2. Neither scenario occurred. Instead, the LaCie drive was mislabeled as Item 2, while the Western Digital drive—the actual item of interest—remained unlabeled in the photograph.

Given this, in my expert opinion, the most plausible explanation is that this mislabeling was intentional. Such an action creates the potential for tampering or substitution.[17]

### Finding 10: There is no record in the chain of custody of what happened to the hard drive after February 22, 2019, months before trial.

A critical irregularity in the handling of the Western Digital hard drive involves a glaring gap in the chain of custody. (Exhibit G, Chain of Custody for the Hard Drive). After SA Lever checked the hard drive out of Evidence Control on February 22, 2019, there is no record of its whereabouts. (See *Figure 18* below). Notably, no entry indicates it was ever returned to Evidence Control. Yet, during the trial on June 10, 2019, SA Mills testified to a hard drive, purportedly with the same serial number, being presented in court.

I confirm, as the former Senior ERT member in Evidence Control at the Miami office, that FBI protocol mandates a continuous, documented chain of custody for all evidence transfers in and out of evidence control to ensure accountability and preserve evidence integrity.

The absence of any record after February 22, 2019 leaves two possibilities: either a) SA Lever never returned the hard drive to Evidence Control—a serious breach of protocol, particularly concerning given the hard drive supposedly contained contraband—or b) Evidence Control failed to log its return and any subsequent transfers, including checking it out for use at trial. The latter scenario is even more problematic, as it would mean that original evidence is being

---

[17] Based on my review, there is no testimony explicitly asserting that the Western Digital hard drive analyzed by CART was collected at 8 Hale. At trial, SA Mills misidentified Item 2 in the photograph as a "gray or silver hard drive" (the LaCie device), and neither he nor AUSA Hajjar corrected this error when he was immediately presented with a black Western Digital hard drive, which he merely described as "a hard drive."  (Trial Transcript (6/10/19), Pg. 4307, Line 22 to Pg. 4308, Line 25) SA Mills was neither asked nor did he confirm that this hard drive was collected at 8 Hale, contrasting with his identification  other items, such as the camera, as originating from 8 Hale. (*Id.* Pg. 4305, Lines 14-24; Pg. 4311, Lines 2-5)

allowed to be transferred and handled without any documentation or oversight, undermining the entire evidence handling system.

---

*Figure 19.* **No Entries Post-February 2019 in the Hard Drive's Chain of Custody**



Ex H., DEF-03.

---

26

# Conclusion

My review of the search at 8 Hale reveals extensive and deliberate malfeasance, including deliberate staging and evidence fabrication, and numerous protocol violations by all members of the search team. **In my 23 years with the FBI, I have never witnessed a search executed with fraudulent conduct of this magnitude, in which at least 4 of the 9 search team members are implicated**:

- **SA Elliot McGinnis** pre-choreographed the precise locations and collection order of key items before arriving at the site, staging both the process and the log as real-time documentation—constituting evidence fabrication. (Findings 2, 5). He also violated FBI protocol by improperly pre-filling and signing as other agents in the personnel list and signing as other agents in 80% of the evidence entries. (Findings 1, 3).

- **SAs Christopher Mills, Tracee Mergen, and TFO Brett Hochron** were complicit in the manufacturing of the staged bookshelf scene depicting Items 36 and 37. (Finding 6) SA Mills, as the primary orchestrator, photographed the staged setup, while SA Mergen logged the consecutive photos, and TFO Hochron collected the falsely staged items, one at a time and directly after each was placed in the same staged scene.

This coordinated fabrication of evidence undermines the integrity of the entire search and renders all seized evidence unreliable. It also invalidates the government's narrative of an 'accidental' discovery regarding the camera and hard drive 11 months later (Finding 4) and raises serious questions about the credibility of the investigation and subsequent prosecution.

Signature: _Kenneth DeNardo_          Executed on: 11/20/2024

Kenneth DeNardo
Former FBI Senior Evidence Technician
Former Evidence Response Team (ERT) Member
23 years of service to the FBI

27

*United States v. Keith Raniere et al.*
Eastern District of New York
Case Nos: 18-cr-204-NGG, 1:24-cv-02925-NGG

**Declaration of Mark Daniel Bowling**

I declare under penalty of perjury, under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1.  I am Mark Daniel Bowling.

2.  I am a retired Office of the Inspector General (OIG) Special Agent and FBI Special Agent and a Digital Forensic Examiner for both agencies.

3.  I served in the FBI for just under 20 years as a Special Agent, rising to the position of Assistant Special Agent in Charge of the Little Rock Field Office, National Security Branch. Immediately following my time in the FBI, I served in a senior management position with the Department of Education (DOE), OIG, as the Assistant Special Agent in Charge of the DOE-OIG Technology Crimes Division, where I directly supervised all cyber investigations and digital forensics on a national basis. In both capacities, and previously as a Supervisory Senior Resident Agent and Supervisory Agent, I was directly responsible for the development of dozens of search plans, and participated in and oversaw dozens of additional searches. I am intimately familiar with proper FBI search protocols, including but not limited to search photography and evidence collection.

4.  In September 2024, I began my review of the findings and analysis prepared by Former FBI Senior Evidence Technician and Evidence Response Team (ERT) member Kenneth DeNardo regarding the search of 8 Hale Drive, Halfmoon, NY, executed on March 27, 2018. Over the course of several weeks, I reviewed drafts and supporting materials to evaluate the methodology and evidence presented. I also analyzed the underlying FBI search logs and photographs. On November 20, 2024, I reviewed the finalized version of Mr. DeNardo's search report and affirm that it reflects the findings and conclusions consistent with my earlier reviews. Based upon my experience and analysis, I agree with Mr. DeNardo's findings in their entirety. His findings are listed as follows:

    **Finding 1: Before the Team Arrived at 8 Hale, SA Elliot McGinnis Pre-Filled the Personnel List and Signed On Behalf Other Agents, Both in Violation of FBI Protocol.**

**Finding 2: Before Arriving at 8 Hale, SA Elliot McGinnis Pre-Filled the Evidence Recovery Log, Violating FBI Protocol and Choreographing the Search to Fit a Predetermined Narrative**

**Finding 3: SA McGinnis Improperly Signed As Other Agents For 80% of the Entries in the Evidence Recovery Log, Further Undermining Its Reliability and Integrity as a Real-Time Record**

**Finding 4: Failure to Log All Search Personnel, Such as a Canine, Constitutes a Knowing Violation of Protocol by Team Leader SA Doyle and the Canine's Handler, Undermining the Integrity of the Search Records**

**Finding 5: The Canon camera and Western Digital hard drive were deliberately prioritized in the improperly pre-choreographed evidence log, demonstrating foreknowledge of their precise locations and importance. This directly contradicts the FBI's claim of an 'accidental' discovery of their significance 11 months later.**

**Finding 6: Agents manufactured a scene on a bookshelf by adding and arranging items—including two incriminating sex trafficking books of unknown origin, likely brought to the scene—and then used this false setup to take evidence photographs.**

**Finding 7: A second camera of unknown origin, likely planted, was staged, labeled as evidence, and photographed, but deliberately left behind.**

**Finding 8: The Canon camera and memory card are not clearly visible in any evidence photograph, contrary to FBI protocol.**

**Finding 9: The hard drive was intentionally mislabeled in its evidence photograph.**

**Finding 10: There is no record in the chain of custody of what happened to the hard drive after February 22, 2019, months before trial.**

5. I agree with Mr. DeNardo's ultimate conclusion that the search of 8 Hale was deliberately and fraudulently staged and that search scene collection photographs were also deliberately staged. Further, I agree that at least 4 of the 9 search team members were complicit in this fraudulent conduct, with 2 of them as key orchestrators: SA Elliot McGinnis and SA Christopher Mills.

2

6. During my nearly 20 years in the FBI, I have never seen a search executed with this level of corrupt and illegal behavior.

Executed on: 11/20/2024 _____

Signature: _Mark Bowling_ _____

**Mark Daniel Bowling**
Retired FBI and DOE-OIG Special Agent
20 years of service to the FBI and DOE-OIG, including my two times as an Assistant Special Agent in Charge, once for each agency.

January 8, 2025

**Via Hand Delivery and Email**
The Honorable Breon S. Peace, United States Attorney,
Chief Alixandra Smith &
First Assistant US Attorney Carolyn Pokorny
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
E: BreonPeace@usdoj.gov
E: alixandra.smith@usdoj.gov
E: carolyn.pokorny@usdoj.gov

Re: **United States v. Keith Raniere et al. (1:18-CR-00204 (NGG))**

Dear Hon. Peace, Chief Smith and First Assistant United States Attorney Pokorny,

Thank you for your January 3rd, 2025 response to Attorney Deborah J. Blum and acknowledgement of the materials we sent to Hon. Peace on November 22nd, 2024 and Ms. Blum sent again on December 20th, 2024.

We are at a critical juncture and request a call or meeting this week with you. The evidence we have submitted, including the FBI records provided by your Office, clearly demonstrates systematic government malfeasance in Mr. Raniere's case that is easily verifiable. This situation transcends Mr. Raniere's guilt or innocence.[1]

This is a matter of addressing a profound injustice and we urge a prompt and thorough assessment, whereupon we hope your Office will consider the appropriate next steps. Our post-conviction experts, former members of the FBI, can be present during our discussion as needed. At the meeting, we want to discuss with you various remedies including release and other appropriate relief.

To avoid a delay that furthers this injustice, especially with the approaching end of The Hon. Peace's term, please advise when you are available to meet this week. We will make ourselves available at your convenience. We are hopeful that you and your Office will now take a leadership role in rectifying this wrong. Thank you.

Alan Dershowitz

Deborah J. Blum

---

[1] *See* Newsweek article by Valerie Bauman, dated December 23, 2024 (https://www.newsweek.com/fbi-nxivm-crime-sex-cult-keith-raniere-2004375).